**IN THE DISTRICT COURT OF THE UNITED STATES**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

RECEIVED

2007 NOV 15 A 11:09

| | |
|---|---|
| **GREG DAVIS, AS NEXT FRIEND** * | |
| **AND NATURAL GUARDIAN OF** * | |
| **JOSHUA DAVIS** * | |
| * | |
| **PLAINTIFF,** * | |
| * | |
| **vs.** * | |
| * | **CASE NO.1:06-CV-953-MEF** |
| **HOUSTON COUNTY,** * | |
| **BOARD OF EDUCATION** * | |
| * | |
| **DEFENDANT.** * | |

### MOTION FOR SUMMARY JUDGMENT

THE DEFENDANT, Houston County Board of Education ("HCBOE,") moves this Court to enter a full, final and appealable summary judgment in its favor and against the Plaintiff as to all counts of the Complaint, pursuant to Rule 56 Fed. R. Civ. P.  In support of this request, the Defendant states:

1.    No genuine issues of material fact exists.

2.    The HCBOE is entitled to a judgment and to affirmative rulings and orders from this Court as a matter of law.

3.    There is no just reason for delay.

4.    The HCBOE submits its Brief in Support of its Motion for Summary Judgment in support of this motion.

5.   The HCBOE submits the following evidentiary materials, in addition to the pleadings of record in this case, in support of this motion:

(a)  The Deposition of Greg Davis together with Defendant's Exhibits 1 and 2 thereto.

(b)  The Deposition of Joshua Davis.

(c)  The Affidavit of Brad Smith.

(d)  The Affidavit of Cheryl Smith.

(e)  The Affidavit of Clay Carter.

(f)  The Affidavit of James Murrey.

(g)  The Affidavit of Josh Cox.

(h)  The Affidavit of Judy Childs.

(i)  The Affidavit of Wanda Seals.

WHEREFORE, the HCBOE moves the Court to grant it a full, final, and appealable summary judgment against the Plaintiff in this matter as to the single count of the Complaint, or alternatively, to enter such further, greater, or different relief as the evidence and law entitle it.

HARDWICK, HAUSE, SEGREST & WALDING

BY: _____
Jere C. Segrest (SEG005)
ASB-1759-S-80J

BY: _____
Kevin Walding (WAL036)
ASB-8121-I-69J

BY: _____
Patrick B. Moody (MOO110)
ASB 0902-T-73M
Post Office Box 1469
Dothan, Alabama 36302
Phone:   (334)794-4144
Fax:     (334)671-9330
ATTORNEYS FOR DEFENDANTS


## CERTIFICATE OF SERVICE

I hereby certify that, this date, I have served a copy
of this document on the following individual(s)or
attorney(s) of record by placing a copy in the United States
Mail in a properly addressed envelope with adequate postage.

Malcolm R. Newman, Esq.
Attorney at Law
Post Office Box 6137
Dothan, Alabama 36302

This the 14th day of November, 2007.

_____
Of Counsel

Page 1

```
 1     IN THE DISTRICT COURT OF THE UNITED STATES
 2         FOR THE MIDDLE DISTRICT OF ALABAMA
 3              SOUTHERN DIVISION
 4  GREG DAVIS, AS NEXT    )
    FRIEND AND NATURAL     )
 5  GUARDIAN OF JOSHUA     )
    DAVIS,                 )
 6                         )
        PLAINTIFF,         )
 7                         )
    VS.                    ) CASE NO.1:06-CV-953-MEF
 8                         )
    HOUSTON COUNTY, ALABAMA)
 9  BOARD OF EDUCATION,    )
                           )
10      DEFENDANT.         )
11        The deposition of GREG DAVIS, taken by the
12  Defendant, pursuant to the Federal Rules of
13  Civil Procedure, before John G. Whitfield, Court
14  Reporter and Notary Public, State at Large, at
15  the law offices of Hardwick, Hause, Segrest &
16  Walding, Dothan, Alabama, on the 14th day of
17  June, 2007, at 9:00 A.M., CST, pursuant to
18  notice.
19
20  APPEARANCES:
21  FOR THE PLAINTIFF:      FOR THE DEFENDANT:
22  MR. MALCOLM R. NEWMAN   MR. PATRICK B. MOODY
    Attorney at Law         MR. KEVIN WALDING
23  Dothan, Alabama         Attorneys at law
                            Dothan, Alabama
24
25
```

Page 2

```
 1              STIPULATION
 2
 3        It is stipulated by and between counsel for
 4  the parties that this deposition be taken at
 5  this time by John G. Whitfield, Court Reporter
 6  and Notary Public, State at Large, who is to act
 7  as commissioner without formal issuance of
 8  commission to him; that said deposition shall be
 9  taken down stenographically, transcribed, and
10  certified by the commissioner.  The signature of
11  the witness is waived.
12        Except for objections as to the form of
13  questions, no objections need be made at the
14  time of the taking of the deposition by either
15  party, but objections may be interposed by
16  either party at the time the deposition is read
17  into evidence, which shall be ruled upon by the
18  Court on the trial of the cause upon the grounds
19  of objection then and there assigned.
20
21
22
23
24
25
```

Page 3

```
 1              GREG DAVIS
 2  having been first duly sworn, testified as
 3  follows, to-wit:
 4
 5              EXAMINATION
 6
 7  BY MR. MOODY:
 8     Q  Mr. Davis, my name is Patrick Moody.
 9  This is Kevin Walding.  We represent the Houston
10  County Board of Education.  And we're wanting to
11  talk to you this morning about the lawsuit you
12  filed concerning a football game and the events
13  after that, back in 2005.
14        Have you ever given a deposition before,
15  sir?
16     A  No.
17     Q  All right.  Well, it's a fairly simple
18  process.  I'm going to ask you some questions.
19  And, if you could, just answer them out loud and
20  try not to say "uh-huh," nod your head and
21  things like that.  If you don't understand
22  anything I'm asking, just ask, and I'll repeat
23  it or try to reword it, so we can communicate.
24        Have you been on any kind of medications or
25  drugs, that would inhibit you from being able to
```

Page 4

```
 1  understand our conversation today, and tell the
 2  truth?
 3     A  No, sir.
 4     Q  Are you suffering from any kind of
 5  medical condition, that would keep you from
 6  being able to communicate with us today?
 7     A  No, sir.
 8     Q  All right.  And, if you could, just
 9  state your full name for the record?
10     A  Gregory Tillman Davis.
11     Q  All right, Mr. Davis.  And where do
12  you currently live?
13     A  615 Sherwood Trail, Newton, Alabama.
14     Q  All right.  And how long have you
15  lived there, sir?
16     A  Approximately 11 years, I believe.
17     Q  And are you married, sir?
18     A  Yes, sir.
19     Q  And to whom?
20     A  Deborah Davis.
21     Q  And how long y'all been married, sir?
22     A  You had to put me on the spot.
23  Twenty-one years.  Trying to make sure.  We just
24  had an anniversary.
25     Q  All right.  And is that Josh's mother?
```

Page 5

1  A  Yes. Correct.
2  Q  And other than Josh, are there any
3 other children?
4  A  Yes, sir.
5  Q  All right. How many children, sir?
6  A  Four more.
7  Q  And would you give me their names and
8 ages?
9  A  Yes. I'll just give you the names we
10 call them by. Gabby Davis. She's 17. Arianna
11 Davis, 15. Elijah. He's ten. And Grace Ann is
12 four.
13  Q  So, Josh is the oldest child?
14  A  Correct.
15  Q  And what is your current occupation,
16 sir?
17  A  I'm a maintenance supervisor.
18  Q  And where are you the supervisor at?
19  A  Grove Park Retirement.
20  Q  And about how long have you been
21 there?
22  A  Two years.
23  Q  And where were you at before there?
24  A  Wiregrass Habitat for Humanity.
25  Q  About how long were you with Habitat?

Page 6

1  A  About three years, I believe. Three
2 or four.
3  Q  So, would you have been at Wiregrass
4 for --
5  A  I was there -- I was working out my
6 last week, when this event happened.
7  Q  And does your wife work, sir?
8  A  No, sir.
9  Q  And so, she wasn't working at the time
10 of this event --
11  A  No, sir.
12  Q  -- or anything? All right. And do
13 you have any relatives, by blood or marriage,
14 that are over the age of 19, and that live in
15 Houston, Henry, Dale, Geneva or Coffee County?
16  A  Repeat that? How close of a relative
17 are we talking about?
18  Q  Cousins? Close cousins?
19  A  I can tell you about where they live.
20 I mean -- Buddy Faircloth. He lives about three
21 miles from me.
22  Q  Okay.
23  A  Works for the board of education.
24  Q  With the Houston County?
25  A  Uh-huh.

Page 7

1  Q  Okay. And that was Faircloth, is the
2 last name?
3  A  Uh-huh. How many miles -- how many
4 counties did you say?
5  Q  Houston, Henry, Dale, Geneva or
6 Coffee?
7  A  That may be the only one that I can
8 recollect.
9  Q  All right.
10  A  At the moment.
11  Q  Would your wife have any different
12 relatives in that area?
13  A  Her father and mother, her sisters and
14 her brother.
15  Q  Could you give me their names?
16  A  Yes. Bob and Barbara Carnell. That's
17 her parents.
18  Q  And I believe there was a brother?
19  A  Yeah. That's Robert Carnell.
20  Q  And was there a sister?
21  A  Elaine. And I'm not sure what her
22 last name is, now. I'm not that close to them.
23 And then, there's Paula. There's another one.
24 I'm not sure what her --
25  Q  And Elaine and Paula are both sisters?

Page 8

1  A  Correct. That's my wife's sisters.
2  Q  All right. And do you have any close
3 friends -- and I usually describe that as people
4 that you normally, you know, socialize with,
5 have cook-outs together, that kind of thing --
6 in Houston, Henry, Dale, Geneva or Coffee
7 County? That same we were talking about
8 earlier?
9  A  Yeah, I could name a few, I guess.
10  Q  All right. Well, let's name a couple.
11 And, if it gets to be real long, we'll just get
12 you to do a list and give them to Mr. Newman.
13 That may be the easiest thing to do.
14  A  Joe Watson.
15  Q  All right.
16  A  Larry Smith. And that would probably
17 be just the two closest, I would --
18  Q  Okay.
19  A  And, of course, my wife would have
20 different --
21  Q  Would you happen to know her closest
22 friends, right off the bat?
23  A  I couldn't tell you who her closest
24 would be.
25  Q  And do y'all attend church anywhere,

Page 9

1 currently?
2    A  Not at the moment.  We're still
3 members of -- (drown out by cough) -- Pleasant,
4 by my wife attending with her father and them.
5 But I'm not sure where that's at.
6    Q  And how long had y'all been members of
7 it?  What is it?  Pleasant Home?
8    A  Yeah.  It's five years, I believe.
9    Q  Are there any other kind of social or
10 civic clubs y'all are a member of?
11    A  No.
12    Q  And can you tell me about your
13 educational history a little bit?  Did you
14 attend high school?
15    A  Yes.  I graduated from Ariton, in
16 1983.
17    Q  Okay.
18    Q  And have you --
19    A  Went to Enterprise some and Wallace
20 some, but not -- never attained a degree from
21 either one.
22    Q  Okay.  And do you happen to know the
23 years, roughly, that you went to --
24    A  That would be -- I would say the
25 Enterprise thing was in '80 -- right at '84.

Page 10

1 And then, I skipped a few years and went to
2 Wallace, probably 86, '87.
3    Q  So, nothing real recent, then?
4    A  No, sir.
5    Q  Okay.  And I think we've already
6 talked about your work history.  We had the
7 Grove Park, and then, the Wiregrass Habitat for
8 Humanity, and I think that took us back about
9 five years or so?
10    A  Yes.
11    Q  Can you tell me where you worked
12 before Wiregrass, just so we can --
13    A  Yeah.  Eaglewood Construction Company,
14 Denver, North Carolina.  I worked here.  The
15 company was in North Carolina.
16    Q  And, if you would, please, sir, just
17 in your own words, explain to me the whole
18 situation concerning this football game?  And I
19 guess you could start back before Josh was, I
20 think, hit, as y'all were claiming, and just
21 kind of work through the rest of the game for
22 me, if you don't mind?
23    A  Start where the incident happened?
24    Q  Yeah.  Well, I think y'all were
25 saying, in the complaint, that he was injured,

Page 11

1 and then, the incident actually happened after
2 the injury.  So, could you start, I guess, right
3 about the time of the injury?  Or how did he get
4 injured and --
5    A  Well, he was playing football.
6    Q  Right.
7    A  So, I mean, we're not sure at what
8 point of the game it happened.  So, I couldn't
9 tell you the exact moment that it happened.
10    I know that they went in at half time --
11 now, this is after the fact that I find out.  I
12 don't know this at the moment.
13    Q  Okay.
14    A  But my understanding was that he was
15 throwing up, at half time.  Nobody attended to
16 him.
17    He come back on the field.  He didn't -- he
18 looked -- you know, he said he was hot.  I asked
19 him.  And then, we go through -- he snapped long
20 snaps.  He had long-snapped -- the punt was the
21 first one down.  And he had a chance to cream a
22 guy, and he just stopped and looked like he --
23 you know, he just didn't do nothing.
24    And he was pulled off the field.  And the
25 coach was all over him about it.  And he -- they

Page 12

1 had a conversation, and he walked off.
2    And they -- I don't know what happened in
3 between that.  Something about he couldn't go
4 back in.  I don't know.
5    The quarterback was seen talking to him.
6 And then, when they were going back on offense,
7 Josh went back out.  And then, they made him
8 come back off.
9    And, as he was walking off -- he wasn't
10 running off -- he come by the coach, hit the
11 coach with his shoulder pad, bumped him.  I
12 remember the coach telling he grazed him.  And
13 that -- then, the coach swung around grabbed him
14 violently.
15    And that's when I got out of my seat and
16 hollered at him, and told him to let him go.
17 And we -- I exchanged words with them.  They
18 didn't say nothing to me.  I didn't go over the
19 fence.  I stayed on the side of the fence.
20    He sat down.  They got him sat down.  He
21 was on the bench.  He was really upset.  He was
22 crying.
23    He stood up.  And, when he stood up, he
24 bumped another coach, the one that claimed he
25 hit him with a fist.  Which all of them claim

**Page 13**

1 that. And, I've seen that on film, where he did
2 it. When he stood up, he bumped him in the
3 face. The guy's glasses crooked. He walked
4 off. And the next thing I know, they're
5 hollering for the police.
6     Josh is visibly upset. He's crying. He's
7 going down the field, has people grabbing at
8 him.
9     The game warden, I can't remember his name,
10 I know the man, he had jumped over and got hold
11 of Josh, and Josh was, like, disoriented, and
12 looked at me. He was, you know, crying, he was
13 upset. He didn't know what was going on.
14     And I told him, I said, "I know him, Josh."
15 You know, "Stay right there with him."
16     We go to the end of the field. Tim
17 Pitchford is sitting on a beach, down at the end
18 of the field.
19     I said, "Mr. Pitchford, we've got a
20 situation. I need you to" --
21     He said, "This is not the time or the
22 place."
23     So, the next thing I know, we're surrounded
24 by police in a locker room. They're all
25 hollering at Josh to take his stuff off and get

**Page 14**

1 out of here, now. That we had to leave.
2     Q All right. And let's kind of walk
3 back through there, and kind of flesh out some
4 of that. So, you believe he was injured before
5 half time --
6     A I believe there was something wrong
7 with him, being -- throwing up at half time,
8 like that. I don't understand. I've played
9 enough ball to know, if you're throwing up like
10 that, there's something wrong.
11     Q Did --
12     A Now, I did not know this until after
13 the fact.
14     Q Right.
15     A I mean, I didn't -- if I had known he
16 was throwing up at half time, I would have went
17 -- if somebody had said, "Greg, your son is
18 throwing up," of course, I would have went back
19 there and seen about him.
20     Because I had an incident two years before
21 that, where he was injured in a football game,
22 he was on the field, and he had to squat down,
23 to breathe, because he had had his ribs bruised,
24 and they wouldn't pull him out.
25     And I finally got him to the sideline, and

**Page 15**

1 nobody was still looking at him. I had jumped
2 the fence, and, "Son, what's wrong?"
3     "I can't breathe."
4     So, we had to leave by ambulance that
5 night.
6     You know, that's the case where -- I mean,
7 I know that, the heat of the battle, they're not
8 paying attention as much as -- but, you know, if
9 I knew there was something wrong, I would have
10 been there.
11     Q All right. Well, do you remember a
12 certain play that Josh had a really hard hit, or
13 hit somebody really hard, where he had to come
14 out of the game, or something like that, before
15 half time?
16     A I can't say that I did. Josh is a
17 lineman. Plays interior a lot. And he's hit --
18 of course, you probably -- if anybody's ever
19 played line. I played quarterback, myself. But
20 you're banged every play.
21     Q Right. I was a lineman in high school
22 and college, so, I understand that.
23     A You understand you're hit pretty much
24 every play. He played guard, tackle, and, like
25 I said, he long snapped, too.

**Page 16**

1     Q Okay. To your knowledge, did Josh try
2 to pull himself out of the game or notify any of
3 the coaches that he was hit really hard?
4     A Not to my knowledge.
5     Q Okay. And so, then, I guess you're
6 saying he was vomiting and things, at half time?
7     A Correct.
8     Q And then, during the third quarter --
9     A This happened minutes after the game
10 began. I mean --
11     Q Okay. So, very early in the third
12 quarter?
13     A Yeah. And, for some reason, our
14 principal was on the field the third quarter.
15 He wasn't there the whole game, until the third
16 quarter.
17     Q Okay.
18     A When the third quarter started, he was
19 out there, also.
20     Q And I know you mentioned that the
21 police got involved. Was Josh arrested or
22 anything?
23     A No. We were asked to leave. And I
24 asked why. We were told that he was the center
25 of the aggression or something. I don't

Page 17

1  understand that.
2     And, during this whole time, I did not have
3  the principal, I did not have Tim Pitchford or
4  anybody in there. It was just my son, myself
5  and the police.
6     Q  But Josh wasn't arrested and charged
7  with anything?
8     A  No, sir.
9     Q  Okay. After the game, was he arrested
10 for anything related to the game?
11    A  No, sir.
12    Q  Okay. Were there any type of legal
13 procedures started, because of his actions at
14 the game?
15    A  Yes.
16    Q  And could you just generally describe
17 those for me, please?
18    A  I'm not sure what they charged him
19 with.
20    THE WITNESS: What did they charge him
21       with?
22    MR. NEWMAN: Well, you have to just
23       answer what you know.
24    A  I don't know.
25    Q  Okay. But there was some type of --

Page 18

1     A  Correct.
2     Q  -- procedures? Okay. Let's talk
3  about Josh's treatment after the game. Did
4  y'all take him to the emergency room or anything
5  like that?
6     A  We did not know, at the time, that he
7  had been, you know, sick. We knew he was
8  visibly upset, and we really thought that was
9  what was wrong with him. He was very sleepy.
10 He was, you know, visibly upset, and sleepy.
11    So -- you know. And we were upset, also,
12 because, you know, we were -- you know, "You've
13 got to go now. You've got to leave."
14    There wasn't no discussion. Wasn't nobody
15 there to help us. It was like -- you know. And
16 I couldn't talk to anybody.
17    The police were like, "You've got to go
18 now."
19    And they escorted us from the field.
20    Q  When y'all left -- and the game was at
21 Columbia? Correct?
22    A  Correct. We went home.
23    Q  Y'all just went straight home?
24    A  Correct.
25    Q  Did you take Josh to a doctor?

Page 19

1     A  Actually, we didn't -- when we found
2  out he was sick, he went that Monday. We
3  scheduled a thing Monday.
4     Q  All right. And where did you take
5  him, sir?
6     A  My wife could tell you more about the
7  doctor. It was the pediatrician he normally
8  goes to.
9     Q  Do you remember which group that is?
10    A  It's the one right beside Winn Dixie.
11 I don't -- she keeps up with that more than I
12 do.
13    Q  But would that be the doctor y'all
14 identified --
15    A  Yes, sir.
16    Q  -- in the discovery? Okay. Were
17 there any other medical doctors that saw Josh?
18    A  He had a CAT scan, but I can't confirm
19 it was a different -- I'm sure it was a
20 different doctor, but --
21    Q  And I'm guessing the CAT scan was a
22 result of this doctor visit?
23    A  Correct.
24    Q  Okay. Do you know the results of that
25 CAT scan?

