## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| GREG DAVIS, AS NEXT FRIEND AND NATURAL GUARDIAN OF JOSHUA DAVIS | * * * * | |
| PLAINTIFF | * * | |
| VS. | * * | CIVIL ACTION No.: 1:06-cv-953 |
| HOUSTON COUNTY, ALABAMA BOARD OF EDUCATION | * * * | |
| DEFENDANT | * * | |

## ANSWER TO MOTION FOR
## SUMMARY JUDGMENT

Comes now the Plaintiff, Greg Davis and answers the Defendant's Motion for Summary Judgment as follows:

I.    Standard of Review

Under Rule 56(c) of the Federal Rules of Civil Procedure, Summary Judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a

1

matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).
"An issue of fact is 'genuine' if the record as a whole could lead a
reasonable trier of fact to find for the nonmoving party.  An issue is
'material' if it might affect the outcome of the case under the
governing law."  *Redwing Carriers, Inc. v. Saraland Apartments*, 94
F.3d 1489, 1496 (11th Cir. 1996) (quoting *Anderson v. Liberty Lobby,
Inc.*, 477 U.S. 242, 248 (1986)).

         The party asking for summary judgment "always bears the
initial responsibility of informing the district court of the basis for its
motion, and identifying those portions of 'the pleadings, depositions,
answers to interrogatories, and admissions on file, together with the
affidavits, if any,' which it believes demonstrate the absence of a
genuine issue of material fact."  *Celotex*, 477 U.S. at 323.  The movant
can meet this burden by presenting evidence showing there is no
dispute of material fact, or by showing the non-moving party has
failed to present evidence in support of some element of its case on
which it beard the ultimate burden of proof. *Id.* at 322-23.

         Once the moving party has met its burden, Rule 56(e) "requires
the nonmoving party to go beyond the pleadings and by her own

affidavits, or by the 'deposition, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324. To avoid summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586(1986). One the other hand, a court ruling on a motion for summary judgment must believe the evidence of the non-movant and must draw all justifiable inferences from the evidence in the non-moving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 255. After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c).

## II

## Undisputed Facts

1) Josh Davis was treated by Allen Freet, LPC, after September 16, 2005 (Freet Depo. pg 19. L 25; pg 20. L 1 thru 18);

2) Josh Davis was diagnosed and treated for a concussion sustained on September 16, 2005 (Freet Depo. pg 21. L 21 thru 25; pg 22; pg 23; pg 24. L 1 thru 14; pg 25; pg 26);

3

3) Houston County Board of Education members had documented evidence that Josh Davis did not act intentionally or with malice on September 16, 2005 (Freet Depo. pgs. 35, 36, 41, 42);

4) The Affidavit of Cheryl Smith is highly suspect and not worthy of belief in that custodian Susan Sanders would have no need to report an "incident" that she herself believed only "inappropriate" and not worthy of discipline. (Affidavit of Cheryl Smith);

5) Josh Davis before September 2005, had an exemplary behavioral and scholastic career at Wicksburg High School (Freet Depo. pgs. 29, 30, 31);

6) The student identified as L.H. committed a class III major offense but did not get expelled as was Josh Davis (Houston County Schools Code of Conduct (2005) pg. 11 – Defendant's Initial Disclosures)

## Argument

There is no contention or assertion here that school officials should not have discretion in imposing punishment, where appropriate, to meet the duty to educate.  However, any discipline policy and procedure must satisfy due process and cannot be

4

arbitrary, capricious or unreasonable.  School Officials and Courts
must however take into account the sex, age, size and mental,
emotional and physical conditions of students along with the nature
of the offense when evaluating penalties.

The Eleventh Circuit has allowed claims to proceed where
punishments are (  ) "so brutal, demeaning and harmful as to literally
shock the conscience of a Court." *Neal v. Fulton Co. Board of
Education*, 229 F.3d 1069 (11th Cir. 2000).  It cannot be denied that
expulsion is the most serious penalty that school officials can mete
out.  Given that, the Defendant here had an obligation to thoroughly
sift the facts surrounding Josh Davis' behavior (and its cause) before
imposing the "death penalty".  The facts to this point indicate that it
did not.

Quite the contrary, the Defendant ignored the professional
opinions of both a medical doctor and a counselor that Josh suffered a
concussion which clearly affected his ability to govern his actions
(Exs. 1 & 2).  The Board completely dismissed the evidence that
showed that Josh had <u>never</u> been a disruptive student in his nearly 13
years at Wicksburg Elementary / High School; In fact, Josh was very
involved in positive aspects of student life.  The Defendant seemed
more concerned with maintenance of some image of unquestioned

authority as evidenced by the repetition that Josh's acts were before hundreds of spectators. (Board of Education Brief, pgs 20, 21, and 23).

Moreover given Josh's impaired condition on September 16, 2005, this Defendant's agents should have paid greater attention to Josh's physical condition which clearly would have explained his "performing poorly" (Board of Education Brief, pgs 10, 20, 23). Instead, they concluded it was "disrespectful" and had him removed from the field.  Continuing with the theme that "disrespect" cannot be tolerated, the two fellow students that consciously committed violations identified in the Cheryl Smith affidavit, apparently received lesser punishment since their conduct did not have hundreds of onlookers.  Punishment can't be determined based on the number of others who saw it, and when it is, equal protection becomes a trite, empty phrase, useful only as a carrot to keep Americans deluded into thinking they have rights.

As to comparisons with other students who ran afoul of the Code of Conduct, Josh was impaired at the time of his infractions, but there is no evidence the L.H. or C.L. were so disabled, yet each received lesser punishment.  Equal protection means nothing if it does not mean appropriate consequences for similar actors performing

similar activities.  And needless to say, similar does <u>not</u> mean identical as some have come to believe.  All three students germane here were just that... students at Wicksburg High School.  That Josh was a senior is not relevant to whether his expulsion was justified given his physical condition on September 16, 2005.