Page 20

1     A  I'm not a medical professional, so, I
2  couldn't say.
3     Q  Did y'all have to go back for any
4  special treatment or anything, because of the --
5     A  He was not allowed to have any
6  physical activities for over 30 days.
7     Q  And that was prescribed after the CAT
8  scan?
9     A  By the doctor.
10    Q  And so, the doctor at the pediatric --
11 I think it's Dothan Pediatrics?
12    A  I think it is, too.
13    Q  So, the doctor there was the only
14 medical doctor that saw Josh, concerning the
15 incident?
16    A  As far as I know, yes. I'm not
17 confirming that, because I don't --
18    Q  But, I mean, you, yourself, didn't
19 take him to any other doctor?
20    A  Huh-uh. During this time we were
21 doing the doctor visits, they ordered a -- at
22 school, they wanted to have a -- I don't know
23 what the call it. Some kind of disciplinary
24 hearing or something.
25    And the principal was wanting to know why

**Page 21**

1 he was not there. And I told him he was having
2 the CAT scans done and all this.
3    But, I had to handle all that, while he was
4 doing doctors' appointments.
5    Q All right. And did Josh see any other
6 kind of professional, or counselors, or --
7    A Yes, he did.
8    Q -- anything like that? And do you
9 know who he saw, sir?
10    A Alan Freed. I believe it's F-r-e-e-d,
11 I believe. I'm not sure.
12    Q And where is he located? Or where is
13 his office located?
14    A It's in Enterprise. I don't have the
15 specifics.
16    Q Okay. Now, had Josh ever visited Mr.
17 Freet's services, before this incident?
18    A No, sir.
19    Q And do you remember, roughly, how
20 close in time to the incident Josh visited with
21 Mr. Freet?
22    A I'd be guessing. I'm got going to
23 give an exact. Probably two weeks to a month.
24    Q Okay. So, it was after he went to the
25 Dothan Pediatrics?

**Page 22**

1    A I believe so. Or -- or it was after
2 that, or it was after the board hearing. I
3 can't remember exactly. I believe it was before
4 the board hearing.
5    Q Okay.
6    A I'm sure it was.
7    Q And do you know how many times Josh
8 visited Mr. Freet?
9    A I do not.
10    Q Was it more than one?
11    A Yes. I believe so.
12    Q Do you think it was more than five?
13    A I couldn't say.
14    Q Couldn't say?
15    A Couldn't say.
16    Q And I think we've kind of went over
17 this, but, if you don't mind, just in your own
18 words, explain for me what you think the Houston
19 County Board of Education did wrong and the
20 coaches or administrators at Wicksburg did
21 wrong, that led to this lawsuit?
22    A I don't understand, on a physical
23 game, when somebody bumps someone, and it
24 becomes a violent action, with a player.
25    Because, I've been around football all my

**Page 23**

1 life. I've announced football games, there at
2 Wicksburg. I've seen worse than what happened
3 that night, at a Wicksburg football game.
4    I don't understand how it escalated or why
5 it escalated to that -- to where it went. It
6 just doesn't make any sense.
7    As far as the board doing what they did,
8 whenever I went to the meeting at the school, I
9 asked for film. The principal told me, there's
10 no film available. Go to the board of
11 education.
12    I took my attorney there. They've never
13 watched the film. No film available. Then,
14 months after, all of a sudden, we get film.
15    I don't understand why they're in such a
16 hurry for expulsion, without looking through all
17 the evidence, to make sure all the facts were
18 there.
19    Q Is there anything else that you're --
20 any other actions that were the basis of your
21 suit, sir? Or does that basically cover
22 everything?
23    A Meaning?
24    Q Any other specific things that you
25 claim the school board did wrong, or anything

**Page 24**

1 they violated, you think they violated,
2 concerning Josh?
3    A I'm not sure I understand what you're
4 saying.
5    Q Well, I think you basically got it. I
6 was just wanting to know why you felt like
7 bringing the lawsuit?
8    A Okay.
9    Q And have you explained that?
10    A I believe so.
11    Q Now, let me ask you about this film.
12 You talked earlier about that you had seen on
13 tape, that it was Josh's shoulder pad that hit a
14 coach in the eye and knocked his glasses off,
15 and not a fist?
16    A Correct.
17    Q And which tape would that be?
18    A Well, we asked to receive film. We
19 received two films. One film was blank. We
20 asked why. Didn't know. I don't know why they
21 would send us a blank film.
22    The other film we got, that we acquired --
23 I guess it come from Houston County, because it
24 looked like from the guy that was shooting in
25 the end zone, and it showed the incident.

Page 25

1  Q  Okay.  So, this was -- was this a --
2  A  This was a game film.
3  Q  And this was the game film that the
4  Houston County Board gave to you?
5  A  Through your -- through my attorney, I
6  guess.
7  Q  So, it's not a tape that you had --
8  A  We asked for tapes, specifically,
9  because we knew what happened, and it was
10 getting twisted around.
11     And it was also, there's no tape.  Didn't
12 have no tape.  It didn't show anything.
13     Mr. Murray quoted me at school, the next --
14 whenever I had to talk with him that Monday or
15 Tuesday, that they looked at their tape, and
16 there was nothing on it.
17     And I said, "Well, we'd like to look at
18 it."
19     And so, I was never produced a tape until
20 my attorney asked for a tape.
21     Q  But the tape that you say showed the
22 shoulder pad bumping the coach --
23     A  Correct.
24     Q  -- was given to you, through your
25 attorney?  Or given to --

Page 26

1  A  Correct.  Through Mr. Segrest's
2  office, I believe.
3     MR. WALDING:  Let me just interject,
4        for a second.  I'm trying to sit
5        over here and not say anything.
6        It's real important, for our
7        record, that you let Mr. Moody
8        ask the questions, and then, you
9        respond to the questions, because
10       there's too much of both of y'all
11       talking at the same time.
12    THE WITNESS:  I'm sorry.
13    MR. WALDING:  And we're not going to
14       be able to understand what was
15       said here today, unless we have
16       one person speaking and stop and
17       another person speaking.
18    THE WITNESS:  I apologize.
19    MR. WALDING:  If we could do that,
20       that would be helpful.
21    THE WITNESS:  Uh-huh.
22    Q  And I'm sorry about that.  I'm bad
23 about doing that, myself.
24    But, you don't have any other tapes from
25 friends or spectators or anything like that, of

Page 27

1  the ball game?
2  A  No, sir.
3  Q  All right.  And earlier, you had
4  mentioned the hearing, concerning which road to
5  take, as far as discipline for Josh.  And were
6  you allowed to attend that hearing?
7  A  The one at the school, yes.  That was
8  the first one.  That was the principal's
9  recommendation.
10    Q  Okay.  Let's walk back through that.
11 So, there was more than one hearing or meeting?
12    A  There was that disciplinary meeting,
13 with the school.  And then, my understanding of
14 the way they work it, then, they send it to the
15 board, and then, the board makes their decision.
16    Q  So, did you get to attend -- or did
17 you attend either one of those meetings, or both
18 of them?
19    A  Correct.
20    Q  I'm sorry.  Did you attend the
21 principal's meeting?
22    A  Yes.
23    Q  And did you attend the board meeting,
24 as well?
25    A  Yes.

Page 28

1  Q  Okay.  Were you allowed to put on your
2  side of the story, and any evidence to support,
3  on behalf of Josh, at the principal's meeting?
4  A  Yes.  Mostly -- it was done within,
5  like, a quick span.  It wasn't like they give
6  you time to prepare.  They call you that morning
7  and say, we want you here in this meeting for so
8  and so.
9     Josh had returned to school Tuesday,
10 because he had went to the doctor that Monday.
11 They made him sit in the library, and wouldn't
12 let him go to class.
13    Q  How soon, if you can remember, was
14 this principal's meeting after the football
15 game?
16    A  Tuesday morning.
17    Q  So, it was that Tuesday morning?
18    A  Uh-huh.
19    Q  Did an attorney attend that
20 principal's meeting on your behalf?
21    A  No, sir.
22    Q  Any medical doctors or counselors?
23    A  No, sir.
24    Q  So, would it have --
25    A  I took a friend with me.

Page 29

1  Q  Who did you take, sir?
2  A  I can't think of her name. It's Ms.
3 Nancy Booth. And she was not at the game that
4 night. I took her on purpose, because she
5 wasn't there.
6  Q  So, at this principal's meeting, on
7 Josh's behalf, there was you and a Ms. Nancy
8 Booth, but Ms. Booth was not at the game?
9  A  Correct.
10  Q  What was the purpose in bringing Ms.
11 Booth?
12  A  To make sure that -- you know, of
13 course, I was upset -- that I would remain, you
14 know, calm, and that someone besides me was
15 there, that wasn't a family member, with us.
16  Q  Was Ms. Booth -- did she say anything
17 at the meeting?
18  A  Yes, she did.
19  Q  Okay. What was the general statement
20 that she --
21  A  My understanding of the meeting is
22 that it's a disciplinary board, which consists
23 of teachers. Also, during that meeting, there
24 was two coaches involved on the disciplinary
25 board. Which didn't seem right, since this was

Page 30

1 an incident with them.
2    But, as we get through about the middle of
3 it, Mr. Murray said he's already made up his
4 mind, that he was going to recommend expulsion,
5 without a chance to graduate. Or long-term --
6 how did he pronounce that? Long-term
7 alternative school, without a chance to graduate
8 with his class.
9    And Ms. Booth, after they said that, said,
10 "Think about what you're doing. You've got a
11 kid that's never been in trouble, had never had
12 any disciplinary action before in his life, here
13 at this school, and you're taking away his
14 senior year, to graduate with his class."
15    And that's what she interjected and said,
16 and asked them all to think about that.
17  Q  I want to ask you a couple of
18 questions about that. First of all, Ms. Booth
19 was just generally saying, in the past, Josh has
20 been --
21  A  Correct.
22  Q  -- a good kid? And she didn't -- she
23 did not attend that football game?
24  A  No, sir.
25  Q  And, to your knowledge, had she

Page 31

1 watched any tape of that game or anything,
2 before that hearing?
3  A  No, sir. Not to my knowledge.
4  Q  Okay. Well, let me ask you about the
5 -- you said there were some coaches on that
6 disciplinary board. Do you remember which
7 coaches --
8  A  Yes, sir.
9  Q  -- were on the board?
10  A  Josh Cox and Coach Whitten.
11  Q  And were these both football coaches,
12 or --
13  A  Correct.
14  Q  And was either Coach Josh Cox or Coach
15 Whitten involved in the incident at the football
16 game? And, by that, I mean, were they one of
17 the ones that Josh supposedly hit or bumped
18 into?
19  A  No, sir.
20  Q  Okay. And so, they weren't his
21 position coaches or --
22  A  No, sir.
23  Q  Who else was at this meeting, other
24 than you and Ms. Booth and the disciplinary
25 committee and Mr. Murray?

Page 32

1  A  Numbers of teachers. I can't name
2 them all. I have a list in a file at the house.
3  Q  Could you get that to us, please, sir?
4 If we don't already have it?
5  A  You should already have it. The board
6 should have it.
7  Q  And were those teachers there on
8 behalf of Josh, or were they just there as part
9 of their duties?
10  A  There as part of their duties.
11  Q  And this was a board hearing?
12 Correct?
13  A  Yes.
14  Q  And who all attended the board hearing
15 on Josh's behalf?
16  A  Mr. Freed and my attorney and my
17 family.
18  Q  And could you be a little more
19 specific on the family?
20  A  It would be all my -- my wife and my
21 kids. My sister was there.
22  Q  What was her name?
23  A  Peggy Beatty.
24  Q  I'm sorry? Could you --
25  A  Peggy Beatty. There was others, but I

Page 33

1 can't remember.
2    Q  Okay.  Are there a lot of others?  Or
3 just a couple?
4    A  No, not a lot.
5    Q  Okay.  And were you allowed to speak
6 on your son's behalf at this hearing?
7    A  I don't think I did -- yes, I did.
8 They had almost like a -- you know, where you go
9 set up --
10    Q  Okay.  And Mr. Freet, the counselor,
11 was he allowed to present information on Josh's
12 behalf?
13    A  I believe so.
14    Q  And was your attorney able to argue on
15 Josh's behalf?
16    A  Yes, sir.
17    Q  All right.  And did your wife or your
18 sister or any of these other people that
19 attended, were they able to make statements on
20 Josh's behalf, or did they want to make
21 statements on Josh's behalf?
22    A  I can't remember if they were given
23 that opportunity, at that hearing.
24    Q  But you know that you and Mr. Freet
25 and your attorney were able to --

Page 34

1    A  Because we were asked to.
2    Q  Okay.  So, the board asked you to
3 present arguments on --
4    A  I'm thinking, yes, sir.
5    Q  Just so this will be clear, you, Mr.
6 Freet and your attorney were able to present
7 information on Josh's behalf, at the board
8 hearing?
9    A  Yes.
10    Q  Okay.  And nobody -- no board member
11 or anyone associated with the school board
12 stopped y'all from presenting arguments on
13 Josh's behalf?
14    A  No, sir.  Not that I can recall.
15    Q  And then, what was the ultimate
16 decision at that board hearing?
17    A  They voted to expel Josh.
18    Q  And this all happened in -- was it in
19 September, the same month as the football game?
20 Or would it have been --
21    A  I'm not positive on a date.  We've got
22 files on it, but I'm not positive.
23    Q  But it would have been the fall
24 semester of his senior year?
25    A  Correct.

Page 35

1    Q  And, Mr. Davis, what did y'all do,
2 after Josh was expelled, to continue his
3 education?
4    A  Of course, there was no option of
5 putting him in a public school, because they're
6 not going to take him, with an expulsion.  I
7 live in that county, so, there was no way to get
8 him in anywhere else.
9    So, I ended up finding a private school,
10 Dixie Academy, in Louisville, and he ended up
11 moving there with my sister, to attend there.
12    Q  And was that your sister --
13    A  Peggy Beatty.
14    Q  Peggy Beatty?  And do you recall an
15 approximate date as to when Josh started
16 attending there?
17    A  No, sir, I do not.
18    Q  Would it have been --
19    A  Within that month.
20    Q  Okay.  So, it was the fall semester?
21    A  Yes, sir.  He was able to -- he was
22 able to play basketball.
23    Q  Okay.  And was there any certain
24 reason y'all decided on Dixie Academy, as
25 opposed to any other private school?

Page 36

1    A  Financially, it was my only option.
2    Q  And roughly how far is Louisville from
3 here?
4    A  From my house, around -- I'm guessing
5 46 miles.
6    Q  And how far was Louisville and Dixie
7 Academy from your sister's residence?
8    A  Approximately two miles.
9    Q  Do you recall approximately -- first,
10 let me ask you, how many semesters did Josh
11 attend at Dixie?
12    A  It would be from that incident until
13 he graduated.  So, I couldn't really say.  I
14 mean, I don't know how their system --
15    Q  All right.  Did he graduate the same
16 year he began attending there?
17    A  Correct.
18    Q  Or the same school year?
19    A  Yes.  Correct.
20    Q  And I believe you provided us with an
21 estimate of the cost for him attending Dixie.
22 Do you remember what that was?
23    A  I do not.  Without looking at it.
24       MR. MOODY:  I think I've got it.  Can
25    we mark this as Defendant's 1 and

Page 37

1       this as Defendant's 2, please,
2    sir?
3       (Thereupon, Defendant's Exhibit No. 1
4    and No. 2 marked for identification.)
5    Q  All right. Mr. Davis, we're going to
6 have to kind of flip back and forth, for these.
7    A  Okay.
8    Q  But, if you'll recall, Defendant's 2
9 is a set of written questions, interrogatories,
10 that we sent earlier in this case, and
11 Defendant's 1 is y'alls responses that we got on
12 your behalf. And if you will turn to the -- I
13 think it's the third page -- or, I'm sorry --
14 the fourth page of Defendant's No. 1.
15    A  Okay.
16    Q  Number 11. There's a breakdown of the
17 cost for Dixie Academy. Does that look
18 accurate?
19    A  Yes, sir.
20    Q  All right. And you recognize that
21 Defendant's No. 2 as the questions that we sent
22 to you earlier?
23    A  Yes.
24    Q  And do you recognize Defendant's No. 1
25 as --

Page 38

1    A  The answers.
2    Q  -- y'all responses?
3    A  Yes, sir.
4    Q  Okay. And is that your signature on
5 the bottom of page four of Defendant's No. 1?
6    A  That is correct.
7    Q  All right. I'm sorry about that.
8 But, back to number 11, then.
9    Your estimate of $10,280.00, would be for
10 Josh finishing the fall semester, and then,
11 completing the spring term at Dixie Academy?
12    A  Yes, sir.
13    Q  Okay. Do you remember the approximate
14 date of when he graduated from Dixie?
15    A  It was the end of May. I can't
16 remember the exact date.
17    Q  And, in your answer to number 11,
18 there, I had a couple of questions about some of
19 the breakdowns. You have $1200.00 listed as
20 expenses for going to Josh's ball games and
21 entry and food. Could you explain --
22    A  Why?
23    Q  -- that to me?
24    A  Yeah. When you play at a private
25 school, as with Dixie, I would have to go almost

Page 39

1 to Tuscaloosa, Auburn. Whereas, when Josh was
2 playing basketball at Wicksburg, the furthest I
3 might travel would be Troy or somewhere of that
4 nature.
5    Q  If you could, for me, on number 11,
6 could you specifically point out which of those
7 expenses were directly related to Josh's
8 academic education, and not the athletics and
9 the extracurricular stuff?
10    A  I guess everything except the 1200,
11 then.
12    Q  Okay. Now, the $200.00 for gas, would
13 that be Josh's travel from your sister's house?
14    A  That would be traveling back and forth
15 for him to come home. He tried to come home
16 every weekend.
17    Q  So, that would be from Louisville to
18 Wicksburg? Correct?
19    A  And his gas to go to school and do
20 what he had to do at school.
21    Could I correct something on that, also?
22    Q  Yes.
23    A  Also, when he was at school at Dixie,
24 it's a private school, and, when you have a ball
25 game, you don't ride a bus. In most cases, you

Page 40

1 take your own vehicle. And that's not only
2 going from -- that would be traveling from
3 Louisville to Auburn, a lot of times, in his
4 car, to go to a ball game.
5    Q  So, that would be included in the
6 $1200.00, there?
7    A  Correct.
8    Q  All right. Let me ask you a question
9 about the room and board. He was staying with
10 your sister, Peggy? Correct?
11    A  That's correct.
12    Q  And y'all were paying her $400.00 a
13 month?
14    A  We were helping her as much as we
15 could, with food and whatever he needed.
16    Q  Okay. And I'm not real familiar with
17 Dixie. It doesn't have dormitories or anything,
18 on campus?
19    A  No, sir.
20    Q  All right. Mr. Davis, if you could go
21 back over some of that again, and let me clarify
22 one of my previous questions. Could you --
23 let's just go down the list, there, on number
24 11, on Defendant's No. 1, and could you tell me
25 whether each item you list was directly related

Page 41

1 to Josh's academic work at Dixie or not?
2    A  Clarify what you mean?
3    Q  I mean, could you go -- the $400.00 a
4 month is or is not for his academic expenses?
5    A  I would say yes.  He had to live
6 there.
7    Q  But that was not tuition or board or
8 anything like that?
9    A  No.  That's part of his having to be
10 away from home.  I consider it to be.
11    Q  Okay.  And then, the $200.00 monthly,
12 for gas.  That was related to his travel back
13 and forth --
14    A  And to school.
15    Q  But all of that wouldn't be to school?
16 Correct?
17    A  No.  But it would be -- considering he
18 had to be away from home, I still consider it
19 part of his -- have to be his academics.
20 Because he was not allowed to be at his home.
21    Q  And your sister's house was
22 approximately two miles from the school?
23    A  Correct.
24    Q  So, Josh's trips to and from school
25 every day, would be roughly four miles, round

Page 42

1 trip?
2    A  Correct.
3    Q  Then, the 160-dollar item for lunch
4 and break food, did you consider that directly
5 related to his academics?
6    A  I would, even if he was at home.  That
7 would be the same.
8    Q  And did Dixie Academy have a lunch
9 room?
10    A  They had a -- I would call it -- not a
11 cafeteria, but, you could order food.  They had
12 food cooked there.  It wasn't really a
13 cafeteria.
14    Q  Okay.  So, you didn't have to leave --
15 Josh didn't have to leave campus, to --
16    A  Correct.
17    Q  -- go purchase food?  And then, the
18 $2,000.00 tuition, you would consider --
19    A  Yes.
20    Q  -- related to the academics?  And the
21 $500.00 for the books?
22    A  Correct.
23    Q  All right.  And then, the 500-dollar
24 graduation expenses.  Could you explain those
25 for me?