## **Conclusion**

Given the evidence the Defendant had before it on the Superintendent's recommendation for expulsion, it was nothing short of brutal and shocking that a child entrusted to its care, would not only not get the help he needed on the football field, but would be summarily booted from the only school he had ever known, to say the least.  This Defendant had a duty to protect Josh Davis and it failed.  This Defendant had an obligation to educate Josh Davis and it refused to complete that mission.

The evidence to this point demonstrates that even if Josh's concussion is ignored (as was done by the Defendant) he nonetheless suffered greater punishment than our Constitution allows.  The Plaintiff can and will prevail at trial as all the credible, pertinent evidence supports him.  The Defended has not met its burden on this

Motion even with the numerous self-serving Affidavits by employees

of the Defendant who say exactly what the Defendant expects them to

say.  The motion is due to be denied.

Malcolm R. Newman, Attorney, PC

/s/ Malcolm R. Newman
Malcolm R. Newman (NEW017)
P.O. Box 6137
Dothan, Alabama 36302
(334)792-2132
ASB-2826-M39M

CERTIFICATE OF SERVICE

I hereby certify that on December 12, 2007, I electronically filed
the foregoing with the Clerk of the Court using the CM/ECF system,
which will send notification of such filing to the following:

Jere C. Segrest
P.O. Box 1469
Dothan, Alabama 36302

Kevin Walding
P.O. Box 1469
Dothan, Alabama 36302

Patrick B. Moody
P.O. Box 1469
Dothan, Alabama 36302

/s/ Malcolm R. Newman
Malcolm R. Newman

# EXHIBIT 2

# HOUSTON COUNTY SCHOOLS



### HIGH SCHOOL (7-12)
### STUDENT CODE OF CONDUCT

2005 Revised Edition

Defendant's Initial
Disclosures            1

Houston County Schools

404 West Washington St.
P.O. Drawer 1688
Dothan, AL 36302
(334) 792-8331

## HOUSTON COUNTY BOARD OF EDUCATION

Mr. Jimmy Kilgore, President
Mr. Doyle Bond
Mrs. Dorothy Butts
Mr. Bobby Harrell
Mr. Ken Lane
Mr. Donny Smith
Mr. Scott Thomas

## SUPERINTENDENT

Mr. Tim Pitchford

## COORDINATORS / SUPERVISORS OF INSTRUCTION

Mr. Larry Fowler
Miss Virginia Singletary
Dr. Roy W. Watford

504 Coordinator
Title I, Title VI
Drug Education
**Miss Virginia Singletary**
(334) 792-8331 Ext. 106

Title IX Coordinator
**Miss Virginia Singletary**
(334) 792-8331 Ext. 106

Code of Student Conduct adopted by Houston County Board of Education March 28, 1985;
Revised August 20, 1985, July 28, 1987, August 24, 1988, September 28, 1989, July 16,
1992, July 12, 1993, July 1, 1996, June 12, 1997, July 1, 1999, July 2000, and June 2003

AA. Any violation which the principal may deem reasonable to fall within this category after consideration of extenuating circumstances.

* Automatic referral to alternative school for a period of three to ten days.

Any violation of federal, state or local laws may be reported to the proper law enforcement agencies.

## DISCIPLINARY ACTIONS FOR CLASS II OFFENSES (Intermediate)

First Offense: Student conference and parental contact, disciplinary action such as corporal punishment, after school detention, etc. (Circumstances may warrant assignment to Alternative School for a period of three to ten days.)

Subsequent Offenses:
1. Parental conference.
2. Referral to Alternative School for 3 days.
   2.1 2nd referral - 5 days (Student must also attend an Anger Management Class for fighting or any other offense deemed necessary by the local school administration.
   3rd referral - 10 days
   4th referral will constitute assignment to long-term alternative school.

Following the 4th referral, a petition will be filed with juvenile authorities.

## CLASS III - MAJOR OFFENSES

A. Drugs - Use, unauthorized possession, transfer or sale of drugs, drug paraphernalia, counterfeit substances or alcoholic beverages.

B. Weapons - Any possession of any object or device that can be defined as a weapon.

C. Battery Upon a School Board Employee - The actual unlawful and intentional touching or striking of a School Board employee against his/her will, or the intentional causing of bodily harm to a School Board employee.

D. Robbery - The taking of money or other property which may be the subject of larceny from the person or custody of another by force, violence or assault.

E. Stealing, Larceny, Grand Theft - The intentional unlawful taking and/or carrying away of property valued at $100.00 or more belonging to or in the lawful possession or custody of another.

F. Burglary of School Property - Entering or remaining in a structure or conveyance with the intent to commit an offense therein during the hours the premises are closed to the public.

G. Criminal Mischief - Willful and malicious injury or damages at or in the excess of $50 to public property, or to real or personal property belonging to another.

H. Possession of Firearms - Any firearm (including a starter gun) which will, or is designed to, or may be readily converted to expel a projectile.

I. Unauthorized discharge of any pistol, rifle, shotgun, airgun or any device capable of expelling a projectile.

J. Arson - The willful and malicious burning of any part of School Board property.

K. Bomb Threats - Any such communication which has the effect of interrupting the education environment.

L. Explosions _ Preparing, possession or igniting on School Board property explosives likely to cause bodily injury or property damage.