Page 43

1    A  What any graduate has, during their
2 graduation year.
3    Q  Okay.  Would that be --
4    A  Cap, gown, whatever.
5    Q  Invitations?
6    A  Correct.
7    Q  Things of that nature?  But was that a
8 required expense, to obtain a degree?
9    A  You have to participate in the
10 exercise.
11    Q  Which of the expenses listed in number
12 11 would you not have had to pay for Josh, if he
13 had completed the school year at Wicksburg?
14    A  Let's see.  Not had to pay?
15    Q  Yes, sir?
16    A  Okay.  The 400 monthly.  The gas, I
17 probably would have still had some, but not as
18 much.
19    Q  Would you have an estimate as to what
20 you would have had?
21    A  No.
22    Q  Okay.
23    A  Tuition, I wouldn't have had to pay,
24 or the books.
25    Q  Would you have had to have paid the

Page 44

1 $1200.00 for the ball games?
2    A  No.
3    Q  And would you have paid $160.00
4 monthly for lunch and break food?
5    A  Probably would have, yes.  Or more.
6 The way he eats.
7    Q  And would you have still had to pay
8 the 500-dollar graduation expenses, if Josh had
9 continued at Wicksburg?
10    A  Probably not as much.
11    Q  Do you have an estimate what you would
12 have had to pay?
13    A  No, I do not.
14    Q  And let's move on, Mr. Davis, to
15 another one your claims, that Josh suffered from
16 psychological and emotional problems, after the
17 incident at the football game.  Could you
18 describe those problems for me, sir?
19    A  Meaning?
20    Q  What psychologically and emotionally
21 changed after the incident?
22    A  I'm not a doctor, so, I couldn't
23 really answer the specifics of that.
24    Q  Okay.  Surely there was something had
25 to change, for you to claim that in your

Page 45

1 complaint?
2    A  Well, my attorney wrote up the
3 complaint.
4    Q  Okay. Do you have any evidence or
5 information to support any claim that Josh is
6 suffering from psychological or emotional
7 problems?
8       MR. NEWMAN: To your knowledge.
9    Q  Yes. To your knowledge?
10   A  That I know of? I know nothing of --
11 you know, I don't know, personally. I mean,
12 like I say, I'm not a doctor or anything. So, I
13 don't know.
14   Q  All right. And, just in your opinion,
15 is Josh suffering from any psychological or
16 emotional problem?
17   A  Now, or --
18   Q  Well, either right after the incident
19 or continuing now?
20   A  Meaning? I mean, here we go to
21 meaning again.
22   Q  Is Josh suffering from depression,
23 because of the incident, or --
24   A  I'm not a doctor. I couldn't say.
25      MR. MOODY: Okay. Mr. Davis, I forgot

Page 46

1       to mention this earlier, but, if
2       you want a break or need to go to
3       the restroom or get a drink or
4       anything, just let us know and we
5       can stop.
6          If we could mark that as
7       Defendant's 3?
8       (Thereupon, Defendant's Exhibit No. 3
9       marked for identification.)
10   Q  Mr. Davis, do you recognize
11 Defendant's 3 as the complaint that was filed on
12 your behalf in this lawsuit?
13   A  Yes, I do. It's the complaint my
14 attorney filed.
15   Q  And could you flip to the third page,
16 paragraph number 17, and could you read that for
17 me, please, sir?
18   A  It says, "Joshua Davis suffered
19 psychologically and emotionally by Defendant's
20 conduct in that he was humiliated and
21 stigmatized before his community as a
22 troublemaker worthy of expulsion."
23   Q  And, to your knowledge, is there any
24 evidence to support that claim, sir?
25   A  I mean, this was drawn up by my

Page 47

1 attorney. I'm sure we have a claim.
2    Q  But, do you personally know of
3 anything?
4    A  Meaning?
5       MR. WALDING: He's asking if you know,
6          Mr. Davis.
7       THE WITNESS: Well, I'm trying to
8          answer it honestly. That's what
9          y'all asked me to do.
10      MR. WALDING: He wants to know what
11         you know. Only what you know.
12   Q  Yeah. I'm not trying to trick you or
13 anything. I'm just wondering if you had any
14 information to support that claim, yourself?
15   A  As far as doctors, or --
16   Q  Anything?
17   A  I mean, we have a doctor's statement,
18 you know, so --
19   Q  And do you know which doctor that's
20 from?
21   A  Probably Dr. Freed.
22   Q  And he was the counselor? Correct?
23   A  That's correct.
24   Q  But, other than Mr. Freet's statement,
25 you don't have any other evidence, that you know

Page 48

1 of?
2    A  That I know of, no.
3    Q  Okay. And while we have the complaint
4 out, Defendant's 3, there, could we look at
5 paragraph number 13, please, sir? And, if you
6 don't mind, could you read the allegations in
7 paragraph 13 for the record, please, sir?
8    A  "Staff of the Wicksburg High School
9 where Joshua attended before his expulsion were
10 the targets of intentional acts by students more
11 erroneous (sic) than Joshua's unintentional
12 conduct, but those students received less harsh
13 punishment."
14   Q  Okay. And do you have any information
15 to support that statement, sir?
16   A  My wife has more than I have.
17   Q  Okay. But, to your knowledge, do you
18 know of any situation where students or staff at
19 Wicksburg were targeted by intentional acts that
20 were more egregious than Josh's?
21   A  Say that again, please?
22   Q  All right.
23   A  Say that again, sir.
24   Q  Basically, do you know of any events
25 at Wicksburg High School, where a teacher or a

Page 49

1 staff member was hit or attacked or anything, by
2 a student --
3    A  I can't say for positive, because I
4 wasn't --
5       MR. WALDING:  Again, if you'd let him
6          finish his question before you
7          start answering.  I think --
8       THE WITNESS:  I thought I did.
9    Q  Sometimes I lag behind and talk a
10 little slow.  But, do you know of any incidents
11 at Wicksburg High School, where a teacher or a
12 staff member was hit or intentionally pushed,
13 shoved, anything of that nature, by a student,
14 but that student received less punishment than
15 Josh?
16    A  I know of stuff.  But, as far as me
17 being there, I wasn't there.
18    Q  Okay.  If you could look back at, I
19 believe it's Defendant's No. 1, on the top, it
20 will say "Plaintiff's answers to first
21 interrogatories."
22    A  Is that it, there?
23    Q  Yes, sir.  Flip over to paragraph
24 number 9.  Maybe this can refresh your memory.
25 And we're going to need to look at Defendant's

Page 50

1 No. 2.  That's this document right here.  It's
2 our question number 9.
3    And, in Defendant's No. 2, our
4 interrogatory stated, "Please describe in detail
5 every instance of an educator at Wicksburg High
6 School being targeted for intentional acts by a
7 student, but that student receiving less
8 punishment than Joshua Davis, as you claim in
9 paragraph 13 of your complaint."
10    And then, number 9, on Defendant's No. 1,
11 is that your response to that interrogatory?
12    A  That's correct.  But, again, I
13 reiterate that I was not there.
14    Q  Okay.  Well, let me ask you about your
15 responses in number 9.  You say that Judy Joiner
16 was wrongly touched by C. L. and that C. L. got
17 one week of alternative school in 2005 or 2006.
18 Who was Judy Joiner, or --
19    A  She's a teacher at Wicksburg.
20    Q  Do you know what grade she teaches,
21 or --
22    A  They swap around, so, I'm not sure.
23    Q  Okay.  And do you know C. L., sir?
24    A  No, sir, I do not.
25    Q  But you believe he was a student at

Page 51

1 the high school?
2    A  He may have been in junior high.
3    Q  And do you know what C. did, that
4 amounted to wrongly touching?
5    A  I do not.
6    Q  Okay.  And how did you find out about
7 this event between Judy Joiner and C. L.?
8    A  I believe Ms. Joiner's daughter
9 teaches at the school that my children are at.
10    Q  And so, would Ms. Joiner's daughter
11 have told you this?
12    A  No.  Not me.
13    Q  Would she have told your wife?
14    A  Yes.
15    Q  And then, there's another instance
16 described there, where a Ms. Sanders was kicked
17 in the buttocks by a high school student named
18 L. And Ms Sanders told the vice-principal, Ms.
19 Smith, about the incident, and Ms. Smith simply
20 told L. to stay away from Ms. Sanders.
21    A  Correct.
22    Q  That's your response, there?  Did you
23 personally know about this incident between Ms.
24 Sanders and L.?
25    A  Through her son.

Page 52

1    Q  And that would be Ms. Sanders' son?
2    A  Correct.
3    Q  And do you know Ms. Sanders' first
4 name?
5    A  I do not.  Her son is a teacher at
6 Wicksburg.
7    Q  And is Ms. Sanders a teacher at
8 Wicksburg?
9    A  Custodian.
10    Q  Okay.  And what is Ms. Sanders' son's
11 name?
12    A  Oh, gosh.  I can't recall his first
13 name, at the moment.
14    Q  But he is a teacher at Wicksburg?
15    A  That is correct.
16    Q  Is his last name Sanders, as well?
17    A  Yes.
18    Q  Do you know how long Mr. Sanders has
19 taught at Wicksburg?
20    A  I would say between eight and ten
21 years.  That's hearsay.  But I believe he's been
22 there that long.
23    Q  And how did it come about that Mr.
24 Sanders, the teacher at Wicksburg, told you
25 about someone kicking his mother?

Page 53

1   A   Went to church together.
2   Q   Okay. And do you know the last name
3 of L., the student involved in this incident?
4   A   I do not.
5   Q   Okay. And are those the only two
6 instances that you're aware of that fit the
7 description from our interrogatory number 9, in
8 Defendant's No. 2? Document No. 2?
9   A   Correct.
10   Q   All right. Did you or your wife read
11 the 2005 and 2006 student code of conduct, for
12 the Houston County -- or produced by the Houston
13 County Board of Education?
14   A   Yes.
15   Q   Did you read it?
16   A   Yes.
17   Q   Okay. And did you sign the back cover
18 of the handbook, that requires a parent's
19 signature, and then, return that sheet to the
20 school?
21   A   It would have been either me or my
22 wife.
23   Q   But you or your wife signed and
24 returned that?
25   A   That is correct.

Page 54

1   Q   Did Josh read the 2005-2006 student
2 code of conduct?
3   A   You'll have to ask him.
4   Q   Did he sign that sheet on the back
5 page, and return it to the school?
6   A   There again, I'd say you'd have to ask
7 him.
8   Q   But you know that either you or your
9 wife did?
10   A   That's correct.
11   Q   Okay. And, Mr. Davis, were you aware
12 of the possible consequences for the offenses
13 that the disciplinary committee charged Josh
14 with?
15   A   Meaning?
16   Q   Were you aware that he could be
17 expelled for what they were charging him with?
18   A   If what happened the way it happened,
19 no. If it happened the way they said it
20 happened, yes.
21   Q   Okay. So, as the disciplinary
22 committees were charging Josh with their view of
23 how things happened at the game, you were aware
24 that expulsion was one possible disciplinary
25 procedure available to them?

Page 55

1   A   Correct.
2   MR. MOODY: Okay. Let's take a break.
3   (Recess in deposition.)
4   Q   Mr. Davis, I want us to look at this
5 document here, Defendant's No. 4.
6   (Thereupon, Defendant's Exhibit
7   No. 4 marked for identification.)
8   Q   And does this document look familiar
9 to you? Do you recognize that?
10   A   Yes.
11   Q   And could you read for me what that
12 document is titled, sir?
13   A   You mean here? "Initial Disclosures"
14 or --
15   Q   Yes. Right up under the caption?
16   A   (A) is, "Individuals believed to have
17 personal factual knowledge about the and/or
18 issues involved in this matter."
19   Q   Okay. And that is under the
20 "Plaintiff's Initial Disclosures"? Correct?
21   A   Correct.
22   Q   All right. And, Mr. Davis, I want to
23 go through each name here, that you have listed,
24 under (A), and I would like for you to tell me
25 the person's name, and then, what information

Page 56

1 that you know of that they possess, concerning
2 this incident?
3   A   Okay.
4   Q   Well, starting with number 2, Debbie
5 Davis?
6   A   Pertaining as to what, now?
7   Q   What does Ms. Davis know about the
8 incident at the football game?
9   A   She was there.
10   Q   And would Ms. Davis's testimony about
11 the incident be the same as what you have
12 testified to today?
13   A   Yes, I believe so.
14   Q   And then, number 3 is Josh Davis.
15 We're going to take his deposition later today.
16 But, do you have any reason to believe that
17 Josh's version of events on the night of that
18 football game would be any different than yours?
19   A   Other than he probably don't remember
20 a lot of it.
21   Q   Okay. But, what your allegations are,
22 would match his recollection of the game?
23   A   Correct.
24   Q   Okay. And who is Ms. Susan Sanders?
25   A   That would be the Ms. Sanders in

Page 57

1 question a while ago. That's her first name.
2    Q  So, would Ms. Susan Sanders have any
3 information about the football game itself?
4    A  No.
5    Q  So, her information would concern an
6 incident with a student --
7    A  Correct.
8    Q  -- at Wicksburg High School? And
9 C. L. number 5?
10    A  That's the student at the school.
11    Q  Was he the student involved in the
12 incident with Ms. Sanders?
13    A  It's either him or L. I can't
14 remember exactly the two.
15    Q  But he was involved in some type of
16 incident?
17    A  Correct.
18    Q  Does C. L. have any information about
19 the football game?
20    A  Not to my knowledge.
21    Q  Okay. And could you identify Mr.
22 Roger Dale Sanders?
23    A  That is the teacher at Wicksburg.
24    Q  And his mother is Ms. Susan Sanders?
25    A  Correct.

Page 58

1    Q  And Mr. Roger Dale Sanders attends
2 church at your church?
3    A  And also a teacher at Wicksburg.
4    Q  But he does attend church with you?
5 Correct?
6    A  He still attends that church. I do
7 not.
8    Q  Okay. Did y'all both attend the same
9 church, at the time of the football game?
10    A  Correct.
11    Q  Mr. Davis, can you describe for me the
12 conversation that you had with Mr. Roger Dale
13 Sanders, about this incident between C. and his
14 mother, Susan Sanders?
15    A  It was just a basic conversation,
16 telling us what happened, and that there wasn't
17 anything done about it.
18    Q  Where did this conversation occur,
19 sir?
20    A  I believe it was at church. In
21 between Sunday school and church.
22    Q  Did you approach Mr. Sanders for this
23 information, or is this something he volunteered
24 to give you?
25    A  Volunteered.

Page 59

1    Q  Was Mr. Sanders on any of the
2 disciplinary committees, concerning Josh?
3    A  I believe he was, at first. They
4 changed it after -- some of them -- some of them
5 signed and some of them didn't.
6    Q  Okay.
7    A  And I don't think I was given a whole
8 list, when we were first there, of who all was
9 there. Through the principal. I was given the
10 -- I was given the signed version, afterwards.
11    Q  Okay. Was Mr. Sanders present at
12 either of the disciplinary meetings that you
13 attended?
14    A  The one at school, I believe he was.
15    Q  Okay. And was Mr. Sanders a member of
16 the disciplinary committee, at that meeting?
17    A  I'm wanting to say yes, but I'm not
18 positive, because, like I said, they didn't give
19 me a list that day, I don't believe.
20    Q  But you think he was a member?
21    A  I do believe. There's quite a few.
22 They call who they want. However they work it,
23 I don't know.
24    Q  Okay. I want us to look at one more
25 document, here. And I believe that's

Page 60

1 Defendant's Exhibit 5.
2         (Thereupon, Defendant's Exhibit
3         No. 5 marked for identification.)
4    Q  Mr. Davis, could you read for me the
5 title of this document?
6    A  "WHS Alternative School Committee."
7    Q  All right. Mr. Davis, do you remember
8 getting this document as part of a packet of
9 initial disclosures that the school board
10 provided you with?
11    A  This is similar to the one I got. The
12 first one I got did not -- the day that I went
13 to the meeting, was not like this.
14    Q  Okay.
15    A  It didn't have James K. Murray, the
16 principal. It had the old principal's name on
17 it.
18    Q  Okay. Do you remember getting a
19 packet of information from the school board,
20 shortly after this lawsuit was filed? It would
21 have had labels down here in the bottom, of
22 consecutively numbered pages?
23    A  Remembering it, I don't. Did I
24 receive it? That's what I'm saying, I'm not
25 sure.

Page 61

1    Q  Okay.  Would your attorney know
2  whether you received that information or not?
3        THE WITNESS:  Malcolm, do you know?
4        MR. NEWMAN:  That would be what you
5        know.
6    A  My wife has all this filed.  I
7  couldn't say correctly.  If I looked at our
8  files, I could tell you.
9    Q  Well, for this document right here,
10  that we're talking about, Defendant's No. 5,
11  could you read for me, starting right here at
12  the first paragraph, the decision of the board,
13  and, to the best that you can make out, the
14  signatures, the teachers that signed this
15  recommendation?
16    A  Okay.  Yes.  "Class III - C and Class
17  III" -- I guess that's "Q offenses."  It says,
18  "Long-term alternative school for the rest of
19  the school year.  We also want him to attend
20  counseling and we recommend his right to
21  participate in graduation ceremonies be removed.
22  We also would strongly recommend that the board
23  review all materials and move toward expulsion."
24        Starla Brannon, James Murray, Kim Kirkland,
25  Becky Birdsong, Rogers Sanders and Angela

Page 62

1  Brookman.
2    Q  And Mr. Roger Sanders, that signed
3  this document, would that be the same Roger
4  Sanders that attends church with you and told
5  you about this earlier incident, concerning his
6  mother?
7    A  That is correct.
8    Q  Okay.
9    A  But may I also add in here that, I was
10  also told, by Mr. Sanders and a few others, that
11  the top part of this paragraph was filled in
12  later, after signatures.
13    Q  Now, when did Mr. Sanders tell you
14  that?
15    A  We were told in confidence, at a
16  church function, also.
17    Q  Would that have been the same
18  conversation that Mr. Sanders was telling you
19  about the incident concerning his mother?
20    A  That's possible, yes.
21    Q  But you don't know if it was the same
22  conversation or not?
23    A  I cannot recall.
24    Q  Now, do you remember this list of --
25  or these teachers here on this document, being

Page 63

1  at the disciplinary meeting you attended?
2    A  I remember three of them.  A couple of
3  them, I do not know.  I also remember Mr. Murray
4  being there.
5    Q  Okay.  Now, the ones that you do not
6  remember being there, do you know for a fact
7  that they were not there, or do you just not
8  remember --
9    A  I don't know them personally.  Or I
10  don't recognize, you know, their names.  If I
11  see them, I might know them, but not know their
12  names.  You understand what I'm saying?
13    Q  So, you're not claiming that any of
14  the people that signed this were not at the
15  meeting?
16    A  No.  There were also more people at
17  the meeting than what's on this list.
18    Q  Okay.  Thank you.  Do you know any
19  other names, or do you know the names of any
20  other people that attended that meeting, that
21  didn't sign that?
22    A  Josh Cox, Coach Whitten.  There was a
23  few others.  I can't remember their names.  If I
24  saw them, I could -- I could pick them out of
25  probably a book or whatever.

Page 64

1    Q  Okay.
2    A  But I don't know why they're not on
3  the list, either.
4    Q  Okay.  I want to talk a little bit
5  about Josh's athletics and his relationships
6  with the coaches and everything.  Josh was a
7  pretty competent athlete, wasn't he?
8    A  He was all right.
9    Q  And did he play sports other than just
10  football?
11    A  Yes.  Basketball.
12    Q  Who were his basketball coaches?
13    A  Coach Scott Whittaker.
14    Q  Now, was Coach Whittaker a coach that
15  was at the disciplinary meeting?
16    A  No.
17    Q  Could you please remind me -- I
18  thought there was a name that sounded familiar.
19  Was there a Whitten?
20    A  Whitting.  Coach Whitting.
21    Q  So, Coach Whitting was on the
22  disciplinary committee, but Coach Whittaker was
23  not?
24    A  Correct.  Not the one that -- he
25  didn't sign the committee thing, but he was

Page 65

1 there.
2    Q Did Josh -- or was Josh being
3 recruited or followed by any colleges, for any
4 possible athletics?
5    A There was talk, but no letters, that
6 were, you know, coming.
7    Q To your knowledge, there was never any
8 scouts coming to watch him, or anything of that
9 nature?
10    A The coaches had mentioned something to
11 him, but, as far as me actually meeting anyone,
12 none that I know of.
13    Q Okay. Did Josh have any kind of ill
14 feelings towards any of his football coaches,
15 during this season? Or the 2005 season?
16    A We had a complaint brought to Mr.
17 Murray's attention, against Coach Charles
18 Winchester.
19    Josh had knee surgery the year before, that
20 Winchester wasn't there.
21    A couple of the players come up to Josh,
22 after a practice and said, "Coach Winchester
23 told us how to block you, as to take your knee
24 out."
25    Josh was concerned. Called me. I told him

Page 66

1 to he needed to go to Murray. And, supposedly,
2 they set up a meeting.
3    This was a week before this incident
4 happened.
5    Q Okay. Let's go back over that. Josh
6 had surgery on his knee when?
7    A It would have been a year before this
8 incident.
9    Q Okay. So, 2004?
10    A Yeah. Somewhere in there, yes.
11    Q And was Coach Winchester not the
12 football coach at Wicksburg during the 2004
13 season?
14    A That's correct.
15    Q So, the 2005 season was his first --
16    A That is correct.
17    Q -- there? Were there any other
18 grievances between Josh and any of the other
19 coaches, before this football game?
20    A Not to my knowledge.
21    Q Did you ever know Josh to use any kind
22 of supplements for weight lifting or anything
23 like that?
24    Not anything illegal. But I know GNC and
25 different companies make weight-gainers and bulk

Page 67

1 -- supplements that bulk people up.
2    A One summer, they tried it. One of the
3 coaches wanted to do it. He didn't even finish
4 what he gave him. I mean, he just didn't do it.
5 We didn't do anything like that.
6    Q Do you recall what that was that he
7 tried?
8    A It was supposed to be like a
9 milkshake, some kind of protein shake, you're
10 supposed to take after lifting. It wasn't --
11 one of the coaches gave it to him. He had
12 bought a case of it or something. I believe
13 that was Coach Mitchell, the year before.
14    Q Did you remember the brand or --
15    A I really don't, no.
16    Q Okay. And did Josh ever use steroids,
17 to your knowledge?
18    A No, sir.
19    Q And do you have any reason to believe
20 that Josh was using any type of supplements or
21 steroids, on the night of the incident?
22    A No.
23    Q Now, Mr. Davis, did you ever have any
24 grievances with any of Josh's coaches at
25 Wicksburg High School?