9

# EXHIBIT 1

Page 1

1  IN THE DISTRICT COURT OF THE UNITED STATES
2     FOR THE MIDDLE DISTRICT OF ALABAMA
3            SOUTHERN DIVISION
4  GREG DAVIS, AS NEXT        )
   FRIEND AND NATURAL         )
5  GUARDIAN OF JOSHUA         )
   DAVIS,                     )
6                             )
       PLAINTIFF,             )
7                             )
   vs.                        )  CASE NO.1:06-CV-953-MEF
8                             )
   HOUSTON COUNTY, ALABAMA    )
9  BOARD OF EDUCATION,        )
                              )
10     DEFENDANT.             )
11     The deposition of ALLEN FREET, taken by the
12  Defendant, pursuant to the Federal Rules of
13  Civil Procedure, before John G. Whitfield, Court
14  Reporter and Notary Public, State at Large, at
15  the law offices of Hardwick, Hause, Segrest &
16  Walding, Dothan, Alabama, on the 14th day of
17  June, 2007, at 11:05 A.M., CST, pursuant to
18  notice.
19
20  APPEARANCES:
21  FOR THE PLAINTIFF:        FOR THE DEFENDANT:
22  MR. MALCOLM R. NEWMAN     MR. PATRICE B. MOODY
    Attorney at Law          MR. KEVIN WALDING
23  Dothan, Alabama          Attorneys at Law
                             Dothan, Alabama
24  ALSO PRESENT:
25  GREG DAVIS

Page 2

1            STIPULATION
2
3      It is stipulated by and between counsel for
4   the parties that this deposition be taken at
5   this time by John G. Whitfield, Court Reporter
6   and Notary Public, State at Large, who is to act
7   as commissioner without formal issuance of
8   commission to him; that said deposition shall be
9   taken down stenographically, transcribed, and
10  certified by the commissioner. The signature of
11  the witness is waived.
12     Except for objections as to the form of
13  questions, no objections need be made at the
14  time of the taking of the deposition by either
15  party, but objections may be interposed by
16  either party at the time the deposition is read
17  into evidence, which shall be ruled upon by the
18  Court on the trial of the cause upon the grounds
19  of objection then and there assigned.
20
21
22
23
24
25

Page 3

1            ALLEN FREET
2  having been first duly sworn, testified as
3  follows, to-wit:
4
5            EXAMINATION
6
7  BY MR. MOODY:
8     Q  Mr. Freet, my name is Patrick Moody,
9  and this is Kevin Walding, and we are
10 representing the Houston County Board of
11 Education. And I thank you for coming today and
12 letting us take your deposition.
13     Have you ever given a deposition before,
14 sir?
15     A  It's been several years, but I've
16 given one before.
17     Q  So, you understand the basic process.
18 And, sometimes, I drag my questions out, but I'm
19 going to try to ask my questions and let you
20 know when they've come to an end, and, if you
21 could, please, wait until the end of the
22 questions to answer them. And please try to
23 answer out loud, so that the court reporter can
24 hear you, and try to avoid nodding your head and
25 saying "uh-huh" and things of that nature.

Page 4

1     Could you please state your name for the
2  record, sir?
3     A  Full name is Virgil Allen Freet.
4     Q  All right, Mr. Freet. Did you receive
5  a subpoena to come here today?
6     A  I did.
7     Q  And did that subpoena request that you
8  bring any documents?
9     A  I did. And it did.
10    Q  Okay. So, you have those documents
11 here today?
12    A  Uh-huh.
13    Q  And are those documents kept in the
14 normal course of your business?
15    A  Yes.
16    Q  Okay. Thank you.
17       MR. WALDING: Let's take a break.
18       MR. MOODY: Let's take a little break
19          and make some copies of those, if
20          you don't mind, sir.
21       THE WITNESS: Now, I have a question
22          before we do that. Because,
23          under HIPAA, regardless of what
24          you all are requesting, I don't
25          have to give them to nobody.

Page 17

1  Q  Okay.
2  A  I started college in January of 1995,
3  and quit working for Dothan Glass. I was in the
4  vocational rehabilitation program for the
5  Department of Veteran Affairs. I did work study
6  and was paid while I went to school, so, I did
7  not work.
8  Q  Now, were you working for the Veterans
9  Affairs at all during '95 and '96?
10  A  No. That was done at Fort Rucker, on
11  post, for about a year and a half, and then, I
12  became a work study for the Department of
13  Veteran Affairs.
14  Q  And what, roughly, was that time
15  frame?
16  A  Somewhere in late '97, '98.
17  Q  I see.
18  A  Actually, August of '97, when they
19  opened up the office here.
20  Q  Okay. And what did you do, after your
21  stint at Veterans Affairs?
22  A  Somewhere in that time frame, I picked
23  up a contract with the VA, and I worked for the
24  VA from January of '98 until I left there in --
25  actually, January, '97, until I left there in

Page 18

1  2001 or 2002. I'd have to go back and look.
2  Q  And what was your job title for the VA
3  at that time, sir?
4  A  I was a GS-12 vocational
5  rehabilitation and employment specialist.
6  Counselor.
7  Q  And after you left that position, what
8  was your next work position, sir?
9  A  I went into private practice, as a
10  licensed professional counselor, for myself.
11  Q  And that was in approximately 2002?
12  A  Yeah, 2001, 2002. 2001, I think.
13  2002. Somewhere in that time frame. I should
14  have brought my vitae, and I would have been
15  able to tell you all that.
16  Q  And what did you do, after your
17  private practice?
18  A  I've been in private practice since,
19  and have formed this corporation and company
20  that I'm in now, since then.
21  Q  Okay. So, the Independent Counseling
22  & Assessment Services is the private practice
23  that you started in 2001 or 2002?
24  A  Right. Actually, it was Independent
25  Counseling Services, ICS, then, and we added the

Page 19

1  Assessment when we brought the psychologists and
2  the other people in.
3  Q  Now, Mr. Freet, did you ever attend
4  medical school?
5  A  I did not.
6  Q  And have you ever attended any kind of
7  training to became a registered nurse or a
8  licensed nurse?
9  A  I have not.
10  Q  Have you ever taken any academic
11  classes or courses, related to nursing or
12  becoming a medical doctor?
13  A  Other than first aid classes and those
14  type of things, no.
15  Q  And would those first aid classes
16  have been' through the Red Cross and the
17  military, or --
18  A  Uh-huh. Red Cross.
19  Q  And so, you've been working as a
20  counselor since roughly '96?
21  A  '96, '97, yes, sir.
22  Q  Okay. And, Mr. Freet, we're here
23  today about Josh Davis. And, was Josh a client
24  of yours?
25  A  Josh Davis was a client for me, yes.