Page 68

1    A I was upset about the incident with
2 Winchester, so, we did research on Charles
3 Winchester.
4    He was fired from the school he had last
5 attended, for starting a riot at a football
6 game.
7    Q And do you know what previous school
8 that --
9    A Wewahitchka High School.
10    Q Can you spell for me?
11    A I surely cannot.
12    Q Was that in Alabama?
13    A That is in Florida. He was fired for
14 that incident, from coaching.
15    Q Did you have any grievances with any
16 of the coaches involved in the incident, on the
17 night of the football game?
18    A No, sir.
19    Q Had you ever been banned from Houston
20 County Board of Education athletic events?
21    A I was banned from the school of
22 Houston County, due to an incident with a band
23 director, which, if we go back to the April --
24 the last month of 2007, resigned, due to sexual
25 allegations that I brought up against him two

Page 69

1 years ago, to the board of education and to Mr.
2 Tim Pitchford.
3    Q  Now, let's just focus on the athletic
4 department, for what we're here today. Had you
5 been banned, or asked not to attend any sporting
6 event?
7    A  I was banned from the school, due to
8 the alt -- not altercation, but the complication
9 with that teacher. I was banned from any school
10 grounds. Could not see my kids play Little
11 League baseball or anything, due to a
12 confrontation with that teacher.
13    I was going to ask him about sexual
14 improprieties.
15    Q  And you mentioned earlier that you
16 used to announce football games at Wicksburg?
17    A  I did. The speakers on the field are
18 still mine. They haven't gave them back, yet.
19    Q  Were you told not to continue
20 announcing the games?
21    A  That is correct.
22    Q  And that was a result of the incident
23 with the band director you were talking about?
24    A  That is correct.
25    Q  Had you previously gotten into any

Page 70

1 heated arguments with any of Josh's or any of
2 your other children's athletic coaches?
3    A  No, sir.
4    MR. MOODY: Give me just a second to
5       look back over everything, Mr.
6       Davis.
7    Q  Mr. Davis, let's go back to this
8 confrontation that led to your being banned from
9 some Houston County schools and no long being
10 allowed to announce.
11    Was this a physical altercation between you
12 and the band director?
13    A  We got into a verbal altercation. He
14 stepped up on a curb, and we bumped noses, and I
15 was accused of -- I wouldn't say physical.
16 There was no law called or anything.
17    It was -- and then, we had a meeting with
18 the -- and I will say this: I requested a
19 meeting with him, the principal and Tim
20 Pitchford, at the school.
21    The result of that was that I had brought
22 up my concerns for the band department being
23 away from the school, that there were no films
24 -- no cameras in the school, and that this man
25 was allowed to be there alone.

Page 71

1    Of course, I was accused -- accusing
2 someone of something, and I did not -- at that
3 time, I said that it was a rumor that he had
4 little girlfriend things going on.
5    And I asked, why can't we put cameras or
6 something up there, for the security of these
7 children. That was my main focus that day. And
8 that things would be treated fairly on how they
9 picked and do stuff.
10    Q  Okay. Now, back to this altercation.
11 Where did it occur?
12    A  It happened in front of the band room,
13 the night of -- I can't remember the night,
14 exactly. But it was during a week night. No
15 one around, except me and him. And his wife was
16 there, but, I mean --
17    Q  So, this altercation with the band
18 director, it occurred at Wicksburg High School?
19    A  That's correct.
20    Q  And it occurred in front of the band
21 room?
22    A  That is correct.
23    Q  And was it -- you said it was at
24 night?
25    A  Yes. In the evening, yes.

Page 72

1    Q  Were there students present?
2    A  No, sir.
3    Q  Were there any other parents present?
4    A  No, sir. His wife was there.
5 Briefly. She didn't stay the whole --
6    Q  Okay. So, it was you, the band
7 director and the band director's wife?
8    A  That is correct.
9    Q  And do you recall his name, sir?
10    A  Jason Cheshire.
11    Q  And do you recall his wife's name?
12    A  I do not.
13    Q  And that was the -- first of all,
14 there was no police report filed about this
15 incident?
16    A  No, sir.
17    Q  No arrests made?
18    A  No, sir.
19    Q  And then, you met with Mr. Pitchford
20 and the principal at Wicksburg?
21    A  Right. And then, whenever I made the
22 -- you now, laid out everything I wanted to say.
23    And then, Jason had told them, "What are
24 y'all going to do about him bumping me?"
25    And then, the next thing I know, I get a

Page 73

1 letter from the board, saying I'm banned from
2 the school, without a hearing or anything.
3      Then, I was allowed to -- I requested a
4 hearing and got to go, but they didn't reverse
5 the decision.
6      A month later, I asked for a request to go
7 back and speak to them.  I spoke to the board.
8 They allowed me to go only to sporting events,
9 then.  I could only go to the games, to pick up
10 -- I couldn't go on the campus, to pick up my
11 kids or drop my kids off.  Then, they allowed me
12 to go to the campus.
13      So, whenever this incident happened, and
14 they asked me to go to the school that Tuesday,
15 I actually had to call Tim Pitchford and ask him
16 was I allowed go on the school grounds.
17      Q   Now, roughly when did this incident
18 between you and the band director occur?
19      A   It was the -- before -- the year
20 before -- it was the end of the year before the
21 football season started, back before the next
22 school year started.
23      Q   So --
24      A   So, like -- it was during baseball
25 season, so, it would be now -- right around now.

Page 74

1 I'm just guessing.  You know, I can't tell you
2 specifics.
3      Q   Spring of 2005 --
4      A   Yes.
5      Q   -- we're talking about?
6      A   Yes.
7      Q   Okay.  So, you had this altercation
8 with the band director in the spring of 2005?
9      A   Verbal.
10     Q   Verbal altercation with the band
11 director, in the spring of 2005?  Then, there
12 was a summer break, and then, the football
13 season, and school would have started back up
14 for the fall of 2005?
15     A   Correct.
16     Q   Okay.  And you were allowed -- or were
17 you allowed to attend Josh's football games?
18     A   I was not, sir.  I went and asked for
19 permission to go.
20     Q   Okay.  And did you ask permission to
21 go to the games before the beginning of football
22 season?
23     A   That is correct.
24     Q   Mr. Davis, how did it come to pass
25 that just you and the band director and his wife

Page 75

1 were at Wicksburg High School?
2      A   Wicksburg is just a school.  There was
3 ball going on -- baseball, down below, and I
4 happened to be there.
5      I was very active in the ball stuff.  I did
6 whatever I could to help the kids with their
7 ball.  I umpired a lot for them and stuff, up
8 there.  Stuff like that, for free.
9      Q   So, you --
10     A   I was at -- I'm near the school.  I
11 was there all the time.
12     Q   Did you have a meeting set up with --
13     A   No, I did not.
14     Q   -- the band director?  So, you were
15 just up at the school and happened to see the
16 band director?
17     A   That is correct.
18     Q   And there was nobody else around?
19     A   That is correct.
20     Q   Okay.  Can you remember what you were
21 doing at the school?
22     A   Baseball field, yeah.  I was down with
23 the -- I'd come by, to see if they needed an
24 umpire, or doing something at the concession
25 stand or something.  I was always there.  So --

Page 76

1      Q   Now, if you came by to see if you
2 could do something, that makes me think there
3 was somebody there that you were going to check
4 and see if you could help them out or something?
5 Was that --
6      A   Yeah.  They were down at the baseball
7 field, yes.  And I saw Cheshire up at the top,
8 and we had a conversation.
9      Q   So, you're saying there were other
10 people on the school grounds, there was just no
11 one around the band area?
12     A   The band area sits away from the
13 school.
14     Q   Okay.
15     A   Quite a ways away from the school.
16 And then, you've got -- I can't describe it with
17 him, I guess.  You've got it up on a hill, and
18 then, and you've got -- the baseball field is
19 down in a hole, and then, you've got the school
20 over to the side.
21      There was a few people down at the field.
22 But we were up at the top, and there wasn't
23 nobody up there but me and him.
24     Q   So, no one was in a position to see --
25     A   Or hear or anything, that's correct.

Page 77

1    Q  -- see or hear the events with you and
2  the band director, except you, the band director
3  and his wife?
4    A  Correct.
5    Q  Okay.  Could you describe for me the
6  confrontation you had with the band director?
7  Just please start from the first words you said
8  to him, to how it ended?  Just walk me through
9  it.
10    A  He had asked my daughter to try out
11  for majorette.  And I was apprehensive about it,
12  and didn't want her to do it, but she did it
13  anyway.
14      We had talked a couple of times before
15  that.  She was doing great, da, da, da, da.  You
16  know, "Oh, I'm looking forward to this year, da,
17  da, da, da."
18      And then, I don't find out about the other
19  until after, that he brings her into his office.
20      "I'm going to take care of you this year,
21  Gabby, da, da, da, da."
22      And then, Gabby kind of was like, you know,
23  "I'm not feeling comfortable here, da, da, da,
24  da."
25      So, the next thing I know, she's not making

Page 78

1  make majorette.  She's the worst one out there.
2  That's what he's telling me.
3      When me and him had this talk, "She's
4  pitiful.  She's awkward.  She can't do
5  anything."
6      And that's when we got into our little
7  conversation.
8    Q  Okay.
9    A  And I did not find out about her going
10  into his office until afterwards.  And that's
11  when I requested the meeting with Pitchford,
12  Murray and the others.
13    Q  Now, tell me about the confrontation
14  itself?
15    A  The confrontation was, I had told him
16  that I had been suspicious of what he had been
17  doing --
18    Q  Let me interrupt you there.  Were you
19  driving by and saw him, or were you walking by
20  and saw him?
21    A  I reiterate that, I'm down at the
22  field.  You park at the top, up there, or you
23  can park at the other.  The band room is way
24  away from everything.  It's up there, and
25  there's parking up there and everything.  It's

Page 79

1  not a typical school.  It's, like, away.
2    Q  How did --
3    A  I saw him pull up, basically.
4    Q  Okay.  You saw the band director pull
5  up?
6    A  Correct.
7    Q  And did you walk to the band
8  director's car, or did you drive --
9    A  I drove my vehicle up there.
10    Q  Okay.  So, you drove from the baseball
11  field --
12    A  I was on the -- I think I was at the
13  basketball -- I can't remember exactly where I
14  was parked.  Somewhere down there.  And then, I
15  drove back up there.
16    Q  So, you got into your car, or your
17  vehicle, and drove to where the band director
18  was?
19    A  Correct.
20    Q  And the band director -- had they
21  exited their car, when you approached them?
22    A  Correct.  He was on the sidewalk.
23    Q  Okay.  Had he been inside the
24  building, when you approached him?
25    A  His wife had been.  I don't think he

Page 80

1  -- I'm not sure.  I can't say he had or hadn't.
2    Q  And you exited your vehicle, to talk
3  to him?
4    A  That's correct.
5    Q  Okay.  And just starting from when you
6  got out your vehicle, please walk me through
7  what you said and what he said and what
8  happened?  I know, earlier, you had mentioned a
9  bump, and let's just --
10    A  I asked him what was going on, and why
11  this happened with Gabby, and da, da, da, da.
12  Why, all of a sudden, she became the worst one,
13  when, a week later -- a week before, she wasn't.
14      And he started saying that, you know, she's
15  the worst one, da, da, da, da.
16      And then, of course, you know, I'm a proud
17  parent, and it gets me in a heated conversation.
18      And I said, "Well, I don't understand
19  this."  That, "She did everything she was
20  supposed to do."
21      And then, there was some words exchanged
22  between me and him.
23      And I did cuss him a couple of times.  And
24  I told the board I did.  I didn't lie to
25  Pitchford or any of them.  I told them what I

Page 81

1 did, because I was mad.
2      I walked away. He said something, and I
3 walked back to him. And I was standing up on
4 the thing, and he stood up, and, when he stood
5 up, we bumped noses. And then, it just got
6 heated.
7      And my last comment, and I'll tell you
8 exactly what I told them, was that I said,
9 "Jason, I've had enough of this" -- "you've got
10 this little girlfriend things going on around
11 here at school, and I'm going to put a stop to
12 it."
13      And that was my last comment to him.
14      Q All right. Now, you say -- when you
15 mentioned that he was standing up on the thing,
16 was he standing --
17      A I was standing on the, like, sidewalk,
18 and there's a curb here.
19      Q Okay.
20      A So, when he stood up, to, you know,
21 level up with me on the curb, we bumped. It was
22 like -- it was kind of like he leveled and we
23 bumped noses. Because we were in each other's
24 face. It wasn't just a one-way street. He was
25 in my face as much as I was in his.

Page 82

1      Q Okay. And so, you said that you did
2 curse at him some?
3      A I did.
4      Q And did he curse back at you?
5      A I don't believe he did.
6      Q Okay. And other than this bump, you
7 said it was -- was it heads bumping or --
8      A It was noses, yes, sir.
9      Q Okay. And, other than this bump, was
10 there any kind of physical contact between
11 either one of you?
12      A No, sir.
13      Q Okay. And how did this argument end?
14      A With me telling him what I just told
15 you. And exactly what I told the board, and
16 exactly what I told Pitchford and them.
17      Q Did you just walk away?
18      A Yeah. After that, I did.
19      Q Okay.
20      A And I gave him the finger, after that.
21      Q You said you did give him the finger,
22 after that?
23      A Yes, I did.
24      Q And after you walked away, you got in
25 your vehicle and left? Is that correct?

Page 83

1      A That's correct. I went home.
2      Q Okay. And there was no police report
3 filed or no arrests, about this incident?
4      A No, sir. It wasn't even brought up at
5 school, when I saw Murray the next day. I'm the
6 one that requested that we have a meeting.
7           MR. MOODY: Okay. I think that's all
8           I have for you, Mr. Davis.
9
10           EXAMINATION
11
12 BY MR. NEWMAN:
13      Q Mr. Davis, you were asked, earlier,
14 about the basis for your lawsuit, and you
15 mentioned, I think, two things. One, the
16 escalation of events. What did you mean by
17 that?
18      A Josh wasn't given the right to finish
19 a public education, for one. He didn't -- and
20 he didn't have a -- I couldn't put him anywhere
21 in public school, so, he was denied his right
22 for that.
23      And then, the other things that happened --
24 and I've never done one of these, so, I'm going
25 to go ahead and tell you guys, I'm kind of

Page 84

1 scared when I bring up, you know, this, medical
2 that, or what. I'm not sure what kind of angle
3 everybody's got on this. So --
4      Q Well, let me stop you and see if I can
5 redirect you back to what I'm talking about.
6      A Oh, okay. Because I don't --
7      Q You mentioned, earlier, an escalation
8 of events. And I don't want to put words in
9 your mouth, but, what do you mean by that,
10 "escalation of events"? That evening or what?
11      A I think it all started with this
12 incident he brought up here at the end, with
13 Cheshire. I believe that -- and the end of the
14 thing was that Josh gets caught in the middle of
15 -- somehow, I get -- I'm ostracized from the
16 beginning here, with this, until this thing
17 happened with Josh. It just doesn't make any
18 sense to me.
19      Q Okay.
20      A That's what I'm saying. I mean --
21      Q Now, the second thing you mentioned
22 was, a rush to expulsion, as a basis for your
23 lawsuit?
24      A Correct.
25      Q Would you explain that a little bit

Page 85

1 better for me?
2    A  Yes, sir.  They didn't take the time
3 to research or do anything -- like I said
4 earlier, about the film.  They never looked at
5 -- as far as I know, the board of education
6 never looked at a film.  We asked for film.  We
7 asked for everything we could.
8    Our medical evidence wasn't even -- they
9 passed the paper around.  They didn't even wait
10 to call a doctor or anything.  They just -- they
11 just, "This is what we're going to do," and did
12 it.
13    So, I just didn't think he was thoroughly
14 given a shake at -- giving us a chance to do
15 what we needed to do.
16    Q  Now, you were asked about your son's
17 psychological and emotional status.  And I got
18 the impression you thought you were being asked
19 a medical diagnosis?
20    A  Yes.
21    Q  Well, I don't think that's what he was
22 intending to ask you.  So, I'm just going to
23 say, I'm not asking you a medical opinion.  But,
24 in the sense that you've been around your son
25 since this incident happened, have you noticed

Page 86

1 any change in his behavior?
2    A  Shortly after, I did.  Josh and I -- I
3 have five children, but Josh is my closest one.
4 We're almost like brothers, instead of like
5 father and son, because he was my first child,
6 and he was -- you know, we did everything
7 together.
8    The hardest part for me and him both was,
9 when this happened, we didn't get to spend the
10 time together, that we normally did.
11    Q  You're saying, because he had to go --
12    A  Yes.  Because he had to go away.
13 That's the hardest thing I've ever had to do in
14 my life.
15    Q  Well, let me ask you, from where you
16 were able to interact with him, did you notice
17 anything different about him, from personality
18 or how he conducted himself?
19    A  He was a little bit more distant.  He
20 didn't confide in me as much as he had before.
21 He -- at first off, he was confused, and didn't
22 understand why all this was happening to him.
23 And he just didn't understand it.
24    Q  Were there ever any times when you had
25 any conversation with him, when he expressed

Page 87

1 that he felt like he been humiliated?
2    A  Yes.  He -- like I said, he didn't
3 understand why this had to happen to him.  I
4 mean, he had always been a kid that always tried
5 to do the best he could.  He had never been in
6 trouble.  If he got in trouble, he was
7 embarrassed about being in trouble.  And then,
8 didn't like that -- he didn't want to come home
9 and say, "Dad, I did this."  Something to get
10 him in trouble.
11    And his school record will show that, you
12 know, he had never been in trouble.  He had
13 never --
14    Q  Had he always attended this school?
15    A  That's correct.
16    Q  And your testimony is that Wicksburg
17 goes from kindergarten up through twelve?
18    A  Yes, sir.
19    Q  And did he go to kindergarten there?
20    A  Yes, sir.
21    Q  Only school he's ever been to?
22    A  Yes, sir.
23    Q  And, obviously, he had his friends at
24 this school?
25    A  That is correct.

Page 88

1    Q  Do you know if there was any change in
2 the way he and his friend interacted, after this
3 incident happened?
4    A  Yeah.  He wasn't around to do the
5 things with his friends that he -- the little
6 parties that they have, you know, the
7 get-togethers and stuff.  That wasn't -- you
8 know, he wasn't a part of any of that any more.
9    He had a girlfriend at the time this
10 happened.  That didn't last too much longer
11 after that.
12    Q  When he would come home on the
13 weekends, after he was expelled, he didn't --
14 did he socialize with those same friends any
15 more?
16    A  No, sir.
17    Q  Do you know why he didn't?
18    A  He didn't feel like he was in
19 connection with them, and a lot of them would
20 bring up the stuff that happened at school.  And
21 there was always talk at the school, about what
22 was going on with him.
23    Q  Talk about him and what had happened?
24    A  That is correct.
25    MR. NEWMAN:  Okay.