Page 20

1  Q  Was he a client of yours before the
2  football game that occurred on September 16th of
3  2005?
4  A  No. I saw him initially, the first
5  time, on September 21st.
6  Q  All right. And are you still treating
7  Josh, to this day?
8  A  I am not.
9  Q  When did your treatment of Josh end?
10  A  Ended on -- October 13th was the last
11  time that I saw Josh.
12  Q  Would that have been 2006?
13  A  The same year, yes.
14  Q  Or --
15  A  2005.
16  Q  Oh, okay. So, all your visits with
17  Josh occurred during September and October of
18  2005?
19  A  Yes, sir.
20  Q  Okay. And approximately how many
21  times did you meet and counsel with Josh?
22  A  Three.
23  Q  Three times? All right. And I
24  believe -- well, we have a report, signed by
25  you, that was part of Mr. Davis's initial

Page 21

1  disclosures in this lawsuit, in Defendant's
2  Exhibit 4. And do you recognize that document,
3  sir?
4    A  Yes.
5    Q  And could you tell me what that
6  document is and who it is addressed to?
7    A  The document is addressed to Malcolm
8  R. Newman, attorney at law. Our reference, Josh
9  Davis. And it talks about my analogy of the
10  medical documentation and some of the behaviors
11  and problems that Josh had presented and was
12  presenting.
13    Q  Okay. And, if you would hold onto
14  that, please. We're going to –
15    A  I've got it, here.
16    Q  Okay. If you will refer to this
17  document, we're going to discuss it in a little
18  while.
19    First off, how many times did you consult
20  with Josh, before this September 26th report?
21    A  I did the report based on the one
22  intake history and information that I did on the
23  21st, and the medical report received back from
24  the doctor, and discussions with family, and
25  history, his history, his scholastic and

Page 22

1  aptitudes prior to the actual time that I saw
2  him.
3    Q  Okay. So, this September 26 letter –
4  or, at the time of this September 26 letter, you
5  had met with Josh one time?
6    A  Yes.
7    Q  And you had, then, discussed Josh's
8  situation with some of his family members?
9    A  Mostly with Josh.
10    Q  Mostly with Josh?
11    A  (Witness nodding head in affirmative.)
12    Q  Do you remember which family members
13  you spoke with, to gather some of this
14  information?
15    A  I talked to his mother, and – I
16  actually did not talk to his father at all, that
17  I know of.
18    Q  Okay. And you said that you relied
19  upon the medical records from the doctor? Is
20  that doctor that you were referring to, Dr.
21  Tamburin –
22    A  Uh-huh.
23    Q  -- that you mention in your report?
24    A  Right.
25    Q  Okay. What did you learn from the

Page 23

1  doctor's report, when you reviewed it?
2    A  The doctor's report, to me, validated
3  that Josh Davis, on the night, in the football
4  game, had suffered a concussion or head injury,
5  probably a mild concussion, commonly referred to
6  as a TBI, in the field, which stands for
7  traumatic brain injury.
8    Q  And is there a copy of Dr. Tamburin's
9  report in your records, sir?
10    A  Yes, sir. You made a copy of it
11  today.
12    Q  Okay. And also contained in
13  Defendant's Exhibit 4, Mr. Freet, could you
14  describe that document for me and tell me if it
15  looks familiar to you?
16    A  It is a copy from Dr. Tamburin, which
17  is the same copy that was sent to me, or faxed
18  to me, to my office, in reference to Josh Davis
19  and his football injury.
20    Q  And so, this would have been the
21  report that you used to draft your report?
22    A  Yes.
23    Q  Okay. And you reviewed this report
24  from Dr. Tamburin? Correct?
25    A  I did.

Page 24

1    Q  Now, in your own report, if you would,
2  sir, please read the last sentence in the first
3  paragraph on the first page, beginning with, "It
4  was noted"?
5    A  "It was noted by the doctor that the
6  client's erratic behavior with the coaches could
7  be secondary to the concussion."
8    Q  Okay. And the doctor you're referring
9  to there is Dr. Tamburin? Correct?
10    A  Correct.
11    Q  And your report says that Dr.
12  Tamburin's opinion was that the erratic behavior
13  could be secondary to a concussion?
14    A  Correct.
15    Q  Okay. Did Dr. Tamburin's report
16  specifically state that any erratic behavior was
17  a result of the concussion?
18    A  I had the report. Too far back.
19  Okay. Restate the question, now that I've found
20  it.
21      MR. MOODY: Could you read that back?
22        (Thereupon, the requested portion
23        was read back by the reporter.)
24    A  I'll have to read the whole thing
25  again.

Page 25

1   Not directly in that way.
2   Q  Okay.
3   A  Insinuated that it come from the head
4  injury or from concussion, but not specifically
5  answered that way.
6   Q  Could you read the area that you are
7  referring to?
8   A  It's in the synopsis on the report.
9  "Assessment: Head CT at Flowers. Sounds like
10  the child had a concussion with possible LOC,
11  with subsequent vomiting and persistent HA."
12  Which stands for "headache." "Assuming head CT
13  is okay, we will keep the child out of contact
14  sports and recheck in one week."
15       MR. WALDING:  Slow down, Mr. Freet.
16       THE WITNESS:  Okay.
17   A  "I told dad that the child needs to be
18  symptom free for a minimum of one week before he
19  can get back on the field. I told dad that it
20  is possible his erratic behavior with the
21  coaches could be secondary to the concussion."
22   Q  That's far enough, Mr. Freet.
23       So, the doctor's assessment was that Josh's
24  erratic behavior could possibly be linked to a
25  concussion?