Page 89

1       EXAMINATION
2
3  RESUMED BY MR. MOODY:
4      Q  Mr. Davis, did anyone ever -- well,
5  let me be more specific.  Did any of Josh's
6  football coaches ever bring up this previous
7  incident with the band director, in their
8  conversations with you?
9      A  I never talked to the coaches after
10 that.  It was a new staff.  I wasn't allowed to
11 get near them.
12     Q  So, no one -- or no coach ever told
13 you that they were punishing Josh because of an
14 incident you had with the band director?
15     A  I never talked to any of the coaches.
16     Q  So, if you didn't talk to them, nobody
17 told you that?  Correct?
18     A  Correct.
19     Q  Okay.  Was this incident brought up,
20 the incident with the band director, was it
21 brought up at all during the disciplinary
22 meetings?  Either the one at the school or at
23 the board?
24     A  No, it was not.
25     Q  And you did attend at least two

Page 90

1  disciplinary hearings, concerning Josh?
2  Correct?
3      A  The one at school and the one at the
4  board, correct.
5      Q  Okay.  And you were allowed to present
6  evidence on Josh's behalf at these meetings?
7  Correct?
8      A  Correct.
9      Q  And no one stopped you from doing
10 that?
11     A  Correct.
12     Q  Okay.  And even at one of those
13 meetings, you had Mr. Freet and your attorney
14 representing you and Josh, as well?  Correct?
15     A  Correct.  Also, though, we asked for
16 films before we ever went to the meetings, and
17 we were never provided.  I don't understand why
18 -- we were provided afterwards, but not -- they
19 had them.  So, what?  Did they pop up months
20 later?
21     Q  Well, at that hearing, you were
22 allowed to present all the evidence that you had
23 on behalf of Josh?  Correct?
24     A  Correct.
25     Q  And did the school board present

Page 91

1  evidence, showing their side of the event?
2      A  All they showed was the coaches
3  involved.
4      Q  Okay.  But did the coaches involved
5  actually show up, physically show up and speak
6  at the hearing?
7      A  They did.
8      Q  Okay.  And did the school board use
9  any type of videotape evidence at the hearings?
10     A  They did not.
11     Q  Okay.
12     A  Supposedly, there wasn't any.
13     Q  But no one used any video at all, at
14 the hearings?  Correct?
15     A  We couldn't, if we couldn't get none.
16     Q  Did anyone use any video at the
17 hearing?
18     A  No.
19     Q  "Yes" or "no"?
20     A  No.
21        MR. MOODY:  Okay.  I think that's all
22        I have.
23        MR. NEWMAN:  All right.
24
25        END OF DEPOSITION

Page 92

1        DEFENDANT'S EXHIBIT NO. 1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## SOUTHERN DIVISION

GREG DAVIS, AS NEXT      *
FRIEND AND NATURAL      *
GUARDIAN OF JOSHUA DAVIS   *
     *
       PLAINTIFF      *
     *
VS.      * CIVIL ACTION No.: 1:06-cv-953
     *
HOUSTON COUNTY, ALABAMA   *
BOARD OF EDUCATION      *
     *
       DEFENDANT      *
     *

## PLAINTIFF'S ANSWERS FIRST INTERROGATORIES

Comes now Plaintiff, Greg Davis, and answers the Defendant's Interrogatories as follows:

(1)     Gregory Tillman Davis – Greg Davis
        615 Sherwood Trail, Newton, Alabama 36352;

(2)     Terrace at Grove Park
        101 Tulip Lane, Dothan, Alabama
        334-792-7349
        Supervisor – Penny Jones
        Years – October 2005 to present;

        Wiregrass Habitat for Humanity
        Reeves Street
        792-8453
        Supervisor – Tamra;

        Eaglewood Inc.
        Denver, North Carolina
        Supervisor – Rick Eagle;

(3)     615 Sherwood Trail, Newton, Alabama 36352;

(4)     a)     Denise Thomley
               Hill Top Road
               Newton, Alabama 36352
               334-692-3917;

        b)     Brad Woodham
               42 Carpenter Road
               Newton, Alabama 36352;

        c)     John Ellise
               163 Vining Drive
               Dothan, Alabama 36303
               334-693-3451;

        d)     Ben Booth
               100 Cumbie Road
               Newton, Alabama 36352
               334-692-3709;

        e)     Nancy Booth
               100 Cumbie Road
               Newton, Alabama 36352
               334-692-3709;

        f)     Roger Dale Sanders
               822 Windmill Road
               Newton, Alabama 36352
               334-692-5497;

        g)     Mike Love
               Taylor, Alabama
               334-793-5693
               334-790-7532;

        h)     Betty Peters
               334-794-8024;

        i)     Starla Brannon;

        j)     Chelsie Welden;

MALCOLM R. NEWMAN
ATTORNEY, P.C.
P.O. Box 6137
Dothan, AL. 36302-6137

k)   Marcie Delittle;

l)   Tammy Peters;

(5)   a)   She was an eye witness the night of the September 16, 2005 football game;

b)   Eye witness at game;

c)   Eye witness at game;

d)   Eye witness at game;

e)   She was at the disciplinary meeting concerning Josh;

f)   He was involved at the disciplinary meeting;

g)   He filmed the game for Wicksburg on September 16, 2005;

h)   She was that the board meeting hearing and was an eye witness to the behavior of the coaches/principal;

i)   She was involved at the disciplinary meeting;

j)   Eye witness at game;

k)   Eye witness at game;

l)   Eye witness at game;

(6)   these are attached to my Answers to the Request for Production and speak for themselves;

(7)   Graduated from Ariton High;
Attended ESCC;
Attended Wallace Community College;

(8)   None;

(9)   Judy Joiner was wrongly touched by Cody Long.  Cody Long
got one wee alternative school in 2005 or 2006. ;
 Mrs. Sanders who was kicked in the buttocks by a high
school student named Lance.  Mrs. Sanders told the Vice
Principal, Mrs. Smith.  Mrs. Smith told Lance to just stay
away from Mrs. Sanders which is employed at Wicksburg
High School.;

10)   N/A;

11)   Dixie Academy, Louisville, Alabama
$400.00 monthly room and board for 8 months;
$200.00 monthly gas for 8 months;
$160.00 monthly lunch and break food for 8 months;
$2,000.00 tuition;
$500.00 books;
$1,200.00 going to Joshes away ball games; gas, entry, food ;
for four months ;
$500.00 graduation expense;
TOTAL = $10,280.00;

12)   Attorney will handle that; I don't know;

13)   Josh walked off the field and brushed Coach Smith.  Coach
Smith grabbed with anger at Josh, they were separated by several other
coached.  Josh was standing there and Coach Carter grabbed Josh and
pushed him back on a bench.  then Josh stands up and bumps Coach
Carter with his shoulder pad in his face while Josh was trying to take off
his jersey. Coach Winchester screams to get Josh off the field.  And then
we were asked to leave by the police and an officer escorted us out of the
gates.;

14)   Pilgrim Home Baptist Church;     5 years;

15)   No;

16   Yes.

Greg Davis

Malcolm R. Newman, Attorney, PC

/s/ Malcolm R. Newman
Malcolm R. Newman (NEW017)
P.O. Box 6137
Dothan, Alabama 36302
(334)792-2132
ASB-2826-M39M

## CERTIFICATE OF SERVICE

I hereby certify that on March, 15 2007, I have served a copy of the foregoing document with the following via U.S. Parcel Service:

Jere C. Segrest
P.O. Box 1469
Dothan, Alabama 36302

Kevin Walding
P.O. Box 1469
Dothan, Alabama 36302

Patrick B. Moody
P.O. Box 1469
Dothan, Alabama 36302

/s/ Malcolm R. Newman
Malcolm R. Newman

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

GREG DAVIS, AS NEXT FRIEND      *
AND NATURAL GUARDIAN OF         *
JOSHUA DAVIS                    *
                                *
        PLAINTIFF,              *
                                *
vs.                             *
                                *   CASE NO.1:06-CV-953-MEF
HOUSTON COUNTY, ALABAMA         *
BOARD OF EDUCATION              *
                                *
        DEFENDANT.              *

## DEFENDANT'S FIRST INTERROGATORIES
## TO PLAINTIFF

THE DEFENDANT, the Houston County Board of Education, by and through counsel, and pursuant to Rule 33, Fed. R. Civ. P., propounds the following written questions to be answered under oath by the Plaintiff, Greg Davis.

1.   State your full name (including any other names, such as nicknames or names that have been legally changed by which you have been known), and your present address.

RESPONSE:

2.   Describe your employment history, giving the dates employed, the location of employment, the name, address, and telephone number of any supervisors and/or employers.

RESPONSE:



DEFENDANT'S
EXHIBIT
2

3.    State each and every place you have lived for the past 10 years.

RESPONSE:

4.    Please state the names, addresses, and telephone numbers of every person whom you believe or know possesses information about or concerning the events made the basis of this case and/or whom you believe or know possesses information that supports or tends to support any one or more of your contentions, allegations, or positions in this matter.

RESPONSE:

5.    For each person listed in your answer to Interrogatory 4, please state what information you believe that person knows or possesses.

RESPONSE:

6.    Please name and describe fully and in detail all the documents or tangible items that you have that concern, relate to, or are associated with the events made the basis of this lawsuit, or that support or tend to support any one or more of your allegations, contentions or positions in this dispute.

RESPONSE:

7.    Please state your educational background; please include a statement of any and all schooling, training, seminars or degree programs that you have attended, attempted, or completed.

RESPONSE:

8.    Please state the style of the case, the Court, names of the parties involved, and the disposition of any lawsuits in which you have ever been involved.

RESPONSE:

9.    Please describe in detail every instance of an educator at Wicksburg High School being targeted for intentional attacks by a student, but that student receiving less punishment than Joshua Davis as you claim in Paragraph 13 of your Complaint.  Please include the name of the student, the name of the teacher, the location and approximate date of the attack, and the punishment the student received.

RESPONSE:

10.    Please list any medical professional that examined Joshua Davis when he was seeking treatment for the alleged head injury he received during the football game at the center of this case.  Please include the doctor's name,

Page 3 of 6

address, diagnosis, treatment plan, and date of the visit.

RESPONSE:

11. List all information concerning your claim in
Paragraph 12 of your Complaint concerning Joshua's
attendance at a private school. Please include the name and
address of the school, the amount and type of expenses
incurred, and information concerning Joshua's post secondary
education.

RESPONSE:

12. Please state the name, address, and qualifications
of every person or expert witness that you expect to call as
a witness at trial, and provide all Rule 26 information on
the witness, including the subject matter on which the
expert is expected to testify, the substance of the facts
and opinions on which the expert is expected to testify, and
a summary of the grounds of each and every opinion held by
each and every expert, and the conclusions or opinions of
each and every expert.

RESPONSE:

13. Relate in your own words the physical altercation
between Joshua Davis and each football coach on the

sidelines at the game on September 16, 2005 with Houston County High School resulting in Joshua being escorted from the field by a Houston County Deputy Sheriff and his expulsion from Wicksburg High School.

RESPONSE:

14. Are you a member of any churches or civic organizations? If so, please list each church and/or civic organization and the length of time you were involved with each church or civic organization.

RESPONSE:

15. Have you ever been arrested for any crime, felony or misdemeanor? If so, please provide the date and place of arrest, the charges, and the current disposition of each case.

16. Are you aware that your answers to these interrogatories are made under oath, that is, that you swear or affirm that your answers are truthful and you may be subject to sanctions for failing to tell the truth while you are under oath?

RESPONSE:

HARDWICK, HAUSE, SEGREST & WALDING

BY: _____
Jere C. Segrest (SEG005)

BY: _____
Kevin Walding (WAL036)

By: _____
Patrick Moody (MOO110)
Attorneys for Defendant
Post Office Box 1469
Dothan, Alabama 36302
Phone:    (334) 794-4144
Fax:      (334) 671-9330


## CERTIFICATE OF SERVICE

I hereby certify that, this date, I have served a copy of this document on the following individual(s) or attorney(s) of record by placing same in the United States Mail in a properly addressed envelope with adequate postage.

Mr. Malcolm R. Newman
P. O. Box 6137
Dothan, Alabama 36302

This the 21st day of February_____, 2007.

_____
Of Counsel

Page 1

```
1    IN THE DISTRICT COURT OF THE UNITED STATES
2       FOR THE MIDDLE DISTRICT OF ALABAMA
3              SOUTHERN DIVISION
4  GREG DAVIS, AS NEXT      )
   FRIEND AND NATURAL       )
5  GUARDIAN OF JOSHUA       )
   DAVIS,                   )
6                           )
        PLAINTIFF,          )
7                           )
   VS.                      )  CASE NO.1:06-CV-953-MEF
8                           )
   HOUSTON COUNTY, ALABAMA) )
9  BOARD OF EDUCATION,      )
                            )
10      DEFENDANT.          )
                            )
11      The deposition of JOSHUA DAVIS, taken by
12  the Defendant, pursuant to the Federal Rules of
13  Civil Procedure, before John G. Whitfield, Court
14  Reporter and Notary Public, State at Large, at
15  the law offices of Hardwick, Hause, Segrest &
16  Walding, Dothan, Alabama, on the 14th day of
17  June, 2007, at 1:35 P.M., CST, pursuant to
18  notice.
19
20  APPEARANCES:
21  FOR THE PLAINTIFF:        FOR THE DEFENDANT:
22  MR. MALCOLM R. NEWMAN     MR. PATRICK B. MOODY
    Attorney at Law          MR. KEVIN WALDING
23  Dothan, Alabama          Attorneys at law
                             Dothan, Alabama
24  ALSO PRESENT:
25  GREG DAVIS
```

Page 2

```
1              STIPULATION
2
3       It is stipulated by and between counsel for
4  the parties that this deposition be taken at
5  this time by John G. Whitfield, Court Reporter
6  and Notary Public, State at Large, who is to act
7  as commissioner without formal issuance of
8  commission to him; that said deposition shall be
9  taken down stenographically, transcribed, and
10  certified by the commissioner.  The signature of
11  the witness is waived.
12      Except for objections as to the form of
13  questions, no objections need be made at the
14  time of the taking of the deposition by either
15  party, but objections may be interposed by
16  either party at the time the deposition is read
17  into evidence, which shall be ruled upon by the
18  Court on the trial of the cause upon the grounds
19  of objection then and there assigned.
20
21
22
23
24
25
```

Page 3

1        JOSHUA DAVIS
2  having been first duly sworn, testified as
3  follows, to-wit:
4
5        EXAMINATION
6
7  BY MR. MOODY:
8    Q  All right, Josh.  My name is Patrick
9  Moody and this is Kevin Walding.  We represent
10  the Houston County Board of Education.  And
11  we're going to talk to you today about this
12  football game of September 16th, 2005, and the
13  events after that.
14     Have you ever given a deposition before?
15    A  No, sir.
16    Q  Okay.  Pretty simply stated, the
17  process is, I'm going to ask you questions, and
18  when I complete my question, if you could please
19  answer it truthfully and out loud.  Try not to
20  nod your head or say "uh-huh" or anything like
21  that.  And, if you don't understand what I've
22  asked, please just tell me, and I'll try to
23  reword the question or repeat it, so that we can
24  communicate with each other.
25     Josh, are you taking any kind of

Page 4

1  medications, drugs, or anything today, that will
2  keep you from being able to communicate with me?
3    A  No, sir.
4    Q  Okay.  And are you suffering from any
5  kind of medical conditions today, that would
6  keep you from being able to communicate and
7  answer truthfully?
8    A  No, sir.
9    Q  All right.  And, if you would, just
10  please state your full name for the record?
11    A  Joshua Corey Davis.
12    Q  And, Josh, what was your age, at the
13  time of this football game we're here about
14  today?
15    A  Seventeen.
16    Q  All right.  And then, how old are you,
17  today?
18    A  Nineteen.
19    Q  Okay.  And where are you currently
20  living, Josh?
21    A  With my parents, in Wicksburg.
22    Q  Can you give us that address again?
23    A  615 Sherwood Trail, Newton, Alabama,
24  36352.
25    Q  And have you lived at that residence

Page 5

1 your whole life, Josh?
2    A  No, sir.  I've lived in Pinckard, and
3 then, we moved there, and then, after this
4 incident, we -- I had to stay in Louisville, to
5 go to school.
6    Q  Right.  I guess, how long has that
7 been your home, there in Wicksburg?  Ten years
8 or so?
9    A  Yeah.
10    Q  And are you married, Josh?
11    A  No, sir.
12    Q  Did you have any children?
13    A  No, sir.
14    Q  Do you have any relatives, by blood or
15 marriage -- that doesn't apply to you -- but, do
16 you have any relatives who are over the age of
17 19 and live in Houston, Henry, Dale, Geneva or
18 Coffee Counties?
19    A  Yes.
20    Q  Would you name those for me, please?
21    A  Robert Carnell and Barbara Carnell.
22 They live in Wicksburg, also.
23    Q  Is there anybody else?
24    A  Buddy Faircloth.
25    Q  Anyone else?  Or is that --

Page 6

1    A  That's all I can think of.
2    Q  -- all you can recall?  Josh, do you
3 attend a church anywhere?
4    A  Not regularly.
5    Q  Were you attending a church, at the
6 time of --
7    A  Pilgrim Home Baptist Church.
8    Q  And are you a member of any social or
9 civic clubs or organizations?
10    A  No, sir.
11    Q  And, Josh, let's talk about your
12 educational history.
13    A  Okay.
14    Q  You attended school at Wicksburg?
15 Correct?
16    A  Yes, sir.
17    Q  And how long did you attend school at
18 Wicksburg?
19    A  K through eleventh grade, and then, a
20 month and a half of my senior year.
21    Q  And then, where did you go after
22 Wicksburg?
23    A  To Dixie Academy.
24    Q  And approximately when did you begin
25 attending Dixie Academy?

Page 7

1    A  I think it was the second nine weeks,
2 so, that would be -- into October.
3    Q  Of what year?
4    A  2005.
5    Q  Okay.  And did you complete school at
6 Dixie Academy?
7    A  Yes, sir.
8    Q  Okay.  So, you graduated from Dixie
9 Academy?  Is that correct?
10    A  Yes, sir.
11    Q  Okay.  Have you attended any college,
12 junior college or trade schools, since then?
13    A  Wallace Community College.
14    Q  How long have you gone to Wallace?
15    A  I went the whole summer course.  And
16 then, I took a real estate course this past
17 January.  I'm studying to take my real estate
18 test, now.  And I went to auctioneer's school,
19 in March, and passed that.
20    Q  Okay.  So, did you receive any degree
21 from Wallace, or did you just take some classes?
22    A  I just took some classes.
23    Q  Okay.  Josh, let's talk about your
24 employment history.  Are you employed currently,
25 right now?

Page 8

1    A  Yes, sir.
2    Q  Where are you employed at?
3    A  Actually, I have two jobs.  I work at
4 Beef O'Brady's, in Enterprise.
5    Q  All right.
6    A  And then, I help my uncle, part time,
7 in Barbour County.  He has a pest control
8 company.  Circle B Pest Control.
9    Q  What's that uncle's name?
10    A  John Beatty.
11    Q  Josh, this incident that occurred at
12 the ball game on September 16, 2005 -- is that
13 the correct date?
14    A  Yes, sir.
15    Q  Okay.  And that was a Friday night
16 football game?
17    A  Yes, sir.
18    Q  And, as I recall, y'all were playing
19 Houston County?  Correct?
20    A  Yes, sir.
21    Q  And that was in Columbia?
22    A  Yes, sir.
23    Q  All right.  Now, y'all were basically
24 -- well, let me just start at the beginning of
25 the game.  Is that a pretty rivalry game,

Page 9

1  between Wicksburg and Columbia, or --
2      A  Not that I recall.
3      Q  So, just like a normal --
4      A  Regular.
5      Q  -- regular game?  Okay.  And, as I
6  understand it, you were playing both sides of
7  the ball?  Is that correct?
8      A  Yes, sir.
9      Q  Okay.  What positions were you playing
10 that night?
11     A  That night, I was playing quick
12 tackle, on offense, and defensive end on off --
13 I mean, defense.
14     Q  Okay.  And were you the long snapper,
15 too?
16     A  Yes, sir.
17     Q  Is that correct?  And some time in the
18 second quarter of this game, you got hit pretty
19 good, or you hit somebody pretty good and --
20     A  I mean, I can't recall.  I mean, I had
21 a concussion, so, I can't recall that.
22     Q  All right.  But you didn't have a --
23 you didn't think you had a concussion when you
24 started playing?  Correct?
25     A  Correct.