Page 26

1   A  Correct.
2   Q  Okay. He did not specifically state
3  that Josh's erratic behavior was a result of a
4  concussion?
5   A  Right.
6   Q  Okay.
7   A  But that he did have a concussion.
8   Q  Okay. And let's go back to your
9  report, if we could. You mention Josh's erratic
10  behavior?
11   A  Correct.
12   Q  What, exactly -- or what behaviors are
13  you describing as erratic, here?
14   A  What Josh reported me in my notes, his
15  response to the coaches and stuff that night, on
16  the field. He had problems with what had
17  happened.
18       And, for the record, Josh came to me more
19  because he was having adjustment issues and
20  depression, due to what was ongoing, rather than
21  the head trauma. And that was why I was
22  initially seeing him, was more of his inability
23  to adjust to those erratic changes and stuff.
24       And we talked about his issues with --
25   Q  Well, I was more interested in finding

Page 27

1  out exactly what behaviors did Josh mention to
2  you, or did you find out about Josh, on the
3  night of the game, that were erratic, in your
4  opinion? Specific examples, if you could
5  provide some.
6   A  Some of the things that he told me,
7  that he had played football since he was seven
8  years old.
9   Q  Let me rephrase my question. I think
10  we're two ships passing in the night, here.
11       What did Josh do at the football game, that
12  you think is erratic, and that he would not
13  normally have done, if it hadn't been --
14   A  Basically, from my memory, Josh told
15  me that he had played the game with -- after
16  being hit, but he had went to half time, had
17  begun to vomit, and had issues.
18       That, somewhere in the -- between the third
19  and fourth quarter, somewhere in that time
20  frame, there was an issue of him remembering the
21  coach yelling at him. That he was playing both
22  sides. He was playing defense and offense. He
23  remembered it being hot. He remembers the coach
24  pulling him somewhat out of the game. And he
25  said that parts of his memory about something

Page 28

1  happening with the coaches, and that -- you
2  know, the coach grabbed him by the pads and
3  stuff, and another coach coming up behind him
4  and grabbing him, but he doesn't remember why
5  they were doing that.
6   Q  Well, just, to me, it seems that
7  you're saying Josh had some type of erratic
8  behavior, that Josh had to have told you he did
9  something that you wouldn't think would be in
10  his normal character. Did he tell you any
11  specific actions that he did, to make you think
12  he was acting erratic --
13   A  He told me what he was told he did,
14  but not what he could remember that he did.
15   Q  Who did he say told him these things?
16   A  He told -- well, he told me that what
17  he was told, after the fact, was that he had
18  become violent or something with one of the
19  coaches, and that he did not remember doing
20  that. But he was told that he had become
21  violent, and that was why the second coach had
22  come up behind him.
23       And that he had, I guess, had had issues,
24  with words and some other things that were said
25  back and forth.

Page 29

1  Q Do you remember how Josh learned about
2  this, if he didn't remember it?
3     A No. Just we were talking. Remember,
4  this was two or three days after. So, by then,
5  he would already had some -- some of the things
6  that came out at school and the other things.
7     Q Okay. Did Josh's mother discuss with
8  you any actions that Josh did on the night of
9  the game, that she didn't think was his normal
10  character?
11     A No. I talked more with the mother
12  about what -- how his behaviors and stuff were
13  prior to that, what he did in the school, get a
14  history of what his behaviors were like at home.
15  Which is some of the stuff that I talked about
16  in my letter, which showed his normal history.
17     To me, if someone who's played football
18  since seven years of age, to turn on a coach
19  after that many years in the field, was erratic,
20  that was unusual. They would have been -- he
21  would have been too disciplined, and he would
22  have already had other instances in his history,
23  if he was going to have an attitude or
24  behavioral problems that were outside of the
25  normal realm.

Page 30

1     Q So, was it your opinion that Josh
2  acted erratically on the night of the football
3  game?
4     A Yes.
5     Q Okay.
6     A It is my professional opinion that he
7  acted erratically because of the head concussion
8  medically documented.
9     Q Okay.
10     A And I am basing that on these changes
11  in behaviors and stuff, which is my field.
12     Q And so, the changes in behavior and
13  the behavior at the football game, you're basing
14  that on things that Josh himself told you?
15     A Josh and the doctor's report, and the
16  fact that he -- his long history of working --
17  being in sports, the fact of his standing in the
18  school, his scholastic -- the fact that he had
19  never had any type of disciplinary problems
20  inside of the school system and stuff, they
21  showed total change, due to something that
22  happened in a trauma way.
23     Q And let's talk about that, Mr. Freet.
24  You mentioned Josh's normal temperament and
25  disposition in your report, and you talk about

Page 31

1  him being involved in athletics and his
2  involvement in student government and other
3  clubs. Where did you receive all of this
4  information at?
5     A Some from Josh, some from his mother.
6     Q Did you follow up this information
7  with the school or the Houston County School
8  Board?
9     A Who did I talk to at the school? I
10  did not go to the school. I talked with
11  somebody at the school. I cannot remember who
12  it was.
13     But it was, like, more in passing, if any
14  of this stuff was actual, factual, and they said
15  yes. But I cannot remember who I talked to.
16     Q So, you never conducted any type of
17  investigation, to confirm that these facts were
18  true, at Wicksburg High School, or with the
19  Houston County Board of Education?
20     A No, I did not.
21     Q So, your mention of his involvement in
22  these clubs and in athletics, would have come
23  solely from Josh and his mother?
24     A Right.
25     Q Okay. Let's talk about your

Page 32

1  conclusions, if you will. There's actually, I
2  believe -- well, first off, Mr. Freet, could you
3  explain for me what the National Institutes of
4  Health is, and discuss your findings based on
5  information from that agency in your report?
6     A The National Institutes of Health is
7  an institution that publishes, on the Internet
8  and another places, for schools and academic
9  places, medical stuff for coaches and people in
10  the sports field, in reference to being able to
11  recognize and understand medical conditions that
12  may be related to sports and other things.
13     Q Okay.
14     A The National Institute of Sport is
15  also the one that certifies coaches for coaching
16  and those kind of things, as far as their
17  training and stuff, to recognize medical
18  conditions and stuff.
19     Q Okay. Now, what was that second
20  institute you mentioned? The National Institute
21  of Sport? Is that what you said?
22     A No, I said -- well, I guess, the
23  National Institute of Health is one of the --
24  they work in the sports field, to help certify
25  coaches and stuff, for the medial stuff that