Page 10

1      Q  Okay.  So, it was sometime during the
2  game, that you believe you got a concussion?
3      A  Yes, sir.
4      Q  Do you remember what time in the game
5  that at you started feeling like there was
6  something wrong with you?
7      A  No.
8      Q  Did you ever notify one of the coaches
9  that you were injured?
10     A  I mean, I had a concussion.  I can't
11 recall that fact.
12     Q  So, you don't remember saying --
13     A  No.
14     Q  -- "Hey, Coach, take me out," or
15 anything like that?
16     A  Huh-uh.
17     Q  Okay.
18        MR. NEWMAN:  Answer out loud.
19     Q  Yes.  Yes.  If you could answer a
20 little louder, please.
21        MR. WALDING:  With words, please.
22     Q  At half time of the football game,
23 it's my understanding that you were vomiting and
24 acting pretty sick?  Do you recall that?
25     A  No, sir.

Page 11

1      Q  Okay.  Have you been told that you
2  were vomiting and you were acting sick?
3      A  Yes, sir.
4      Q  Who told you that, Josh?
5      A  We were told that during the --
6  actually, the board meeting, the Houston County
7  Board meeting, at the expulsion.
8      Q  Do you remember who, specifically, was
9  giving that testimony?
10     A  All the coaches said that.
11     Q  Okay.  Did any of your teammates tell
12 you that you were throwing up or vomiting or
13 acting funny or anything like that?
14     A  I mean, I never talked to them after
15 that, so, they --
16     Q  You never talked to any of your
17 teammates after the game?
18     A  I mean, I might have.  I had a
19 concussion, so, I don't know what I said or what
20 I, you know, done.
21     I didn't see them after the game, anyway,
22 because I was escorted off the field.
23     Q  Well, I mean, in the days following
24 this, none of your --
25     A  I was never allowed to go back to

Page 12

1  class.
2      Q  Okay.  But you never talked to any of
3  your teammates or friends, outside of school?
4      A  Well, they all sort of shunned me for
5  that --
6      Q  Did any of them tell you why they were
7  not talking to you after that game?
8      A  No, sir.
9      Q  Did anyone tell you that you were hit
10 pretty good in the second quarter and that
11 that's where they think you got injured at?
12     A  No, sir.
13     Q  Okay.  After half time, do you
14 remember starting the third quarter?
15     A  No, sir.
16     Q  Okay.  So, you basically don't
17 remember anything after the game starting?
18     A  No, sir.  I just remember a little bit
19 at the beginning, and, after that, I don't -- I
20 don't recall anything.
21     Q  Now, as I understand it, you were a
22 longer snapper, and sometime during the third
23 quarter, Wicksburg was punting the ball, and you
24 snapped the ball, the punter punted, and you
25 were going down the field to tackle a returner,

Page 13

1  and missed the returner or something like that,
2  and some of the coaches began correcting you?
3  Do you remember that?
4    A  No, sir.
5    Q  Okay.  Do you remember the coaches
6  taking you on the sidelines and explaining to
7  you how you had missed your assignment or
8  anything?
9    A  No, sir.
10   Q  Okay.  Josh, do you remember -- or do
11 you know a Coach Smith, at Wicksburg?
12   A  Yes, I do.
13   Q  Okay.  And was Coach Smith one of your
14 position coaches?
15   A  No, sir.
16   Q  He was not?
17   A  He was not.
18   Q  Okay.  What positions did he coach?
19   A  If I recall, I think he was a wide
20 receiver coach.
21   Q  Did he have anything to do with the
22 punt team?
23   A  No, sir.
24   Q  Okay.  Did you have any problems with
25 Coach Smith?

Page 14

1    A  No, sir.
2    Q  Had y'all always gotten along?
3    A  Yes, sir.
4    Q  You'd never had any arguments with him
5  or any reason to dislike him?
6    A  Huh-uh.  Not at all.
7    Q  Josh, are you aware that lots of
8  people claim that you hit Coach Smith, when you
9  were coming off the field, after that punt?  Do
10 you remember that?
11   A  No, I do not remember that incident.
12   Q  Do you remember another coach trying
13 to restrain you and keep you and Coach Smith
14 from getting into an altercation?
15   A  No, sir.
16   Q  So, as you sit here today, do you deny
17 that you hit Coach Smith?
18   A  I mean, I can't recall that, because I
19 had a concussion that night.  I mean, I can't
20 deny anything.
21   Q  Okay.  So, you --
22   A  I mean, I've never seen the films for
23 the game.
24   Q  Okay.  But you're not denying that you
25 did hit him, you just can't remember?

Page 15

1    A  I mean -- rephrase that question.
2    Q  Okay.  Okay.  Just a simple "yes" or
3  "no" question.  Do you deny hitting Coach Smith?
4    A  I mean, that's a trick question, all
5  the way around, you know.  You know that.
6    Q  No.  Josh, did you hit Coach Smith?
7    A  No.
8    Q  So, your testimony is that you did not
9  hit Coach Smith?
10   A  Yes, sir.
11   Q  Did you ever hit a coach trying to
12 restrain you, when you were talking to Coach
13 Smith?
14   A  No.
15   Q  Do you remember a coach trying to
16 restrain you at all, on the sideline?
17   A  No.
18   Q  So, you wouldn't know who that coach
19 was?
20   A  No.
21      MR. MOODY:  Let me have just a second
22         to look over something, please.
23         Let's take a break just a second.
24         (Recess in deposition.)
25   Q  Josh, do you know a Coach Carter, that

Page 16

1  was a coach on that night, at Wicksburg?
2    A  Yes, sir.
3    Q  Was Coach Carter one of your position
4  coaches?
5    A  No, sir.
6    Q  What position did he coach?
7    A  I believe he coached the linebackers.
8    Q  Okay.  Coach Carter's statement is
9  that you -- or that he tried to restrain you,
10 and that you punched him with your fist and
11 knocked his glasses off.  Do you remember doing
12 that?
13   A  No, sir.
14   Q  Do you know of any reason Coach Carter
15 would say that, if it wasn't the truth?
16   A  No.  I mean --
17   Q  Okay.  Had you ever had any previous
18 arguments or disagreements with Coach Carter?
19   A  No, sir.
20   Q  Do you deny that you hit Coach Carter?
21   A  Yes.
22   Q  Okay.  Josh, do you remember throwing
23 your helmet at anybody?  Any of the coaches or
24 any other players?
25   A  No.

Page 17

1  Q  Okay.  Do you know at what point the
2  policemen got involved on the sidelines?
3    A  No.  I do not remember that at all.
4    Q  Are you aware that they did?
5    A  I was told that, afterwards, yes, sir.
6    Q  Okay.
7    A  Actually, I was told the game warden
8  escorted me off the field.
9    Q  Okay.  But you are aware that you were
10  escorted off the field by some type of law
11  enforcement --
12    A  Not that night.
13    Q  But, right now, as we sit here today,
14  you're aware that --
15    A  Yes, sir.
16    Q  -- some law enforcement official
17  escorted you off the field?
18    A  Yes.
19    Q  Okay.  And do you recall asking to
20  come out of the game at any point?
21    A  No, sir.
22    Q  Do you recall wanting to stay in the
23  game?
24    A  No, sir.
25    Q  The coaches have stated that they

Page 18

1  actually pulled you out of the game, and that
2  you then tried to go back in the game.  Do you
3  remember any of that happening?
4    A  No, sir.
5    Q  Do you deny that that happened?
6    A  I mean, I can't recall.  I mean, I
7  can't deny that or not.
8    Q  And, as a result of all of this stuff,
9  all these instances in the game, Josh, were you
10  arrested for that?
11    A  No, sir.
12    Q  Have you ever been arrested for
13  anything else?
14    A  No, sir.
15    Q  Now, after the game, I understand that
16  you went to see a doctor?  Do you remember that?
17    A  Yes.  That was on Monday.
18    Q  Do you remember which doctor you went
19  to see?
20    A  It was Dr. Tamburin.
21    Q  And how many times did you visit Dr.
22  Tamburin, regarding the injuries you got that
23  night?
24    A  I believe three or four.
25    Q  Do you recall how close in time to the

Page 19

1  football game those visits were?
2    A  There was one that following Monday,
3  and then, I believe, two or three weeks later.
4    Q  So, they would have all been within a
5  month or so of the --
6    A  Yes, sir.
7    Q  -- incident?  Josh, did you see any
8  other medical doctors, concerning the injuries
9  you may have received at the football game?
10    A  No.
11    Q  Did you see any counselors, or mental
12  health professionals, about the game?
13    A  Yes, sir.
14    Q  And who did you see, Josh?
15    A  Allen Freet.
16    Q  And how many times did you meet with
17  Mr. Freet?
18    A  Twice, I believe.
19    Q  Okay.  And do you remember Mr. Freet
20  ever testifying on your behalf at a board
21  meeting?
22    A  Yes, I do.
23    Q  Do you remember -- well, let me ask
24  you this:  Do you remember attending any
25  meetings for disciplinary committees or

Page 20

1  anything, with the Houston County Board of
2  Education, or Wicksburg High School, concerning
3  the football game on September 16th of '05?
4    A  I attended one.  And that was the
5  expulsion -- Houston County Board expulsion
6  meeting.
7    Q  So, you did not attend a meeting at
8  Wicksburg High School?
9    A  No, sir.
10    Q  And at the expulsion meeting with the
11  Houston County Board, that you attended, do you
12  recall who all testified on your behalf, there?
13    A  Yes.
14    Q  Could you name those people for me,
15  please?
16    A  My dad.  And, of course, I testified.
17    Q  Anybody else?
18    A  That's it, I believe.
19    Q  Did Mr. Freet testify?
20    A  Yes, he did.
21    Q  Okay.  And did you have an attorney
22  there representing you, Josh?
23    A  Yes, sir.
24    Q  And you and your dad and Mr. Freet and
25  your attorney were allowed to represent you and

Page 21

1 put evidence, showing your side of the story,
2 before the board? Correct?
3    A Yes.
4    Q Okay. And nobody from the board
5 stopped y'all from being able to present
6 evidence? Correct?
7    A No.
8    Q And, Josh, after you were expelled,
9 you attended Dixie Academy, in Louisville? Is
10 that right?
11    A Yes, sir.
12    Q Did you like Dixie Academy?
13    A As soon as I got used to everybody,
14 yes, I did.
15    Q And did you continue playing
16 athletics, at Dixie Academy?
17    A I did.
18    Q And where did you stay, while you were
19 attending Dixie Academy?
20    A I stayed with my aunt and uncle.
21    Q Can you give me their names, please?
22    A John and Peggy Beatty.
23    Q Now, is this the same uncle that owns
24 the --
25    A Yes, it is.

Page 22

1    Q -- the pest control service?
2    A Yes, sir.
3    Q Okay. And that is Circle B Pest
4 Control, that you are currently employed with?
5    A Yes, sir.
6    Q Now, Josh, there's a claim for the
7 cost of attending Dixie Academy and for travel
8 and tuition and room and board. Have you seen
9 the estimate of those costs that y'all have
10 provided to the board?
11    A Yes, I have. I'm not sure exactly
12 what they are.
13    Q And are you aware that, at the time
14 you were staying with your aunt and uncle, you
15 and your family were paying them money for room
16 and board?
17    A Yes.
18    Q Okay. Josh, let's talk about your
19 personality after the accident, or the incident,
20 here. Did you have any kind of personality
21 changes after this football game?
22    A What do you mean? What time frame are
23 you talking about?
24    Q Let's start from immediately after and
25 go through the next little while. I mean, were

Page 23

1 you depressed about the game?
2    You went to see a counselor. Could you
3 tell me why you thought you needed to go see a
4 counselor?
5    A I mean, I was depressed. I mean,
6 friends I had been with for since kindergarten,
7 just are going to be gone. I mean, I wouldn't
8 be seeing them every day, five days out of the
9 week.
10    Q Okay. Well, now, these are the same
11 friends that you said -- you testified earlier,
12 had already quit talking to you? Correct?
13    A Yeah.
14    Q Okay.
15    A And I'm not seeing them five days of
16 the week, either.
17    Q Now, when you met with Mr. Freet, do
18 you recall how many times you met with him
19 before he testified on your behalf at the board
20 hearing?
21    A One time, before that.
22    Q And do you recall about how long that
23 meeting lasted?
24    A The Houston County Board meeting?
25    Q I'm sorry. The meeting with Mr.

Page 24

1 Freet?
2    A About an hour and a half, I believe.
3 An hour, hour and a half.
4    Q Okay. And did anyone else attend that
5 meeting at Mr. Freet's office, other than just
6 you?
7    A It was just me and him.
8    Q Okay. Did your mother attend at all?
9    A She was there. I think she was in the
10 lobby.
11    Q Okay. And was Mr. Freet taking notes
12 and diarying things that you were telling him?
13    A Yes, sir.
14    Q And do you think that what Mr. Freet
15 was writing down and keeping in his records
16 would accurately reflect the conversation that
17 you and him had?
18    A Yes, sir.
19    Q Okay. Are you still claiming to have
20 any psychological or emotional problems today,
21 as a result of the incident?
22    A Oh, yeah. Yes, sir.
23    Q Could you please describe those for
24 me?
25    A I lost a year's relationship with a

Page 25

1 girl that I had, at seventeen, beginning with my
2 junior year. I mean, there's friends I don't
3 even see any more.
4    Q  Okay. Josh, this relationship, did
5 you end it or did the girl end it?
6    A  I did.
7    Q  Okay. So, you chose to end this
8 relationship?
9    A  Yeah. I couldn't put her through
10 this. How do you drag a girl through an
11 emotional trip like this?
12    Q  Okay. So, you ended the relationship
13 with your girlfriend?
14    A  (No audible or visible answer.)
15    Q  And are you saying that the friends
16 that had already quit talking to you, are no
17 your longer friends, now?
18    A  Right. I mean, if this incident
19 wouldn't have never happened, I'm sure we would
20 still be friends. I mean, people get sort of an
21 opinion of you, and that's how things work out.
22    Q  How many total times have you seen Dr.
23 Freet? Or Mr. Freet? Mr. Freet?
24    A  Two or three times, as I recall.
25    Q  Are you currently seeing anyone --

Page 26

1    A  No, sir.
2    Q  -- for psychological or emotional
3 problems?
4    A  No, sir.
5    Q  Have you seen anyone other than Mr.
6 Freet, at any time, for psychological or
7 emotional problems?
8    A  No, sir.
9    Q  Could you specifically describe for me
10 the psychological and emotional problems that
11 you're having? The symptoms you're experiencing
12 and --
13    A  Right now, as of today?
14    Q  Let's go back to when you were seeing
15 Mr. Freet? Let's start there.
16    A  I mean, I couldn't talk to anybody. I
17 was -- you know. At that time, I couldn't go to
18 school. They took me out of all of my classes.
19    Q  Were you able to still talk to your
20 family?
21    A  Yes.
22    Q  Were there any friends at school, that
23 still kept in touch with you or that you kept in
24 touch with?
25    A  No.

Page 27

1    Q  None at all?
2    A  I take that back. One. He was my
3 best friend since kindergarten.
4    Q  What was his name?
5    A  James Purvis.
6    Q  Is that Purvis?
7    A  Yes.
8    Q  Okay. And are you and James still
9 friends, today?
10    A  Yes.
11    Q  Did he attend Wicksburg High School
12 during this time?
13    A  He did.
14    Q  Josh, you've testified that these
15 friends quit talking to you. Did you ever try
16 to contact any of your friends at Wicksburg,
17 after this incident that we're here about today?
18    A  I mean, if I saw them, like, on the
19 street or something, I'd try. But, I mean, they
20 didn't want any part of me.
21    Q  So, you never picked up the phone and
22 called some of your old friends and --
23    A  No. I didn't have any of their
24 numbers.
25    Q  Okay.

Page 28

1    A  I mean, the only person I had a number
2 to was James. He was the one that stuck beside
3 me the whole time.
4    Q  Did James remain friends with some of
5 your other friends?
6    A  He had different friends than I did.
7    Q  So, as I understand it, your testimony
8 is that you didn't try to contact any of your
9 friends at Wicksburg, after the football game,
10 because you didn't have their phone numbers and
11 you just never ran into them?
12    A  Right.
13    Q  Did you ever try to go to any of the
14 hang-out spots or places where the friends
15 usually went?
16    A  I mean, I moved to, like, 60 miles
17 away. That's an hour from where I lived. You
18 know, that's an hour drive, just --
19    Q  Right.
20    A  -- to even try to get with all my
21 friends. I mean --
22    Q  Did you ever come back -- or, once you
23 went to Louisville, did you ever come back to
24 Wicksburg?
25    A  Like just the --

Page 29

1  Q  For the weekend?
2  A  Oh, yes.  To see my family.  When I
3  could.
4  Q  Did you ever try to see James Purvis
5  or any of your other friends, when you were back
6  home on those weekends?
7  A  I tried.  Just James.
8  Q  James was the only one you tried to
9  see?
10  A  Well, that's the only one that would
11  actually see me, so --
12  Q  But did you try --
13  A  I mean, everybody else -- I mean, I
14  couldn't try.  I didn't have phone numbers for
15  everybody else, for me to contact them.
16  Q  You didn't know where any of them
17  lived, or James didn't know where they were
18  hanging out or anything of that nature?
19  A  No.  I mean, like I say, he had
20  different friends.  I mean --
21  Q  Okay.
22  A  -- than I did.
23  Q  Josh, from the documents that you all
24  have provided, you discussed incidents at
25  Wicksburg High School, where teachers or staff

Page 30

1  were hit or bumped by a student, and y'all are
2  claiming that those students didn't receive the
3  same type of punishment that you did.  Are you
4  aware of any instances like that?
5  A  Yes, I am.  What I've been told.
6  Q  Okay.  Do you know Ms. Judy Joiner?
7  A  Yes, I do.
8  Q  And who is she?
9  A  She is a sixth-grade teacher.  I had
10  her when I was in sixth grade.
11  Q  So, she's at Wicksburg Elementary?
12  A  Yes.
13  Q  And are you aware of an incident
14  involving her and a C. L.?
15  A  Like I say, somebody told me that.
16  Q  Okay.  So, do you know C. L.,
17  personally?
18  A  Not personally.
19  Q  Is it your understanding that he was a
20  sixth-grade student of Ms. Joiner's?
21  A  Yes.
22  Q  And do you remember who told you about
23  this situation?
24  A  I believe my parents did.
25  Q  Okay.  And do you recall how they

Page 31

1  described this situation to you, as far as what
2  C. supposedly did?
3  A  They just told me that -- I mean, they
4  didn't go into real details with me.
5  Q  Okay.  Do you know a Ms. Sanders,
6  Josh?
7  A  Yes, I do.
8  Q  And is she employed at Wicksburg High
9  School?
10  A  At this time?
11  Q  At the time of -- well, is she
12  employed there, now?
13  A  I'm not sure.
14  Q  Okay.  Are you aware of an incident
15  involving her and a student named L., where L.
16  supposed kicked her in the buttocks?
17  A  I heard about the incident.
18  Q  Do you know when that event supposedly
19  occurred?
20  A  I'm not sure.
21  Q  Was it before the September 16th, 2005
22  football game and your disciplinary procedures
23  that followed?
24  A  Yes, I believe so.
25  Q  Now, did you know L.?

Page 32

1  A  I know of him.  I didn't know him like
2  a friend.
3  Q  Do you know his last name?
4  A  No, I couldn't -- I can't recall his
5  last name.
6  Q  Was this L. in your same grade, or was
7  he older or younger?
8  A  Actually, he was in our grade, and he
9  failed.
10  Q  Okay.
11  A  He was in the grade below me.
12  Q  And do you remember -- or do you
13  recall what school year you would have been in,
14  when this incident happened?  Like when you were
15  a senior or a junior or --
16  A  I believe I was a senior when it
17  happened.
18  Q  All right.  Josh, at the beginning of
19  the school years, do you remember getting a copy
20  of the student code of conduct?
21  A  Yes, I do.
22  Q  Do you remember getting one at the
23  beginning of the 2005 and 2006 school year?
24  A  Yes.
25  Q  And did you read that student code of

Page 33

1 conduct?

2    A  I've read it every year we've had it.

3 Since I've been able to read.

4    Q  And did you sign the back page of the

5 handbook, stating that you had read it and

6 understood it?

7    A  Yes, sir.

8    Q  And did you have your parents sign

9 that document?

10    A  Yes, sir.

11    Q  And then, did you return that to

12 Wicksburg High School?

13    A  Yes.

14    Q  Okay.  Were you aware that hitting or

15 physically contacting a teacher was punishable,

16 according to the student code of conduct?

17    A  Yes.

18    Q  And would you think it would be

19 appropriate for a student to ever hit or

20 physically contact a teacher?

21    A  No.

22    Q  Josh, were you being recruited or

23 sought after by any colleges, for athletic

24 scholarships or anything like that?

25    A  Yes, sir.  Spring training, my junior

Page 34

1 year, for Head Coach Phillip Mitchell, Alabama

2 State was calling about me.

3    Q  Okay.  Do you know if anyone was

4 recruiting you, actively, during the fall of --

5 or the football season of 2005?