Page 33

1 comes in sports and sports medicine.
2    Q  Okay.
3    A  My understanding of it.
4    Q  Okay.  And is the National Institutes
5 of Health, is it a controlling body for
6 counselors or the counseling profession?
7    A  No, it's not.
8    Q  Okay.  And I notice that, in your
9 report, you say, according to the National
10 Institutes of Health, the following are some
11 symptoms suggesting a more serious head injury,
12 that require emergency medical treatment.  Were
13 you suggesting there, that there was a more
14 serious head injury than a concussion, or were
15 you just saying that these are --
16    A  These were some of the symptoms that
17 they listed for any type of head injury.  And
18 it would be for a doctor to describe whether
19 they were mild or moderate.
20    But these are the kind of things that
21 they're -- people are taught to look for, in
22 looking for head injuries and stuff that could
23 require medical injury (sic).
24    You have a player that is knocked
25 unconscious in a game and he is taken off the

Page 34

1 field, by state law, they're mandated to go for
2 medical treatment.
3    Q  All right.  And I was reviewing this
4 list of symptoms.  Did any of those specifically
5 mention violent behavior?
6    A  Behaved abnormally may fall under
7 that.
8    Q  Okay.  But, I mean, nothing says a
9 head injury will cause someone to behave
10 violently?
11    A  Not in this report.  But, if I go back
12 and actually were to pull, from my field, and
13 talk about brain injuries and how people's
14 behaviors become erratic and change, through the
15 mental health field, anyone with TBIs, seizures,
16 can have extreme behavioral changes, due to a
17 brain injury or brain -- whether concussion or
18 otherwise, car accidents --
19    Q  But none of that -- you did not rely
20 on any of that in this report?  Correct?
21    A  No.
22    Q  Okay.  And could you please read for
23 me your conclusions about Josh's situation, sir?
24    A  Where do you want me to start?  At the
25 top of the page?  Middle paragraph?

Page 35

1    Q  Well, I believe there's actually two
2 paragraphs.  I'm trying to find them.  There's
3 one at the bottom of the first page, and then,
4 the second to the last paragraph of your report.
5 And, both places, you state that either you
6 believe or, "This is my professional opinion."
7 If you could read those two paragraphs for me?
8    A  Okay.  "I believe, based on the
9 evidence presented to me" -- well -- "presented,
10 that any erratic behavior on the night in
11 question were the result of the effects of the
12 concussion and should be considered mitigating
13 circumstances.  It is my professional opinion
14 this adolescent's normal temperament and
15 disposition are in direct contrast with his
16 actions on the night in question."
17    Second paragraph.  Page two.  "It is my
18 professional opinion that Josh Davis is being
19 penalized for a medical condition that he is not
20 responsible for in any way.  Any presumed
21 negative behaviors or actions on the night in
22 question are a direct relation to the concussion
23 he received and are mitigating circumstances
24 that must be taken into full consideration by
25 school officials."

Page 36

1    Q  Okay.  And do you still stand by those
2 conclusions today, sir?
3    A  Today, I still stand by those
4 conclusions, yes.
5    Q  And just so I can fully understand
6 you, your opinion, gathered from those two
7 paragraphs, were based on one initial interview
8 with Josh, talking to his mother, and from the
9 report from Dr. Tamburin?
10    A  Correct.
11    Q  Okay.  Was there any report from any
12 doctor, other than Dr. Tamburin, that you
13 reviewed?
14    A  No, sir.
15    Q  And then, I know, earlier, you had
16 mentioned the adjustment disorder and depressed
17 mood.  And you mentioned that as a diagnosis in
18 your report.  Could you describe for me the --
19 well, that disorder, and what, exactly, it all
20 encompasses?
21    A  Under the DSM 4, adjustment disorder
22 with depressed mood, would be someone who goes
23 through a life-changing event, or something
24 happening where they have difficulty
25 psychologically adjusting to that.  And one of

Page 41

1 training, as far as doctor, nursing, that area?
2 Correct?
3    A No.
4    Q Okay. Have you treated Josh at all,
5 since the October of 2005 time frame?
6    A October 10th, 2005, no.
7    Q Okay. Have you ever been called upon
8 to present these opinions on Josh's behalf
9 before any hearing or meeting, be it court
10 related or related to the Houston County School
11 Board?
12    A I can't remember the date or the time,
13 but I did appear before the Houston County Board
14 of Education, and I discussed my report at that
15 time.
16    Q And when you appeared at this Houston
17 County Board of Education hearing, did anyone
18 prevent you from discussing your report and the
19 findings of your report?
20    A I remember that it was -- my
21 discussions with the board was adversarial.
22 They directed the questions. I was not -- I
23 remember being ostracized because I wasn't a
24 psychologist or a doctor. And --
25    Q But, you were allowed to speak and

Page 42

1 testify on Josh's behalf?
2    A In that hearing?
3    Q Yes?
4    A To some extent, yes.
5    Q Okay. Have you presented your
6 opinions or your report on Josh's behalf in any
7 other type of forum, other than that one
8 meeting?
9    A No.
10    Q And just to clarify, I mean, you were
11 allowed to give your opinion at the board
12 hearing? Correct?
13    A I did give my opinion.
14    Q Okay. Thank you. And just to
15 clarify, the behaviors at the football game,
16 that you think were erratic, that information
17 came from Josh and his mother?
18    A Right.
19    Q No one else told you that -- or, did
20 anyone else tell you that Josh did these certain
21 things?
22    A Not to my recollection or memory.
23    Q Okay. And can you remember any
24 specific behaviors that Josh told you, "I was
25 told I did this," or anything of that nature?