6    A  Not that I know of.

7    Q  You weren't receiving letters --

8    A  2005 or -- oh, yeah, 2005.

9    Q  Yes?

10    A  No, I don't.  That's all I knew of.

11    Q  You weren't receiving letters from

12 schools, asking for films or anything of that

13 nature?

14    A  I did during the spring training that

15 year, of 2005.

16    Q  Okay.

17    A  That's how Alabama State got in touch

18 with us.

19    Q  Okay.  So, you had spring training?

20    A  Uh-huh.

21    Q  And you were getting letters from

22 Alabama State?  And this was the end of the

23 junior year?

24    A  Yes, sir.

25    Q  Then, you had your summer break?

Page 35

1    A  Yes, sir.

2    Q  And you came back at the start of the

3 2005 season?

4    A  Right.

5    Q  Okay.  And, after the season started,

6 you don't recall getting recruitment letters or

7 visits from any other schools?

8    A  No.

9    Q  Okay.  Josh, did you ever use any kind

10 of supplements -- and I don't mean illegal

11 things -- but Ripped Fuel or Hydroxycut, Met-Rx,

12 that kind of stuff?

13    A  Never used it.

14    Q  Never used any of that?

15    A  (Witness shaking head in negative.)

16    Q  Did you ever use any protein shakes or

17 any kind of supplements like that, on a regular

18 basis?

19    A  No, sir.

20    Q  Okay.  And, Josh, have you ever used

21 steroids, in your athletic competitions?

22    A  No, sir.

23    Q  Okay.  So, were you using supplements

24 or steroids on the night of the game that's the

25 basis of this claim?

Page 36

1    A  No, sir.

2    Q  Josh, at the September 16th football

3 game, was Wicksburg, were they winning that

4 game?  Or did they win that game?

5    A  I mean, I can't recall that.  I had a

6 concussion.  I didn't -- I don't remember

7 anything.

8    Q  Looking back on it, as we sit here

9 now, do you know whether they won or lost that

10 game?

11    A  Oh, I know they lost, now.

12    Q  And Coach Winchester was the head

13 coach at the time that this football game

14 occurred?  Correct?

15    A  Yes, sir.

16    Q  Now, did you have any ill will or bad

17 feelings toward Coach Winchester?

18    A  What do you mean by bad feelings?

19 Like any arguments before, or --

20    Q  Yes?

21    A  Or any confrontations before that?

22    Q  Had you ever confronted Coach

23 Winchester about anything?

24    A  Yes, sir, I did.

25    Q  And describe that confrontation for

Page 37

1  me?
2      A  That week, actually, before that
3  football game, there was an incident, I believe,
4  Monday, and they were trying to do a chop block
5  on me.
6      I was playing defensive end.  And one boy
7  was going to take out my knees and one push me
8  over.
9      And we were at practice, and the boy that
10 was actually -- he wouldn't do it to me, but, he
11 told me that Coach Winchester told him that he
12 needed to do that to me.  And he told me, when
13 we had a water break or something, he told me
14 what happened.  What he told them.
15     Q  And then, did you confront Coach
16 Winchester about this?
17     A  No.  I actually took it to the
18 principal, Jim Murray, and confronted him about
19 it, and he didn't seem too -- too worried about
20 anything.  And then, we --
21     Q  Josh, can you describe a chop block
22 for the record?
23     A  I mean -- I've never done one, but I
24 know what they're talking about.  The chop block
25 is where, actually, the player takes and hits

Page 38

1  your knee, right here at the joint, and another
2  one hits you the other way, so it tears up your
3  knee.  Tears all your ligaments out.
4      Q  Sometimes?
5      A  Yeah.  Most of the time.  That's why
6  football players wear knee braces.
7      Q  Now, Josh, was Coach Winchester -- I
8  know he was the head coach.  Was he also an
9  offensive line coach?
10     A  He was the quarterback/running back
11 coach.
12     Q  So, this was just something that he
13 was instructing the linemen to do, as a head
14 coach?
15     A  Well, it was actually -- it was like
16 first string defense.  We had a bunch of younger
17 guys on the other side.  And some older ones
18 that didn't -- that wasn't on first string
19 defense.  They was telling them how to do it in
20 a huddle.
21     Q  Okay.  See if I'm describing this
22 accurately.  You were on the first team
23 defensive squad?
24     A  Correct.
25     Q  And there were some offensive players,

Page 39

1  the backups, that were trying to run plays --
2      A  Right.
3      Q  -- for y'all to practice with?  And
4  they were having trouble stopping the first team
5  defense?
6      A  Correct.
7      Q  So, the coach told them, one way to
8  stop it is to chop block?
9      A  Me, in particular.  Just me
10 singularly, actually.
11     Q  Okay.  You had played on offensive
12 line before?  Correct?
13     A  Correct.
14     Q  Were you a first string offensive
15 lineman?
16     A  All except for my ninth-grade year.
17     Q  Okay.  Had you ever chop blocked
18 anybody?
19     A  No.
20     Q  Never?
21     A  Never.  I would never do that to
22 anyone.
23     Q  Okay.  After you talked to Mr. Murray
24 about this chop block incident, did you ever
25 hear from Coach Winchester?

Page 40

1      A  Actually, me and Mr. Murray went down
2  there to his office, and he just didn't have
3  anything to say about it.
4      Q  He didn't --
5      A  He said he would never do anything
6  like that to me.
7      Q  Okay.  After that incident, did Coach
8  Winchester confront you, away from Mr. Murray,
9  at all?  Did you and Coach Winchester ever have
10 a one-on-one conversation, concerning the chop
11 block incident?
12     A  No.
13     Q  Okay.  Do you think that Coach
14 Winchester wanted you to be hurt?
15     A  Yes, I do.
16     Q  You think that he wanted one of his
17 starting defensive and offensive linemen to be
18 hurt?
19     A  Yes, I do.
20     Q  Why would you feel that way, Josh?
21     A  He was just that type of coach.  He
22 didn't --
23     Q  He was the type of coach that wanted
24 his starting football players to be injured, so
25 they couldn't play and win?

Page 41

1    A   Yeah. I mean, when he was down with a
2  team in Florida, he actually ran a play, which
3  he had to resign from. Or they actually fired
4  him from that school, because of an incident
5  like that.
6    Q   Okay. Well, now, were there any other
7  coaches on that team that you think wanted you
8  to be hurt?
9    A   No.
10   Q   Okay. So, the only coach that you
11 would have -- or on the night of the football
12 game, the only coach that you would have had any
13 bad feelings toward, would have been Coach
14 Winchester?
15   A   Yes.
16       MR. MOODY: Okay. I think that's --
17       MR. WALDING: Let's take a break.
18       MR. MOODY: Yeah, let's take a break.
19          (Recess in deposition.)
20   Q   Josh, you've testified today that you
21 don't remember a lot of things, because you had
22 a concussion that you got the night of the
23 football game? Is that correct?
24   A   Correct.
25   Q   And who told you that you had a

Page 42

1  concussion?
2    A   Dr. Tamburin.
3    Q   Did he use those exact words, that,
4  "You have a concussion"?
5    A   Yes.
6    Q   Okay. Josh, I want you to look at
7  these documents on Defendant's Exhibit 4. Do
8  you recognize those?
9    A   Are you talking about here?
10   Q   Do you recognize seeing those
11 documents at all?
12   A   Yes, sir.
13   Q   Do you know what those documents are?
14 Are those documents that y'all have provided the
15 Houston County Board of Education, because of
16 this lawsuit?
17   A   Yes. It looks like it.
18   Q   Okay. And if you will flip --
19   A   To the last page? Right here?
20   Q   Well, if you'll flip to the second to
21 the last page? Will you just read the heading
22 of that, so we can identify what document we're
23 talking about?
24   A   "Dothan Pediatric Clinic."
25   Q   Okay. And then, can you read that

Page 43

1  line there for me?
2    A   This right here, where it has my name?
3    Q   Yes?
4    A   "Davis, Joshua C. Chart number 50334.
5  Date of birth: 04/17/1988."
6    Q   And is that Dr. Tamburin's report,
7  concerning you?
8    A   It looks like that.
9    Q   Okay. Can you review that document in
10 the next couple of moments, and show us where he
11 diagnosed you as having a concussion?
12   A   I don't see it right here. I don't
13 see it directly in here.
14   Q   Okay.
15   A   "Sounds like this child has a
16 concussion with possible LOC."
17   Q   Okay. But you don't see in that
18 report anywhere, where the doctor says, "Josh
19 Davis is suffering from a concussion as a result
20 of a football game"?
21   A   No, I do not see that.
22   Q   Okay. Thank you. And I wanted to ask
23 you about -- let me take back from you, so you
24 can focus on me, here.
25       I want to go back over with you some of

Page 44

1  your meetings with Dr. Freet --
2        MR. WALDING: Mr. Freet.
3        MR. Freet. Mr. Freet has some facts
4  in his report of things that happened at the
5  football game. Did you tell him those things?
6    A   I mean, I -- what kind of facts are
7  you talking about? I don't know.
8    Q   He says -- he's referring to you
9  playing both ways. Pulled out of game. Coach
10 -- there's a sentence that I just can't make out
11 right now. Then, it says, "Taken out. Next
12 thing remember, coach had hold of him." And
13 then, quotations, "Don't ever fucking touch me.
14 Another coach grabbed me from behind." And I
15 believe --
16   A   I mean, playing both ways is pretty
17 obvious. The other one is what my parents told
18 me.
19   Q   Okay. So, did you tell Mr. Freet that
20 phrase?
21   A   Yes. I mean, that's the things my
22 parents told me I said and stuff.
23   Q   Your parents had told you that you
24 said that?
25   A   Yes.

Page 45

1　Q　Okay.
2　A　That's what happened.  I mean, playing
3　both ways is obvious.  I did that since the
4　beginning of the year.
5　Q　Did anyone else tell you that you had
6　said things like that?
7　A　I mean, at the board meeting, the
8　coaches said that.
9　Q　Did any other Wicksburg students at
10　that game ever tell you that you said things of
11　that nature?
12　A　No.
13　Q　Okay.
14　A　Like -- again, like I say, I didn't
15　have contact with them after that.
16　Q　But, just to make sure, your parents
17　told you --
18　A　I mean, they told me what happened at
19　the game.  I mean --
20　Q　Okay.
21　A　I wasn't going into a board meeting
22　just not knowing what was going on.
23　Q　Right.  But your parents -- or let me
24　make sure I understand your testimony.  Your
25　parents told you that one of the things you said

Page 46

1　at the football game was, "Don't ever fucking
2　touch me."  And then, another coach grabbed you
3　from behind?
4　A　Yes.
5　Q　Okay.  And, Josh, would that be
6　something appropriate for a student to tell a
7　teacher or a coach?
8　A　I mean -- no.
9　Q　Just "yes" or "no"?
10　A　No.
11　　　MR. MOODY:  Okay.  That's all I have.
12
13　　　　EXAMINATION
14
15　BY MR. NEWMAN:
16　Q　Okay.  Josh, I want to go over a few
17　things with you, just by way of background.
18　You've already testified that you had gone
19　to this school from the time of kindergarten to
20　the eleventh grade, and a few weeks into your
21　senior year?
22　A　Correct.
23　Q　And were you involved in, say, any of
24　the activities of the student body, other than
25　playing sports at school?

Page 47

1　A　Yes, I was.
2　Q　Now, what other things were you
3　involved in?
4　A　I was in the student council.  I was
5　one of the members that represented the class.
6　I was voted best personality in my senior class.
7　Q　Were you ever involved in the Future
8　Farmers of America organization?
9　A　Yes, sir.
10　Q　In what capacity were you involved in
11　that?  As a member, or an officer of the group
12　or anything?
13　A　I was a member.  I would have been an
14　officer that year.
15　Q　What about the Beta Club?
16　A　I wasn't in that.  I was going to join
17　that year.
18　Q　And you were voted by your other
19　classmates as best personality?
20　A　Yes, sir.
21　Q　You feel like you had a good
22　relationship with all your classmates?
23　A　Yes, sir.
24　Q　By and large, were these kids that you
25　had grown up with, there at Wicksburg?

Page 48

1　A　Yes, sir.
2　Q　Were you ever class representative to
3　the student government association?
4　A　Yes, sir, I was.
5　Q　When you were expelled and started
6　going to school up at Dixie Academy, would you
7　come home every weekend?
8　A　Not every weekend.
9　Q　Let me back up a little bit.  What
10　were your grades like at Wicksburg?
11　A　I mean, I had an A, B average.
12　Q　Pretty consistently, throughout high
13　school?
14　A　Yes, sir.
15　Q　And you said, earlier, on direct, that
16　you had been recruited, or at least a school had
17　expressed interest, from a football standpoint?
18　A　Correct.
19　Q　And that was Alabama State?
20　A　Yes, sir.
21　Q　Any other schools?
22　A　Yes.  I received letters from
23　Princeton and a lot of Division 2A Ivy League
24　schools.
25　Q　Did you get any -- was that for your

Page 49

1 athletics, or for your combination athletics and
2 academics?
3    A  Just for athletics.
4    Q  Okay.  Did you get any letters that
5 were clearly because of your grades?  You were a
6 good student, so, they were writing to you,
7 trying to get you interested in --
8    A  Right.  I mean, I got information from
9 Troy and Auburn and Alabama and places like
10 that.
11    Q  Okay.  Did you expect your teammates,
12 former teammates at Wicksburg, to behave in a
13 certain way toward you, after you got expelled?
14    A  What do you mean by that?
15    Q  Well, they had been your teammates for
16 a while, hadn't they?
17    A  Right.
18    Q  Did you think they were going to kind
19 of support you?
20    A  Yes.
21    Q  And how did you feel, when that didn't
22 happen?
23    A  I was really depressed.  It goes back,
24 you know, friends for so many years, and then,
25 this happened, they all turned against me.

Page 50

1    Q  From a -- well, let me rephrase that.
2 When there are community kind of events in
3 Wicksburg, do you go to them, now?
4    A  No.
5    Q  Why not?
6    A  Because everybody there, you know,
7 looks at me a different way than before.
8    Q  Do you feel they're looking at you in
9 a negative light?
10    A  Yes, sir.
11    Q  So, you avoid going to community
12 events?
13    A  Yes, sir.
14       MR. NEWMAN:  Okay.  That's all.
15
16       EXAMINATION
17
18 RESUMED BY MR. MOODY:
19    Q  Just a few more questions on that
20 following-up and clarifying, Josh.
21    These schools that you had talked about
22 that had recruited you athletically and
23 academically, what time frame were these people
24 recruiting you?  Would it have been your junior
25 year, or your --

Page 51

1    A  Yes.  I was a junior, right there at
2 the end, at spring training.
3    Q  Okay.  Now, after you went to Dixie
4 Academy, did you still have contact with any of
5 these schools?
6    A  No.  I mean, it was my senior year and
7 this other coach transferred out.  Or actually
8 -- yeah, he transferred out.  And I didn't have
9 any contact from that --
10    Q  So, during your senior year --
11    A  -- after the new coach came in.
12    Q  During your senior year, you had no
13 contact from any schools, about scholarships?
14    A  Not that I know of.
15    Q  Okay.  When you went to Dixie, what
16 were your grades up there like?
17    A  It was A, B.  It was consistent.
18    Q  Okay.  So, you were making good grades
19 at Dixie and good grades at Wicksburg?
20    A  Correct.
21    Q  Okay.  Did you receive any scholarship
22 offers or interest, academically, from Troy or
23 Auburn or some of the other schools you
24 mentioned earlier, once you went to Dixie?
25    A  No, I didn't.

Page 52

1    Q  Okay.  Josh, your teammates and the
2 kids that you grew up with, that voted you to
3 some of these achievements that you had, about
4 best personality and they'd elected you to SGA
5 positions and all that, with the exception of
6 your friend, James, the rest of these kids
7 didn't have any communication with you, after
8 the incident?
9    A  Correct.
10    Q  Okay.  And you had known these kids
11 your whole life, but you didn't have any of
12 their phone numbers or any way to contact any of
13 them?
14    A  I mean, I saw them at school every
15 day.  But they were people I played basketball
16 games and football with, so, we hung out before
17 practice and stuff like that.
18    Q  And so, you never -- knowing them your
19 whole life, though, you didn't know where any of
20 them lived, or you didn't feel like you could
21 stop by their homes --
22    A  I mean, I knew where a lot of them
23 lived.  But, I mean, it's kind of weird for
24 somebody that gets kicked out of school and just
25 knock on your door and --

Page 53

1    Q  So, you did have ways to get in touch
2  with your friends -- your lifelong friends and
3  your teammates?
4    A  Right.  If I would go to their house.
5    Q  So, you did have ways to get in touch
6  with them?  Correct?
7    A  Correct.
8    Q  But you chose not to?
9    A  Yes.
10    Q  And, Josh, what else did your parents
11  tell you happened at the football game, other
12  than this statement that we've read earlier from
13  Mr. Freet?
14    A  I mean, they just explained to me what
15  happened.
16    Q  And how did they explain what
17  happened?
18    A  They said I was running off the field.
19  When I came off the field, I bumped into Coach
20  Smith, and then, he turned around and was
21  pushing me back.  And then, Coach Carter came in
22  between us, and then, pushed me back against the
23  fence.  And they said there was a bench there,
24  and I sat down on it.  And then, when he left, I
25  stood up and my shoulder pads hit him in the

Page 54

1  eye.
2    Q  And did they tell you any other
3  instances of you using profanity towards one of
4  the coaches?
5    A  Yeah.  I mean, they told me that,
6  what's in there.
7    Q  But other than the sentence, "Don't
8  ever fucking touch me," followed by, "another
9  coach grabbing me from behind" --
10    A  They never told me any other --
11    Q  Okay.  Josh, the different
12  relationship between your teammates and your
13  friends, that happened after this incident, do
14  you think that they look at you differently
15  because you were expelled, or do you think it
16  was because of your behavior on the night of the
17  game, and that they're trying to distance
18  themself from that behavior?
19    A  More because I got expelled.  I mean
20  -- I mean, you go from being at school -- I
21  don't know how many days it is.  I mean -- 45
22  times 4.  I mean, you're looking at that, going
23  five days out of the week --
24    Q  No, Josh --
25    A  -- and you're with them all that time,

Page 55

1  and now, you're just gone.
2    Q  Now, Josh, are you saying that the
3  relationship between you and your friends just
4  grew apart because you were not in school, or
5  are you saying that, because of the incident of
6  this game, they made a conscious effort to start
7  treating you differently?
8    A  I mean, it was a little bit of both.
9  Because you're looking -- you know, not every
10  high school student and everybody there attend a
11  football game.  You know what I'm saying?
12    So, everybody else is sort of -- it's more
13  hearsay.  And you're getting coaches and
14  teachers and stuff saying stuff that never
15  happened, and they're getting the wrong
16  impression about me.
17    Q  Okay.  Well, now, Josh, your teammates
18  were certainly at the football game?
19    A  Right.
20    Q  And they saw what happened?
21    A  Right.
22    Q  Correct?
23    A  (Witness nodding head in affirmative.)
24    Q  Okay.  And, you know --
25    A  But, I mean, it -- the same thing.  I

Page 56

1  mean, who would have saw it.
2    Q  Right.  But some of your teammates saw
3  what was going on?
4    A  And, there again, it's just hearsay.
5  You know how stuff, rumors, get around.
6    Q  But you'll admit that some of your
7  teammates had to have seen what happened on the
8  sideline?
9    A  Yes.  Of course.  I'm sure.
10    Q  And these were your teammates that you
11  played football with your whole career there at
12  Wicksburg, and you're saying that none of them
13  continued to be friends, because of the events
14  that happened that night?
15    A  Correct.
16    MR. MOODY:  Okay.  I think that's all
17      I've got.
18    MR. NEWMAN:  All right.
19
20      END OF DEPOSITION
21
22
23
24
25

Page 57

```
 1    DEFENDANT'S EXHIBIT NO. 4
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 58