Page 43

1    A Well, some of the stuff that I found
2 out about what Josh had done, I know I talked to
3 his mother about, you know, the fact that he was
4 accused of swinging at one of the coaches, and I
5 think I was told he took his helmet off, and
6 that two of the coaches had to restrain him and
7 stuff. And that there was some foul language,
8 or something like that. Those type of things
9 were discussed.
10    And then, I went back to look at what I
11 felt was his history of temperament before and
12 after, in the recovery process.
13    And, in those few days, even his change of
14 temperament was -- even on my first day with
15 him, back on the 21st, was totally different
16 than what was displayed or told to me of the
17 16th of September.
18    Q Okay. Mr. Freet, just a couple of
19 more questions. How long was your initial
20 meeting with Josh, timewise?
21    A Normally, an intake, an hour and a
22 half to two hours. The paperwork, the actual
23 assessment part. I did a full mental status
24 exam, because I was told that there was a
25 possibility of a head injury, which is part of

Page 44

1 my notes in here.
2    So, I went back and checked his memory and
3 -- to make sure there were no other deficits
4 that would have affected what information was
5 being given that day.
6    Q And did that hour and a half to two
7 hours include meeting with Josh and his mother?
8    A Maybe 30 minutes of it. The rest of
9 it was actually with Josh.
10    Q Okay.
11    A So, about an hour and a half of would
12 have been Josh, and then, a half-hour for the
13 paperwork, finding out what some of the initial
14 reasons were.
15    Because Josh was over 14, I could not have
16 the mother in the room when I actually did the
17 actual intake and stuff.
18    Q Okay. So, your initial assessment was
19 based on an hour-and-a-half to two-hour intake
20 process and Dr. Tamburin's report that was
21 provided for you?
22    A Correct.
23    Q Okay. Was there anything else you
24 relied upon, in assessing Josh?
25    A Yeah. My years of training and those

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## SOUTHERN DIVISION

GREG DAVIS, AS NEXT   *
FRIEND AND NATURAL   *
GUARDIAN OF JOSHUA DAVIS *
          *
   PLAINTIFF    *
          *
VS.         * CIVIL ACTION No.: 1:06-cv-953
          *
HOUSTON COUNTY, ALABAMA *
BOARD OF EDUCATION   *
          *
   DEFENDANT   *
          *

## PLAINTIFF'S INITIAL DISCLOSURES

(A)   Individuals believed to have personal factual knowledge about the and/or issues involved in this matter:

 (1) Greg Davis, 615 Sherwood Trail, Newton, Alabama 36352, (334) 692-5352;

 (2) Debbie Davis, 615 Sherwood Trail, Newton, Alabama 36352, (334) 692-5352;

 (3) Joshua Davis, 615 Sherwood Trail, Newton, Alabama 36352, (334) 692-5352;

 (4) Susan Sanders, 219 West Crawford Street, Dothan, Alabama 36301, (334) 792-2132;

 (5) Cody Long, 219 West Crawford Street, Dothan, Alabama 36301, (334) 792-2132;



MALCOLM R. NEWMAN
ATTORNEY, P.C.
P.O. Box 6137
Dothan, AL 36302-6137



DEFENDANT'S
EXHIBIT

(6)   Roger Dale Sanders, 219 West Crawford Street, Dothan
Alabama 36301, (334) 792-2132.

(B) Supporting documents and tangible things in Plaintiff's possession:

(1)   Videotape of the football game made the basis of Defendant's
actions;

(2)   Medical reports of minor's injury.

(C) The injury to Plaintiff's son can not be reduced to an exact monetary
amount.

(D) There is no insurance coverage.

Malcolm R. Newman, Attorney, PC

/s/ Malcolm R. Newman
Malcolm R. Newman (NEW017)
P.O. Box 6137
Dothan, Alabama 36302
(334)792-2132
ASB-2826-M39M

MALCOLM R. NEWMAN
ATTORNEY, P.C.
PO. Box 6137
Dothan AL, 36302-6137

## CERTIFICATE OF SERVICE

I hereby certify that on February 9, 2007, I have served a copy of the foregoing document with the following via U.S. Parcel Service:

Jere C. Segrest
P.O. Box 1469
Dothan, Alabama 36302

Kevin Walding
P.O. Box 1469
Dothan, Alabama 36302

Patrick B. Moody
P.O. Box 1469
Dothan, Alabama 36302

/s/ Malcolm R. Newman
Malcolm R. Newman

# INDEPENDENT COUNSELING & ASSESSMENT SERVICES, INC.

1275 James Drive Suite A
Enterprise, AL 36330
(334) 308-1940

September 26, 2005

Malcolm R. Newman, Attorney at Law
219 W. Crawford Street
P.O. Box 6137
Dothan, AL 36301

RE:     Josh Davis
        DOB: 04/17/1988

Dear Mr. Newman:

Josh Davis is currently in treatment with our agency. According to medical documentation received
from Dothan Pediatric Clinic, Dr. Jeffrey Tamburin treated Josh Davis for a concussion. It was noted by
the doctor that the client's erratic behavior with the coaches could be secondary to the concussion.

According to information obtained, it is believed that during the second quarter of the football game on
9/16/05 Josh received a head injury. It was indicated that Josh was vomiting at half-time and resumed
his position without medical treatment when the third quarter began. He did not receive medical
treatment until his parents took him to Dr. Tamburin on 9/19/05 due to persistent headache.

According to the National Institutes of Health the following are some symptoms suggesting a more
serious head injury that requires emergency medical treatment:

- Loss of consciousness, confusion, or drowsiness
- Severe headache
- Initial improvement followed by worsening symptoms
- Irritability (especially in children), personality changes, or unusual behavior
- Restlessness, clumsiness, lack of coordination
- Stiff neck or vomiting

It states further that medical help should be obtained immediately if the person:

- Becomes unusually drowsy
- Develops a severe headache or stiff neck
- Vomits more than once
- Loses consciousness (even if brief)
- Behaves abnormally

I believe based on the evidence presented that any erratic behavior on the night in question was a result
of the effects of his concussion and should be considered mitigating circumstances. It is my
professional opinion this adolescent's normal temperament and disposition are in direct contrast with his
actions on the night in question.

Josh Davis
Page 2 of 2

Josh's normal temperament and disposition can be best evidenced by his long-term involvement in the following activities: Student Government Association, BETA Club, Junior Varsity Athletics, Varsity Athletics, and Future Farmers of America. Josh Davis' peers recognized his leadership by voting him President of Student Government Association (SGA) in his Junior year. This year his peers voted him to be their Class Representative in SGA and recognized him as the member of their class with the Best Personality.