```
 1  STATE OF ALABAMA
 2  HOUSTON COUNTY
 3
 4      I, John G. Whitfield, Court Reporter and
 5  Notary Public, State at Large, do hereby certify
 6  that the foregoing transcript, pages 1 through
 7  57, is a true and correct transcript of the
 8  testimony and proceedings taken at said time and
 9  place; and that the same was taken down by me in
10  stenograph shorthand, and transcribed by me
11  personally or under my personal supervision.
12      I further certify that I have no interest
13  in this matter, financial or otherwise, or how
14  it may develop or what its outcome may be.  I
15  further certify that I am not of counsel for any
16  of the parties, nor am I related to counsel or
17  litigants or associated with anyone connected
18  with this cause to my knowledge.
19      Witness my hand this 23rd day of June,
20  2007.
21
22
23      _____
        Court Reporter and Notary
24            Public, State at Large
25
```

**IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| GREG DAVIS, AS NEXT FRIEND | * | |
| AND NATURAL GUARDIAN OF | * | |
| JOSHUA DAVIS | * | |
| | * | |
|     PLAINTIFF, | * | |
| | * | |
| vs. | * | |
| | * | CASE NO.1:06-CV-953-MEF |
| HOUSTON COUNTY, ALABAMA | * | |
| BOARD OF EDUCATION | * | |
| | * | |
|     DEFENDANT. | * | |

**AFFIDAVIT OF BRAD SMITH**

**STATE OF ALABAMA**   )
                     )
**HOUSTON COUNTY**    )

Before me, the undersigned authority, personally appeared BRAD SMITH, who, being duly sworn, deposes and says as follows:

My name is Brad Smith. I am over 19 years of age and am a resident of the State of Alabama, residing in Rehobeth, Houston County, Alabama. I have personal knowledge of the facts stated below.

On the night of Friday, September 16, 2005, I was employed as a football Coach for Wicksburg High School. On that night, Wicksburg was playing a football game at Houston County High School. I was one of Josh Davis' position coaches at the time the incidents described below occurred.

Early in the 3rd Quarter of the football game I noticed that Josh Davis was not performing well during a series of defensive plays. I was yelling directions onto the field from Wicksburg's sideline. Josh Davis immediately made a gesture with his hand telling me to be quiet and leave him alone. I took this action as a sign of disrespect for the

coaching staff.  On the next play, I decided to replace Josh
with another player because disrespectful behavior towards
coaches would not be tolerated on our team.

Wicksburg High School's head coach at that time,
Charlie Winchester, told me to go and explain to Josh Davis
why he had been removed from the game.  I walked over to
where Josh was standing and I put my arm around him.  In a
very calm and deliberate voice I told him that he was
getting off of the ball too slowly and that he needed to
improve his performance.  I also told Josh that I removed
him from the game because of his hand motion and
disrespectful behavior.

Once I completed my statement about Josh's disrespect,
Josh jerked away from me and said "whatever."  I immediately
told him that he would not play the rest of the night due to
his actions and attitude.  I then walked back to Coach
Winchester and explained to him the situation I was
experiencing with Josh.

Josh Davis began throwing and kicking his helmet while
he was on the sideline.  Several coaches ordered Josh to put
his helmet back on.

During the next offensive series, Josh ran back onto
the field of play to assume his position as an offensive
lineman.  Coach Winchester saw this and immediately sent
another player onto the field to replace Josh and send Josh
back to our sideline.  When the other player relayed this
message to Josh, Josh turned directly towards me and ran in
a straight line towards me.  I continued to coach the other
players, however, I saw Josh Davis coming towards me out of
the corner of my eye.  As Josh got closer I heard him saying
the words "God Damn" and other profanity.  Once Josh reached
my position, he threw his shoulder and elbow into my
shoulder and side.  I turned around and grabbed his shoulder
pads telling him that "he could not do that to me; he could
not do that type of thing to a coach."  Josh began throwing
his arms around in an attempt to get away from me.  Josh was
being very aggressive and I believed that he was going to
try and hit me.  Believing I was in danger, I continued to
hold onto Josh thinking he would calm down.

Coach Clay Carter ran over and grabbed Josh in order to move him away from me. Seeing Coach Carter's attempts to control the situation I released my hold on Josh's shoulder pads. Josh then turned and punched Coach Carter in his left eye. Josh then took off his helmet and threw it at me hitting my hip. After these events, Josh was escorted off the sidelines by a law enforcement officer.

The facts stated above are true and correct.

_____

BRAD SMITH

Sworn to and subscribed before me on this the 11th day of September, 2007.

_____

(S E A L)                  NOTARY PUBLIC

MY COMMISSION EXPIRES:
5/29/2010

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

GREG DAVIS, AS NEXT FRIEND     *
AND NATURAL GUARDIAN OF        *
JOSHUA DAVIS                   *
                              *
    PLAINTIFF,               *
                              *
vs.                           *
                              *     CASE NO.1:06-CV-953-MEF
HOUSTON COUNTY, ALABAMA        *
BOARD OF EDUCATION            *
                              *
    DEFENDANT.               *

## AFFIDAVIT OF CHERYL SMITH

STATE OF ALABAMA        )
                        )
_Houston_        COUNTY )

    Before me, the undersigned authority, personally appeared CHERYL SMITH, who, being duly sworn, deposes and says as follows:

    My name is Cheryl Smith.  I am over 19 years of age and am a resident of the State of Alabama, residing in _Newton_, _Houston_ County, Alabama.  I have personal knowledge of the facts stated below.

    I am currently an Assistant Principal at Wicksburg High School ("WHS"), and I have held that position since the start of the 2003-2004 school year.  Including my time as Assistant Principal, I have been employed at WHS for 8 years.  One of my duties as Assistant Principal is to discipline students for violations of the Student Code of Conduct.

    I am aware that Greg and Josh Davis have identified in their lawsuit instances concerning 1 current student at WHS and 1 former student of WHS.  I know the facts surrounding these two incidents and I was the person responsible for

investigating these events and disciplining the students.

Sometime during the 2003-2004 school year, Ms. Susan Sanders, a custodian at WHS, informed me that Lance Hughes, a student at that time, kicked her in the buttocks. During my investigation I asked Ms. Sanders to explain the event to me. Ms. Sanders explained that Lance kicked her in the buttocks while they were "horse playing" on school grounds. My investigation into this matter showed that Ms. Sanders and Lance "horse played" frequently at WHS. Ms. Sanders was not injured by the kick. Ms. Sanders felt that the kick was disrespectful, but she believed it was not intended to harm her. Ms. Sanders did not want Lance to get into any formal trouble at school, but she did ask that I speak to him and explain appropriate conduct.

I spoke with Lance concerning this incident. I told him that even if he thought he could "horse play" with Ms. Sanders, he crossed over the line of disrespect when he kicked Ms. Sanders. I explained to Lance that the "playful" intentions of the kick did not make the act any less disrespectful. Lance indicated to me that he was sorry for his disrespectful action. I explained to Lance that he would not face more severe punishment because Ms. Sanders did not believe Lance had kicked her in anger and/or with intent to harm her. I clearly stated to Lance that if anything similar to this event happened again he would be sent to alternative school.

The second incident, Josh and Greg Davis identified involves a WHS teacher, Ms. Judy Childs, f/k/a Judy Joiner and a minor student at WHS named C.L. This incident occurred in 2006 while C.L. was a sixth grade student at WHS. My investigation of that incident found that Ms. Childs confronted C.L. and asked him if he had locked another student inside one of the school buses nearby. C.L. became angry and started to walk away from Ms. Childs. Ms. Childs placed her hand on C.L.'s shoulder and C.L. turned around, threw up his hands and said something to the effect of "Get your hands off me, bitch!" C.L. then began walking to the principal's office, because earlier I had instructed C.L. to come straight to my office if he started to feel that he was going to lose his temper and go out of control. Mr. Murrey, WHS principal at the time, administered corporal punishment

and I served as the witness.

I was aware of a rumor circulating around WHS that C.L. actually hit Ms. Childs, but Ms. Childs informed me and my investigation confirmed that C.L. never hit her.

After investigating these incidents, I believe that the punishment issued to these students was in accordance with the discipline policy in effect at WHS.

The facts stated above are true and correct.

*Cheryl L. Smith*

CHERYL SMITH


Sworn to and subscribed before me on this the 7th day of November , 2007.

*Charlotte Mackey*

(S E A L)         NOTARY PUBLIC

MY COMMISSION EXPIRES:

5/9/2010

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

GREG DAVIS, AS NEXT FRIEND    *
AND NATURAL GUARDIAN OF       *
JOSHUA DAVIS                  *
                             *
     PLAINTIFF,              *
                             *
vs.                           *
                             *    CASE NO.1:06-CV-953-MEF
HOUSTON COUNTY, ALABAMA       *
BOARD OF EDUCATION            *
                             *
     DEFENDANT.              *

### AFFIDAVIT OF CLAY CARTER

STATE OF ALABAMA    )
                    )
HOUSTON COUNTY      )

    Before me, the undersigned authority, personally appeared CLAY CARTER, who, being duly sworn, deposes and says as follows:

    My name is Clay Carter.  I am over 19 years of age and am a resident of the State of Alabama, residing in Cottonwood, Houston County, Alabama.  I have personal knowledge of the facts stated below.

    On the night of Friday, September 16, 2005, I was employed as a football Coach for Wicksburg High School.  On that night, Wicksburg was playing a football game at Houston County High School. I was coaching from Wicksburg's sideline during this game.

    Josh Davis was removed from the game during a series of defensive plays because he was not performing well. Once Josh was on Wicksburg's sideline, I heard Coach Charlie Winchester ask Coach Brad Smith to explain to Josh why he had been pulled from the game.  Coach Smith approached Josh and began trying to explain to Josh why he had been removed.

Josh immediately began acting very disrespectful to Coach
Smith. He was walking away from the Coach while he was
talking to him.  Josh also turned back to Coach Smith and
was talking disrespectful. Josh threw his helmet down the
sideline.

    When Wicksburg received the ball again, Josh ran out
onto the field to assume his position on the offensive line.
Josh was called back onto our sideline because his position
coaches had decided that he would not re-enter the game due
to his disrespectful behavior.  When Josh was told to come
off of the field, he turned and looked directly at Coach
Smith.  Josh then began coming off of the field and ran
shoulder first into Coach Smith.  It was evident that Josh
ran into Coach Smith on purpose because of the path he took
off of the field.

    After Josh ran into Coach Smith, Coach Smith turned and
grabbed Josh by the front of his shoulder pads.  Coach Smith
told Josh that he could not hit a coach like that.  Josh
began yelling and cursing at Coach Smith.  Josh then lost
control of himself even more and began jerking around.  In
an effort to diffuse the situation, I decided to put my
hands around Josh's waist and separate him from Coach Smith.
I told him "to calm down, and everything would be all
right."  As I was trying to calm Josh down, he swung his
fist and hit me in the left eye knocking my glasses and my
hat off of my head. After being hit, I released my hold on
Josh and Coach Winchester, the head coach, began calling for
police to escort Josh off of the field.

    Before we left Houston County High School, a Houston
County Sheriff's Deputy asked if I wanted to press charges
against Josh and I said yes.  Deputies at the game then
filled out a report.  The Deputies photographed the injuries
to my face.

    The facts stated above are true and correct.

CLAY CARTER

Sworn to and subscribed before me on this the _7th_
day of November, 2007.

_Charlotte Mackert_

(S E A L)                    NOTARY PUBLIC

MY COMMISSION EXPIRES:
_5/29/2010_

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

GREG DAVIS, AS NEXT FRIEND &ast;
AND NATURAL GUARDIAN OF &ast;
JOSHUA DAVIS &ast;
 &ast;
 PLAINTIFF, &ast;
 &ast;
vs. &ast;
 &ast; CASE NO.1:06-CV-953-MEF
HOUSTON COUNTY, ALABAMA &ast;
BOARD OF EDUCATION &ast;
 &ast;
 DEFENDANT. &ast;

## AFFIDAVIT OF JAMES MURREY

STATE OF ALABAMA )
     )
HOUSTON COUNTY )

Before me, the undersigned authority, personally appeared JAMES MURREY, who, being duly sworn, deposes and says as follows:

My name is James Murrey. I am over 19 years of age and am a resident of the State of Alabama, residing in Headland, Henry County, Alabama. I have personal knowledge of the facts stated below.

On Friday, September 16, 2005, Wicksburg High School was involved in a football game against Houston County High School in Columbia, Alabama. At that time, I was the principal of Wicksburg High School. I was on Wicksburg's sideline during this football game.

Wicksburg's football team was having a hard time finding any success in this game despite their best efforts. The coaches kept demanding leadership from the players and reminded them that despite the score of the game they should continue to play hard and never quit. Josh Davis, one of the senior football players, was not hustling on the field.

Coach Brad Smith asked me if I saw that Josh Davis was not performing well.  I told Coach Smith I did not think Josh was playing hard.

Coach Smith called Josh Davis over to him and told Josh that he needed to perform to his capabilities.  Josh brushed off Coach Smith by waving a hand at him.  On the very next play Josh Davis made very little attempt to tackle the opposing team's ball carrier.  Coach Smith again tried to encourage Josh Davis to perform to his capabilities. Josh was very disrespectful saying something to the effect of "whatever" toward Coach Smith, and Coach Smith benched Josh because of his attitude and lack of effort.  Josh reacted to this by throwing his helmet down through the bench area.

On Wicksburg's next possession, Josh tried to re-enter the game.  Wicksburg's other players motioned Josh back off of the field at the Coaches' directions.  As Josh was leaving the field he stated that someone was a "God Damn Idiot."  He continued off of the field and ran toward Coach Smith. Josh hit Coach Smith with his forearm as he was coming off of the field.  Coach Smith then grabbed the front of Josh's shoulder pads and said something to the effect of "hey, you can't do that."

After Coach Smith's comments, Josh went ballistic. Coach Clay Carter tried to get in between Josh and Coach Smith in an attempt try and calm Josh down.  At this point, Josh threw his helmet at Coach Smith striking him in the abdominal area.  Fans in the stands were yelling about the situation.  I stepped toward them instructing Mr. Davis and others to sit down and shut up.  **It was during this time that Coach Carter was hit in the eye.  As I was getting between the players Josh walked off with Officer Williams.**

The facts stated above are true and correct.

JAMES MURRAY

Page 2 of 3

Sworn to and subscribed before me on this the 11th day of September, 2007.

(S E A L)

NOTARY PUBLIC

MY COMMISSION EXPIRES:
5/09/2010

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| GREG DAVIS, AS NEXT FRIEND | * | |
| AND NATURAL GUARDIAN OF | * | |
| JOSHUA DAVIS | * | |
| | * | |
| PLAINTIFF, | * | |
| | * | |
| vs. | * | |
| | * | CASE NO.1:06-CV-953-MEF |
| HOUSTON COUNTY, ALABAMA | * | |
| BOARD OF EDUCATION | * | |
| | * | |
| DEFENDANT. | * | |

## AFFIDAVIT OF JOSH COX

STATE OF ALABAMA    )
                    )
HOUSTON COUNTY      )

Before me, the undersigned authority, personally appeared JOSH COX, who, being duly sworn, deposes and says as follows:

My name is Josh Cox. I am over 19 years of age and am a resident of the State of Alabama, residing in Bay Springs, Houston County, Alabama. I have personal knowledge of the facts stated below.

On the night of Friday, September 16, 2005, I was employed as a football Coach for Wicksburg High School. On that night, Wicksburg was playing a football game at Houston County High School. I was in the press box on the Wicksburg sideline. During this game I observed Josh Davis intentionally hit 2 of my fellow coaches. At the beginning of the 3rd Quarter of the football game Josh Davis was instructed to come out of the game because he was not performing well on the field. Josh began walking to the sidelines in a straight line toward Coach Brad Smith. As Davis approached Coach Smith, Davis threw his shoulder into Coach Smith's chest.

After being hit in the chest, Coach Smith grabbed Davis' jersey and I saw him begin talking to Josh.  After hearing this, Davis jerked away and threw his helmet at Coach Smith striking him in his hip.  Davis then proceeded to try and grab Coach Smith.  As Davis was trying to grab Coach Smith, Coach Clay Carter grabbed Davis around the waist from behind in an effort to keep Davis from hitting Smith.  Once Coach Carter grabbed Davis, Davis spun around and punched Coach Carter in the eye.  Despite being punched in the eye, Coach Carter, with the help of Coach Phil Moseley, continued trying to calm Josh Davis down.  These efforts did not work, and Davis pulled off his shoulder pads and threw them into the ground as he was escorted out of the stadium.

The facts stated above are true and correct.

_____
JOSH COX

Sworn to and subscribed before me on this the _11th_ day of September, 2007.

_____
NOTARY PUBLIC

(S E A L)

MY COMMISSION EXPIRES:
_5/29/2010_

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

GREG DAVIS, AS NEXT FRIEND   *
AND NATURAL GUARDIAN OF     *
JOSHUA DAVIS                    *
                             *
    PLAINTIFF,           *
                             *
VS.                        *
                             *   CASE NO.1:06-CV-953-MEF
HOUSTON COUNTY, ALABAMA    *
BOARD OF EDUCATION        *
                             *
    DEFENDANT.           *

### AFFIDAVIT OF JUDY CHILDS

STATE OF ALABAMA      )
                     )
_Houston_ COUNTY )

Before me, the undersigned authority, personally appeared JUDY CHILDS, who, being duly sworn, deposes and says as follows:

My name is JUDY CHILDS and I was formerly known as Judy Joiner. I am over 19 years of age and am a resident of the State of Alabama, residing in _Hartford_, _Alabama_ County, Alabama. I have personal knowledge of the facts stated below.

I have been a teacher for 21 years. I have been a 6th grade teacher at Wicksburg High School ("WHS") for many of those years. In September of 2006, I had been assigned break duty to observe and supervise the students at WHS during break time.

One day during this time, students reported to me that C.L., then a sixth grade student, had locked another student inside one of the buses that was parked nearby. I confronted C.L. about the situation and he turned and began to walk away. When I confronted C.L. about this report he

began to walk away from me. Before this incident, C.L. had a history of running away from school so I began to follow him while calling for him to stop. C.L. continued to walk until I caught up with him. I placed my hand on C.L.'s shoulder so that I could stop him and talk to him. When I placed my hand upon his shoulder C.L. turned around, threw up his hands and said, "Get your hands off me bitch!" C.L. then turned away and began to walk away from me again. I continued to call for him to stop but he would not.

Some students began spreading a rumor that C.L. hit me. C.L. never hit me.

Cheryl Smith, WHS Assistant Principal, learned of the incident. Ms. Smith asked me if I was hurt and if I wanted her to call the police. I told Ms. Smith that I had not been hit therefore I was not hurt and a call to the police would not be necessary. I then described the incident to Ms. Smith as I have discussed above. Ms. Smith began disciplinary procedures against C.L. C.L. was disciplined by corporal punishment. Mr. Murrey, WHS Principal at the time, administered the corporal punishment and Ms. Smith served as the witness.

The facts stated above are true and correct.

_Judy Childs_
JUDY CHILDS


Sworn to and subscribed before me on this the _7th_ day of _November_ , 2007.

_Charlotte Mackey_
NOTARY PUBLIC

{S E A L}

MY COMMISSION EXPIRES:
_5/29/2010_

**IN THE DISTRICT COURT OF THE UNITED STATES**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **GREG DAVIS, AS NEXT FRIEND** | * | |
| **AND NATURAL GUARDIAN OF** | * | |
| **JOSHUA DAVIS** | * | |
| | * | |
| **PLAINTIFF,** | * | |
| | * | |
| **vs.** | * | |
| | * | **CASE NO.1:06-CV-953-MEF** |
| **HOUSTON COUNTY, ALABAMA** | * | |
| **BOARD OF EDUCATION** | * | |
| | * | |
| **DEFENDANT.** | * | |

**AFFIDAVIT OF WANDA SEALS**

**STATE OF ALABAMA** )
                     )
**HOUSTON COUNTY** )

Before me, the undersigned authority, personally appeared WANDA SEALS, who, being duly sworn, deposes and says as follows:

My name is Wanda Seals. I am over 19 years of age and am a resident of the State of Alabama, residing in Wicksburg, Houston County, Alabama. I have personal knowledge of the facts stated below.

On the night of Friday, September 16, 2005, I was standing on Wicksburg's sideline during the football game with Houston County High School. I saw Josh Davis run off of the field and run straight toward Coach Brad Smith. Josh lowered his head and ran into Coach Smith hard enough to push him back several feet. Coach Smith grabbed Josh's shoulder pads trying to stop Josh from attacking him. Coach Smith began talking to Josh in efforts to calm him down.

Josh continued to push Coach Smith. Coach Clay Carter then approached Josh and began trying to separate Josh and Coach Smith. Coach Carter then began attempts to calm Josh

down.  At that time, Josh turned and hit Coach Carter in the face knocking his glasses off and giving him a swollen eye. Josh then continued pushing Coach Carter after he had punched him in the face.

Coach Charlie Winchester called for the police to come over and diffuse the situation.  Josh was escorted off of the field by a law enforcement officer.

The facts stated above are true and correct.

*Wanda Seals*

WANDA SEALS

Sworn to and subscribed before me on this the 11th day of September, 2007.

*Charlotte Mackert*

(S E A L)                    NOTARY PUBLIC

MY COMMISSION EXPIRES: 5/29/2010

Page 2 of 2