It is my professional opinion that Josh Davis is being penalized for a medical condition that he is not responsible for in any way. Any presumed negative behaviors or actions on the night in question are a direct relation to the concussion he received and are mitigating circumstances that must be taken into full consideration by school officials.

In my initial session with Josh, I found that he is suffering from depression and having extreme difficulty understanding and adjusting to both the school and his coaches' responses to this situation. Josh will continue to be treated for Adjustment Disorder with Depressed Mood by our agency. If you need any additional information, please feel free to contact me.

Sincerely,

Allen Freet, MS, LPC
Licensed Professional Counselor #2030

**Dothan Pediatric Clinic**
**126 Clinic Drive**
**Dothan, Al 36303**
**334-793-1881**

October 27, 2005

Dear Mr. Newman,

This letter is to verify the enclosed document is an authentic medical record from our office. If I can be further assistance, please call me at the above telephone number.

Sincerely,

Deanna Sheffield

Deanna Sheffield

## DOTHAN PEDIATRIC CLINIC
## 126 CLINIC DRIVE
## DOTHAN, ALABAMA 36303
### 334-793-1881
### FAX: 334-712-1815

| DAVIS, JOSHUA C | CHART #: 50334 | DOB: 04/17/1988 |
| --- | --- | --- |

Date of Service: 09/19/2005 04:10 pm    Provider: JEFFREY TAMBURIN MD    DPC - EXAM

PATIENT ACCOMPANIED BY: Father.
PATIENT S AGE: 17 yrs, 5 mths, 0 wks, 2 days
EXAM TYPE:
    SICK CHILD VISIT.
CHIEF COMPLAINT: FOOTBALL INJURY
DETAILED (NEW) SYMPTOM HISTORY:    During HS football game 3 nights ago the child had "blow" to the head
which caused him to transiently black out. The patient says he can remember getting hit but a lot of the events after that
are not clear. He continued to play the last few minutes of the first half and then at half time he says he vomited. Child
went out to play second half.  Child was playing and apparently was pulled out of the game because he was not "firing off
the ball" and was not playing well. He apparently bumped a coach coming off the field and then when the coach
confronted him the child became belligerent and things got so out of hand on the sideline the coaches had the police
escort the child from the field. Dad says his child is a straight A student and it is not normal for him to get so belligerent
to coaches and adults.
The child was very upset after event and was emotional and dad says he was crying. Slept all night that night and slept
late the next day. Has been complaining of headache ever since game and says it was bad enough to wake him up at
night. HA's have gotten better and now tylenol and motrin are managing the pain. No further vomiting or black outs.
Dad just found out about the vomiting at halftime and brought child here to be evaluated. Dad is upset because he does
not feel like the team took care of his son appropriately. He wanted to know if the child's unusual behavior to the coaches
could be related to the head injury.
MEDICATIONS:
    NO CURRENT MEDICATIONS, status: NEW HISTORY, 12/29/2003.
ALLERGIES:
    NO KNOWN DRUG ALLERGIES
SOCIAL HISTORY:
    CHILD CARE: Day care is not used.
HISTORY:
    796.2-ELEVATED BLOOD PRESSURE W/O HYPERTENSION
    840.0-SPRAINS AND STRAINS OF SHOULDER AND UPPER ARM
REVIEW OF SYSTEMS:
    GENERAL: Decreased appetite.
    GASTROINTESTINAL: Has been vomiting.
    NEUROLOGICAL: "Appears" to have blackouts, "appears" to have headaches.
PHYSICAL EXAMINATION:
    VITALS SIGNS:
        VS-BLOOD PRESSURE: 128/62 Right Arm Sitting

        VS-WEIGHT: 238lbs
        VS-TEMPERATURE: 98.1°f Tympanic

        GENERAL: Alert, awake, in no distress. HEAD: Normocephalic, atraumatic, EYES: Pupils equal,
        round and reactive to light, EOM's intact, no conjunctival inflammation. EARS: EAC's and TM's not
        inflamed, normal landmarks, no fluid. NOSE: Septum at midline; no discharge or lesions noted;
        turbinates grossly normal, THROAT: Non-inflamed pharynx and tonsils; moist mucosa, NECK: Supple,

My Commission

Page 1 of 2

## DOTHAN PEDIATRIC CLINIC
### 126 CLINIC DRIVE
### DOTHAN, ALABAMA 36303
### 334-793-1881
### FAX: 334-712-1815

---

DAVIS, JOSHUA C          CHART #: 50334          DOB: 04/17/1988

Date of Service: 09/19/2005  04:10 pm     Provider: JEFFREY TAMBURIN MD    DPC - EXAM

no adenopathy or mass, LUNGS: Clear to auscultation with equal breath sounds; no rales, wheezes, rhonchi or retractions, CARDIAC: Regular rhythm, normal S1 and S2, no murmurs, rubs, or gallops, ABDOMEN: Soft, non-tender, non-distended, without masses or organomegaly. Bowel sounds normal, EXTREMITIES: No cyanosis, clubbing, or edema.

EYES:

FUNDOSCOPIC EXAM: Funduscopic exam is normal.

NEUROLOGIC:

CRANIAL NERVES: CNs II-XII grossly intact.

DEEP TENDON REFLEXES: Reflexes normal.

OTHER: No cerebellar signs present, Rhomberg negative. No focal deficits on exam.

ASSESSMENT/PLAN:

850.1-CONCUSSION

ASSESSMENT: Head CT at Flowers.

Sounds like the child has had concussion with possible LOC with subsequent vomiting and persistent HA. Assuming Head CT is OK we will keep child out of contact sports and recheck in one week. I told dad that the child needs to be symptom free for a minimum of one week before he can get back on the field. I told dad that it is possible his erratic behavior with the coaches could be secondary to the concussion. I told dad for future reference that any head trauma with LOC the child needs to be taken out of game and not sent back in until evaluated 24 hrs later.

PLAN: Symptomatic care.

RETURN VISIT: Patient instructed to return in 1 week.

*Head CT showed no fractures or other abnormalities.*

*JTa*

*Deanna Sheffield*

My Commission
Expires May 16, 2009